RAYMOND M. DIGUISEPPE
CA State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

WILLIAM SACK*
FIREARMS POLICY COALITION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149-4584
P: (916) 596-3492
E: wsack@fpclaw.org
*App. Pro Hac Vice Forthcoming
Attorneys for Plaintiffs

JOHN W. DILLON
CA State Bar No. 296788
DILLON LAW GROUP, APC
2647 Gateway Rd.
Suite 105 #255
Carlsbad, CA 92009
P: 760.642.7150
E: jdillon@dillonlawgp.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FAHR; DESIREE BERGMAN; COLIN RUDOLPH; SAN DIEGO COUNTY GUN OWNERS PAC; and FIREARMS POLICY COALITION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN DIEGO, CALIFORNIA; and DAVID NISLEIT, in his official capacity as Chief of Police of San Diego City, California,<br><br>Defendants. | Case No.:  '21 CV1676 BAS BGS<br><br>**COMPLAINT**<br><br>**42 U.S.C. § 1983** |

COME NOW Plaintiffs James Fahr, Desiree Bergman, Colin Rudolph, San Diego County Gun Owners PAC, and Firearms Policy Coalition, Inc., by and through their attorneys, and complain of Defendants and allege:

## **INTRODUCTION**

1.      Throughout American history and our nation's traditions of robustly exercising the right to keep and bear arms, people have been free to personally manufacture, construct, or otherwise assemble arms in common use for lawful purposes, including lawful self-defense and defense of others.

2.      The Supreme Court "has held that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Caetano v. Massachusetts*, 577 U.S. 411 (2016), quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and that this "Second Amendment right is fully applicable to the States," *id*. (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)).

3.      And the Second Amendment protects the right to keep and bear all "weapons 'typically possessed by law-abiding citizens for lawful purposes,'" *Caetano*, 577 U.S. at 416 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 625)), which includes all "typically possessed" firearms that are not *both* "dangerous per se and unusual," *Caetano* at 417. To be "dangerous" in this sense requires substantially more than a firearm's mere potential to cause injury, and a firearm is not "unusual" so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id.* at 420 (italics original). "The *Heller* test is a test that any citizen can understand. *Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes. It is a hardware test." *Miller v. Bonta*, __ F.Supp.3d __, 2021 WL 2284132 at *16 (S.D. Cal. June 4, 2021). In other words, if the arm

is commonly owned by law-abiding citizens for lawful purposes, then it is protected by the Constitution, full stop.

4.    But in spite of the text of the Constitution and binding Supreme Court precedents, Defendant City of San Diego enacted into law Ordinance Number O-2022-7 (hereinafter the "Ordinance," or the "Ban"), which, *inter alia*, prohibits "possession, purchase, sale, receipt, and transportation of non-serialized, unfinished frames and unfinished receivers" (hereinafter "non-firearm objects" or "NFO"s) by the over one million residents of, and all those traveling through, the City of San Diego, under pain of criminal penalty.

5.    In fact, while California law permits and creates a regulatory path for the self-manufacture of firearms (as well as the acquisition and ownership of the precursor parts and materials necessary to the self-manufacture of firearms), the Ordinance expressly and completely bans the possession, purchase, sale, receipt, and transportation of the parts and materials necessary to undertake the constitutionally protected conduct of self-manufacturing arms for self-defense, defense of others, and other lawful purposes.

6.    Defendants' Ban completely and categorically prohibits individuals not prohibited from exercising their Second Amendment rights from acquiring and possessing the parts necessary to self-manufacture firearms, as well as possession of self-manufactured firearms that are constitutionally protected because they are both of categories, types, functions, and/or designs, and are themselves commonly owned and possessed by law-abiding citizens for lawful purposes across the country and which are in fact lawful under California's firearms regulatory regime.

7.    By enacting the Ordinance, the City of San Diego willfully and affirmatively disregarded the Supreme Court's well-known and binding *Heller*, *McDonald*, and *Caetano* decisions, which establish that the Second

Amendment fully protects the right to self-manufacture, keep, and bear all such arms in common use for lawful purposes based on the amendment's text and the history and tradition of our Nation.

8.      "But the enshrinement of constitutional rights necessarily takes certain policy choices"—including these—"off the table." *Heller*, 554 U.S. at 636.

9.      Plaintiffs therefore bring this challenge because they unquestionably face "a realistic danger of sustaining a direct injury as a result of the law's operation or enforcement," *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020), seek to vindicate their rights, and to preliminarily and permanently enjoin enforcement of the Ordinance as required to conform the law to the Constitution's text, our Nation's history and tradition, and the Supreme Court's binding precedents.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11.      This action, based on Defendants' violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Southern District of California.

## PARTIES

13.      Plaintiff James Fahr is a natural person and a citizen of the State of California, residing in the City of San Diego, California.

14.      Plaintiff Desiree Bergman is a natural person and a citizen of the

State of California, residing in the City of San Diego, California.

15.     Plaintiff Colin Rudolph is a natural person and a citizen of the State of California, residing in the City of San Diego, California.

16.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization incorporated under the laws of Delaware and operating in California and other states. The purposes of FPC include defending and promoting the People's rights, especially First and Second Amendment rights, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in the State of California, including in the City of San Diego and San Diego County. FPC represents the interests of its members, including in individual plaintiffs herein, who wish to self-manufacture firearms for self-defense and lawful purposes in the exercise of the Second Amendment rights without being subjected to the threat of criminal sanction under the Ordinance.

17.     Plaintiff San Diego County Gun Owners PAC ("SDCGO") is a local political organization whose purpose is to protect and advance the Second Amendment rights of residents of San Diego County, California, through their efforts to support and elect local and state representatives who support the Second Amendment right to keep and bear arms. SDCGO's membership and donors consist of Second Amendment supporters, people who own guns for self-defense and sport, firearms dealers, shooting ranges, and elected officials who want to restore and protect the right to keep and bear arms in California. SDCGO has members in the City of San Diego and San Diego County. SDCGO represents the interests of its members, including in individual plaintiffs herein, who wish to self-manufacture firearms for self-defense and lawful purposes in the exercise of the Second Amendment rights without being

subjected to the threat of criminal sanction under the Ordinance.

18.    Defendant City of San Diego is a municipal corporation and a chartered city, organized and existing under the laws of the States of California. Under its City Charter, the City of San Diego is granted "the right and power to make and enforce all laws and regulations in respect to municipal affairs," is "authorized to exercise any and all rights, powers and privileges," and "generally shall have all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever," now or hereafter granted or prescribed or authorized to be granted or prescribed by the laws and Constitution of the State of California. City of San Diego, City Charter, art. I, §§ 1-2, https://docs.sandiego.gov/citycharter/Article%20I.pdf.

19.    Defendant David Nisleit is the Chief of Police of San Diego and the chief law enforcement official in and for the City of San Diego, who has all power and authority necessary for the operation and control of the City's Police Department. City of San Diego, City Charter, art. V, § 57, https://bit.ly/3o7RTUZ; *see also* San Diego Police Department Organizational Chart, https://bit.ly/3EJCuQp. Defendant Nisleit is sued in his official capacity.

## THE RIGHTS AT STAKE

### *The Right to Keep and Bear Arms*

20.    The Second Amendment to the United States Constitution provides (italics added): "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not be infringed*."

21.    Incorporated against the states and local governments through the Fourteenth Amendment in *McDonald*, 561 U.S. at 749, the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595.

22.    The "central" holding of the Supreme Court in *Heller* is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. It "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

23.    "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634.

24.    The Second Amendment "elevates above all other interests"—including any interest San Diego may claim in advancing "public safety"—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635.

25.    The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780, and it cannot "be singled out for special—and specially unfavorable—treatment," *id.* at 778–79.

26.    Even purported "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment[.]" *United States v. Marzzarella*, 614 F.3d 85, 92, n. 8 (3d Cir. 2010). Indeed, "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *Id.*

27.    Instead, "[j]ust as the First Amendment protects modern forms of communications, … and the Fourth Amendment applies to modern forms of search, … the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (internal citations omitted); *accord Caetano*, 577 U.S. at 416 (Alito, J., concurring).

28.     Thus, the Second Amendment "guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes,'" *Caetano*, 577 U.S. at 416 (quoting *Heller*, 554 U.S. at 625), and its protection extends to all firearms currently in common use that are not both "dangerous *per se*" and "unusual," *id.* at 417 ("A weapon may not be banned unless it is both dangerous *and* unusual.").

29.     "Dangerous *per se*" does not mean the mere inherent propensity of a firearm to cause injury. *Caetano*, 577 U.S. at 418 ("firearms cannot be categorically prohibited just because they are dangerous"). In fact, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* "*Heller* defined the 'Arms' *covered by* the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *Id.* (quoting *Heller*, 554 U.S. at 581) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)) (italics original in *Caetano*).

30.     It is well-established that AR-15 type semiautomatic rifles are in common use and are not "dangerous" or "unusual" in this sense. *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."); *Miller*, 2021 WL 2284132 at *6 (finding such rifles are "commonly owned by law-abiding citizens" and that "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home").

31.     Defendants' Ban does not merely prohibit the conduct of making and keeping firearms by dangerous convicted felons and other dangerous persons otherwise prohibited from exercising their Second Amendment rights.

32.     Rather than attempt to regulate the conduct and instruments in a

targeted, tailored manner, the City completely bans all conduct and possession *in toto*, forcing all law-abiding people to purchase pre-manufactured commercial firearms, often more expensive than what can be constructed at home, and cutting off their ability to lawfully self-manufacture arms in common use for lawful purposes in the exercise of their constitutional rights under the Second Amendment.

33.     The City's categorical Ban on the self-manufacture of firearms is notably more expansive than the State of California's regulations, which, by contrast, at least establishes a path for the lawful self-manufacture of firearms, and the ongoing possession and use of the end-product self-manufactured firearms.

34.     In the First Amendment context, free speech rights include the ability to build one's own printing and communications devices, print one's own fliers, and utilize largely unregulated channels of speech in the exercise of the rights secured. In that context, it is well established and readily accepted that the government cannot lawfully narrow the channels for exercising the right to freely speak through government-approved gatekeepers who create or provide limited channels of speech and limited means of distribution for a beholden populace.

35.     Likewise, in the Second Amendment context, the government cannot lawfully narrow the channels for exercising the right to keep and bear arms by limiting one's access to the instruments essential to self-manufacturing in the exercise of that right, by forcing people to exercise it solely through the acquisition of firearms from limited, government-approved manufacturers of firearms and firearm predecessor materials.

36.     The Second Amendment right necessarily includes and thus guarantees the ability of ordinary law-abiding citizens to self-manufacture

firearms in common use for self-defense and other lawful purposes.

37.    The ability to self-manufacture arms has always been part of the Second Amendment right, as well as American history and tradition, so as to become firmly entrenched and now enshrined under the Second Amendment.

38.    The colonists in the first permanent English settlements had the express right to import arms and the items necessary to make them. Binding his "Heirs and Successors," King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3787–88 (Francis Thorpe ed., 1909). And the 1620 Charter of New England granted colonists the right "to take, load, carry, and transports in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1834–35 (Francis Thorpe ed., 1909). And "[f]rom the earliest periods American gunsmiths had made and repaired military firearms." Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 178 (1956).

39.    "The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the

colonial era." M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980).

40.     As historian Charles Winthrop Sawyer explained, "in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." 1 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 145 (1910). Moreover, many gunsmiths worked primarily in other trades and built or repaired firearms as a hobby. *See* James Whisker, THE GUNSMITH'S TRADE 145–63 (1992).

41.     During the Revolutionary War, many colonies relied on and incentivized people outside of the firearms industry to produce firearms. For example, on August 2, 1775, a Committee appointed by Maryland's Provincial Convention "to enquire into the practicability of establishing a manufactory of Arms within this Province" determined that "Arms may be furnished sooner, and at less expense by engaging immediately all Gun Smiths, *and others concerned in carrying on that business*." Journal of the Maryland Convention July 26 – August 14, 1775, at 64–65 (William Hand Browne ed. 1892) (italics added).

42.     In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications. "[E]very good firearm Manufactured in this Colony" was rewarded with "three pounds for each." *8 Documents and Records Relating to the State of New-Hampshire During the Period of the American Revolution, From 1776 to 1783*, at 15–16 (Nathaniel Bouton ed., 1874).

43.     In March 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or

Persons who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof." *5 American Archives, Fourth Series*, 1418 (Peter Force ed. 1844). The Provincial Congress offered rewards for the manufacturers who could produce the greatest number of arms for the colony, but excluded "any person with whom the Congress or Committee of Safety have already contracted"—thus incentivizing those capable of manufacturing arms but not necessarily in the firearms business.

44.    A month later, the North Carolina Provincial Congress called for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony. *5 American Archives, Fourth Series*, 1338 (Peter Force ed. 1844). And further, "that they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.*

45.    Certainly, the ratifiers of the Bill of Rights remembered that the young country depended on the manufacture of firearms by those outside of the formal firearms industry for survival and intended to protect such activity through the Second Amendment. Indeed, building firearms was entirely unregulated during the colonial and founding eras in America. And there were no restrictions on who could be a gunsmith or make guns.

46.    "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Secretary of State Thomas Jefferson, letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

47.    Thus, no history or precedent exists for extinguishing citizens' ability to self-manufacture firearms for self-defense or other lawful purposes— and rightly so, since the Second Amendment, through its text, as it is informed

by history and tradition, and as interpreted by the Supreme Court, is intended to guarantee this right as part of the fundamental liberty it secures.

### The Right to Due Process of Law and Just Compensation

48.     The fundamental right to due process of law is also at stake in this case, in light of the Ban's effect of mandating that all ordinary law-abiding San Diego residents ultimately dispossess themselves of all "unfinished frames" or "unfinished receivers" (and the many other NFOs that fall within the Ordinance's sweepingly broad definition of these terms), without any compensation for the destruction of their valuable property rights.

49.     The Fifth Amendment to the United States Constitution states, in pertinent part: "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

50.     The Fourteenth Amendment to United States Constitution states, in pertinent part: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law."

51.     "[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005); *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct. 2063, 2074 (2021) ("government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation").

52.     "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). A "regulatory" taking having such effect is no different than a "physical" taking, as it requires compensation *per se. Cedar*

*Point*, 141 S.Ct. at 2072 (the "regulatory taking" label "can mislead" in this context because the more lenient *Penn Central* test for less invasive regulations "has no place").

53.     Beyond these recognized categories of "takings *per se*," any other "regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain" require compensation to the property owner. *Lingle*, 544 U.S. at 539. This is measured by "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests," where "the complete elimination of a property's value" or other "permanent physical invasion" of the property is a "determinative factor." *Id.*

### THE BAN

54.     City of San Diego Ordinance Number O-2022-7, a copy of which is attached as **Exhibit A**, prohibits, *inter alia*, the possession, purchase, sale, receipt, and transportation of non-serialized, unfinished frames and receivers, as well as non-serialized firearms.

55.     The Ordinance was passed by the City Council on September 14, 2021, and signed into law by Mayor Gloria on September 23, 2021.

56.     "The date of approval by the Mayor pursuant to section 280(c) shall be deemed the date of its final passage." City of San Diego City Charter, art. XV, § 295(a)(1).

57.     "Ordinances making the annual tax levy, the annual appropriation ordinances, ordinances calling or relating to elections, and emergency measures, shall take effect at the time indicated therein. All other ordinances passed by the Council shall take effect at the time indicated therein, but not less than thirty calendar days from the date of their final passage. Ordinances adopted by vote of the electors shall take effect at the time indicated therein or

the date the final canvass is issued by the County Registrar of Voters, whichever occurs later." City of San Diego City Charter, art. XV, § 295(d).

58.     Consistent with the foregoing, the Ban "shall take effect and be in force on the thirtieth day from and after its final passage." Ordinance § 3.

59.     Thus, the Ordinance is effective and enforceable by Defendants against all persons in the City of San Diego, including named Plaintiffs herein, by no later than October 23, 2021, leaving those who already lawfully acquired and possess proscribed items before the Ordinance was enacted only 30 days to dispossess themselves of their personal property, and it forevermore prohibits all persons in San Diego from acquiring the necessary products for and self-manufacturing firearms in compliance with State law.

60.     Under the Ordinance, with few exceptions not relevant to the instant action, it is unlawful for any person to "[p]ossess, purchase, transport, or receive an unfinished frame or unfinished receiver, unless the unfinished frame or unfinished receiver is imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearms Importer or Federal Firearms Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver." San Diego Municipal Code ("SDMC") § 53.18(c)(1).

61.     Under the Ordinance, with few exceptions not relevant to the instant action, it is unlawful for any person to "[s]ell, offer to sell, transfer, or offer to transfer an unfinished frame or unfinished receiver, unless the unfinished frame or unfinished receiver is imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearms Importer or Federal Firearms Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice

for that unfinished frame or unfinished receiver." SDMC § 53.18(c)(2).

62.     Under the Ordinance, the term "Person" has "the same meaning as in San Diego Municipal Code section 11.0210." SDMC § 53.18(b)(7).

63.     SDMC § 11.0210 provides that the term "person" means "any natural person, firm, joint venture, joint stock company, partnership, association, club, company, corporation, business trust, organization, or the manager, lessee, agent, servant, officer or employee of any of them or any other entity which is recognized by law as the subject of rights or duties."

64.     Under the Ordinance, the term "Firearm" has "the same meaning as in California Penal Code section 16520(a)" and includes a handgun, rifle, or shotgun. SDMC § 53.18(b)(3).

65.     Under the Ordinance, the term "unfinished frame" means "a piece of any material that does not constitute the completed frame of a firearm, but that has been shaped or formed in any way for the purpose of becoming the frame of a firearm, and which may be made into a functional frame of a firearm through milling, drilling, or other means." SDMC § 53.18(b)(11).

66.     "Frame means the primary structural component of a firearm to which the fire control components are attached." SDMC § 53.18(b)(4).

67.     Under the Ordinance, the term "unfinished receiver" means "a piece of any material that does not constitute the completed receiver of a firearm, but that has been shaped or formed in any way for the purpose of becoming the receiver of a firearm, and which may be made into a functional receiver of a firearm through milling, drilling, or other means." SDMC § 53.18(b)(12).

68.     "Receiver means the primary structural component of a firearm to which the fire control components are attached." SDMC § 53.18(b)(8).

69.     The Ordinance's definitions of "unfinished frame" and

"unfinished receiver" are so broadly defined as to sweep into their net virtually all conceivable forms and types of firearm precursor parts, as well as even raw materials.

70. Indeed, based on the Ordinance's expansive definitions, even raw materials, such as a uniform block of metal or plastic, would be captured by the Ordinance—and therefore subject a buyer, seller, or possessor to criminal prosecution if the materials had been "shaped or formed *in any way*" for the purpose of becoming" the frame or receiver of a firearm.

71. The phrase "shaped or formed in any way" is undefined in the Ordinance.

72. The federal regulatory regime only recognizes and thus federal firearms importers or manufacturers only place serial numbers *required* by federal law, and such serialization is currently limited to *firearms* as defined under federal law. No statutory or regulatory scheme currently exists for serialization of NFOs. *See* 27 C.F.R. § 478.92(a)(1) and (a)(2) (firearms importers and manufacturers "must legibly identify each *firearm* manufactured or imported" through serialization).[1] *See also* Proposed Rules, United States Dept. of Justice, Definition of "Frame or Receiver" and Identification of

---

[1] Under 27 C.F.R. § 478.92, the identification requirement for *firearms* is established in subdivision (a)(1), and this identification requirement provides that importers and manufacturers "must legibly identify each firearm manufactured or imported … [¶] [b]y engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame or receiver thereof an individual serial number" and "certain additional information." "Firearm frames and receivers" are treated in a separate subsection of subdivision (a), which provides "[a] firearm frame or receiver that is not a component part of a complete weapon at the time it is sold, shipped, or otherwise disposed of by you must be identified *as required by this section.*" 27 C.F.R. § 478.92(a)(2). As currently written, nothing within subdivision (a)(2) or any other part of this section creates any serialization or other specific identification requirement for such components. Thus, no serialization process exists for firearm frames or receivers—much less *unfinished* frames or receivers—and none will exist unless and until the regulatory scheme is changed to specifically require it.

Firearms, 86 Fed. Reg. 27720, 27722-27 (proposing to modify the definition for purposes of creating a serialization requirement for such components because no such requirement and thus no mechanism for serialization currently exists under federal law).

73.     As a result, individuals in the City of San Diego simply cannot acquire unfinished frames or unfinished receivers that have been "imprinted with a serial number by a federal firearms importer or a federal firearms manufacturer," because no such items even exist.

74.     California law regulating the assembly of firearms generally provides that a person, prior to self-manufacturing or assembling a firearm, must apply for and receive a California Department of Justice ("DOJ")-issued serial number and engrave or permanently affix that number or mark to the firearm in accordance with regulations prescribed by the DOJ. *See generally* Cal. Penal Code § 29180, et seq.

75.     SDMC § 53.18(c)'s "option" for individuals in San Diego to "possess, purchase, transport, or receive" an unfinished frame or unfinished receiver which has already been "engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver" is also illusory. As the express language of California's regulatory scheme provides, one must *personally* apply for and obtain a serial number, *personally* manufacture or assemble the firearm, and then *personally* engrave or permanently affix the serial number (or *personally* have it engraved or permanently affixed) within ten days of completing the firearm. Cal. Pen. Code § 29180(b) & (b)(2)(A); *see also* 11 CCR § 5518(b)(2).

76.     In other words, the California scheme *solely* authorizes the issuance of a serial number to the person or entity who applied and was approved for it, and thus it *solely* authorizes the approved applicant to engage

in the self-manufacturing process. It does not permit or even envision a situation where a person could lawfully acquire, through purchase, receipt, or other transfer, a *pre-serialized* NFO from some third-party individual or entity and then lawfully manufacture or assemble a firearm with *that* NFO, since the DOJ issues these serial numbers *solely* to the approved applicant.

77.   Indeed, "[i]f *the applicant* fails to engrave, cast, stamp (impress), or permanently place the unique serial number in a conspicuous location on the receiver or frame of the firearm and upload the required digital images before the end of the tenth day, the unique serial number will become invalid." 11 CCR § 5518(b)(2)(B) (italics added). So, the serial number on any pre-serialized NFO that one *might* be able to acquire from a third party would invariably be invalid and thus useless for purposes of being able to lawfully self-manufacture a firearm under the scheme, as one would have to obtain his or her own serial number, 11 CCR § 5518(b)(2)(B), *and*, in all such events, the acquisition, possession, and transport of the NFO would be unlawful under the Ordinance because it would lack a *valid* serial number under California law.

78.   Because firearms importers and manufacturers do not and are not authorized to serialize any unfinished frames or unfinished receivers under federal law, and because it is likewise legally impossible to have an unfinished frame or unfinished receiver pre-serialized with a DOJ-issued serial number, the general prohibition set forth in SDMC § 53.18(c) is total and complete.

79.   Despite the City's contention that it "is intended to be applied and interpreted consistent with state and federal law," SDMC § 53.18(a), the Ban's very text effectively precludes any path for any San Diego resident to self-manufacture her own firearm under either state or federal law.

80.   Indeed, as detailed, individuals in San Diego have no lawful avenue to acquire an unfinished frame or unfinished receiver that has been pre-

serialized by a federal firearms importer or manufacturer, nor do they have a lawful avenue to acquire an unfinished frame or unfinished receiver that has been pre-serialized with a DOJ-issued serial number.

81.     With each of those avenues foreclosed—by federal law in the first instance, and state law in the second—all that remains is the blanket prohibition set forth in SDMC § 58.18(c), which makes it unlawful, upon criminal penalty, to possess, purchase, transport, receive, sell, offer to sell, transfer, or offer to transfer any unfinished frame or unfinished receiver.

82.     Consequently, no later than October 23, 2021, all ordinary, law-abiding citizens in the City of San Diego, including the named individual Plaintiffs herein and similarly situated members of Plaintiffs FPC and SDCGO, will have *no choice* but to dispossess themselves of any item that could be construed by Defendants as an "unfinished frame" or "unfinished receiver" to comply with the Ordinance, in violation of their fundamental constitutional rights, or face enforcement and prosecution by the Defendants.

83.     Further, under the Ordinance, the named individual Plaintiffs herein and similarly situated members of Plaintiffs FPC and SDCGO will never again be permitted to possess any "unfinished frames" or "unfinished receivers" in the future without the threat of arrest and prosecution by the Defendants, and Plaintiffs and similarly situated members of Plaintiffs FPC and SDCGO will likewise be forever categorically prohibited from self-manufacturing their own firearms in San Diego, in violation of their fundamental constitutional rights.

84.     Accordingly, the Ordinance expressly and completely bans anyone in San Diego citizen from purchasing, receiving, possessing, and transporting the very items one would engrave onto or permanently affix the DOJ-issued number for purposes of otherwise lawfully self-manufacturing a

firearm compliant with State law and the Ordinance itself.

85.    Rather than tailor its laws, as the Constitution requires, the City elected to take an overbroad, categorical approach that unquestionably infringes on the rights of San Diego residents, businesses, and visitors, and empowers Defendants to use criminal sanctions and impose by such force the City's policy preferences on individuals in San Diego, denying them access to and the exercise of their right to keep and bear protected arms.

### The Consequences for Violating the Ban

86.    The Ordinance may be enforced "by any remedy available in Chapter 1 of the San Diego Municipal Code." Ordinance recitals, p.3.

87.    SDMC § 12.0105 provides:

> The City Manager, the City Clerk or any of their designated Enforcement Officials have the authority and powers necessary to gain compliance with the provisions of the Municipal Code and applicable state codes. These powers include the power to issue Notices of Violation and field citations, inspect public and private property and use whatever judicial and administrative remedies are available under the Municipal Code or applicable state codes.

88.    SDMC § 12.0105 provides:

> A Director or any designated Enforcement Official is authorized to arrest without a warrant any person whenever the Enforcement Official has reasonable cause to believe that the person has committed a violation of the Municipal Code or applicable state codes in his or her presence. Pursuant to Penal Code Section 836.5 the Enforcement Official can only arrest a person by issuing a misdemeanor field citation.

/ / /

/ / /

89.   SDMC § 12.0201 provides:

It shall be unlawful for any person to violate any provision or to fail to comply with any of the requirements of this Code. A violation of any of the provisions or failing to comply with any of the mandatory requirements of this Code shall constitute a misdemeanor; except that notwithstanding any other provision of this Code, any such violation constituting a misdemeanor under this Code may, in the discretion of the City Attorney, be charged and prosecuted as an infraction; and, with the further exception that any violation of the provisions relating to parking, operation of bicycles, operation of motor vehicles, and use of freeways, highways and streets by animals, bicycles, motor vehicles or pedestrians shall constitute an infraction. Any person convicted of a misdemeanor under the provisions of this Code, unless provision is otherwise herein made, shall be punishable by a fine of not more than one thousand dollars ($1000) or by imprisonment in the County Jail for a period of not more than six months or by both fine and imprisonment. Any person convicted of an infraction under the provisions of this Code, unless provision is otherwise herein made, shall be punishable by fine only as follows: Upon a first conviction, by a fine of not exceeding two hundred fifty dollars ($250) and for a second conviction or any subsequent conviction within a period of one year, by a fine of not exceeding five hundred dollars ($500).

Each such person shall be charged with a separate offense for each and every day during any portion of which any violation of any provision of this Code is committed, continued or permitted by such person and shall, upon conviction, be punished accordingly.

/ / /

90.   SDMC § 12.0202 provides:

(a)   In addition to any other remedy provided by this Code, any provision of this Code may be enforced by injunction issued by the Superior Court upon a suit brought by The City of San Diego.

(b)   As part of a civil action filed to enforce provisions of this Code, a court may assess a maximum civil penalty of two thousand five hundred dollars ($2,500) per violation of the Municipal Code for each day during which any person commits, continues, allows or maintains a violation of any provision of this Code.

91.   SDMC § 12.0204 provides:

(a)   It is unlawful to maintain or allow the existence of any condition that creates a public nuisance.

(b)   Pursuant to California Government Code section 38773, the City has the authority to judicially abate public nuisances by filing criminal or civil actions. The City also has the authority to make the expense of abatement of the public nuisance a special assessment, or a lien against the property on which it is maintained and a personal obligation against the property owner, in accordance with California Government Code section 38773.1 or 38773.5.

## FACTS AS TO THE INDIVIDUAL PLAINTIFFS

### *James Fahr*

92.   The foregoing paragraphs are incorporated herein as if set forth in full.

93.   Plaintiff Fahr is not disqualified from exercising his Second

Amendment right to acquire and possess firearms and ammunition.

94.    Plaintiff Fahr is not a licensed firearms manufacturer, importer, or dealer.

95.    Plaintiff Fahr is a member of Plaintiffs FPC and SDCGO.

96.    As resident of the City, Plaintiff Fahr owns and possesses in the City of San Diego three unfinished frames or receivers now prohibited under the Ordinance, which he lawfully acquired before enactment of the Ban.

97.    Plaintiff Fahr desires and intends to use his unfinished frames or receivers now prohibited under the Ordinance to construct California-compliant firearms for his own self-defense, defense of others, and other lawful purposes.

98.    Plaintiff Fahr's unfinished frames or receivers now prohibited under the Ordinance are of a type that would allow for the construction of California-compliant AR-15-platform semi-automatic rifles in common use for lawful purposes by citizens throughout California and the United States.

99.    Plaintiff Fahr desires and intends to use for all lawful purposes, including self-defense, defense of others, and proficiency training at his local shooting range in the exercise of his rights secured under the Second Amendment, the firearms that he would otherwise construct but for the Ban.

100.   But for the Ordinance and Defendants' imminent enforcement of it, Plaintiff Fahr would retain his now-prohibited unfinished frames or receivers and use them to construct such firearms in common use for such purposes.

101.   However, because of the Ordinance and Defendants' imminent enforcement of it, Plaintiff Fahr must dispossess himself of this property within 30 days of the Ordinance's enactment or face criminal prosecution under § 53.18(c)(1) and thus forfeit the ability to use it for such protected purposes.

102.   Plaintiff Fahr also desires and intends to purchase, acquire, possess, and transport in San Diego additional unfinished frames and receivers prohibited under the Ordinance in the future so that he may construct other California-compliant firearms for self-defense, defense of others, and other lawful purposes in the exercise of his rights secured under the Second Amendment.

103.   But for the Ordinance and Defendants' enforcement of it, Plaintiff Fahr would exercise his constitutional right to purchase, acquire, possess, and transport in San Diego additional unfinished frames and receivers for the lawful and constitutionally protected purpose of constructing firearms in common use for self-defense, defense of others, and other lawful purposes.

### *Desiree Bergman*

104.   The foregoing paragraphs are incorporated herein as if set forth in full.

105.   Plaintiff Bergman is not disqualified from exercising her Second Amendment right to acquire and possess firearms and ammunition.

106.   Plaintiff Bergman holds a valid license to carry a firearm under Cal. Penal Code § 26150, et seq. ("CCW"), which she acquired after passing an extensive background check and being placed in a "Rap-Back" law enforcement notification system.

107.   Plaintiff Bergman is not a licensed firearms manufacturer, importer, or dealer.

108.   Plaintiff Bergman is a member of Plaintiffs FPC and SDCGO.

109.   As a resident of the City, Plaintiff Bergman owns and possesses in the City of San Diego an unfinished frame or receiver now prohibited under the Ordinance, which she lawfully acquired before enactment of the Ban.

110.   Plaintiff Bergman desires and intends to use her unfinished frame

or receiver now prohibited under the Ordinance to construct a California-compliant firearm for her own self-defense, defense of others, and other lawful purposes in the future.

111.   Plaintiff Bergman's unfinished frame or receiver now prohibited under the Ordinance is of a type that would allow for the construction of a California-compliant AR-15-platform semi-automatic rifle in common use for lawful purposes by citizens throughout California and the United States.

112.   Plaintiff Bergman desires and intends to use for all lawful purposes, including self-defense, defense of others, and proficiency training at her local shooting range in the exercise of her rights secured under the Second Amendment, the AR-15 type firearm that she would otherwise construct but for the Ban.

113.   But for the Ordinance and Defendants' imminent enforcement of it, Plaintiff Bergman would retain her now-prohibited unfinished frame or receiver and use it to construct such a firearm in common use for such purposes.

114.   However, because of the Ordinance and Defendants' imminent enforcement of it, Plaintiff Bergman must dispossess herself of the property within 30 days of the Ordinance's enactment or face criminal prosecution under §53.18(c)(1) and thus forfeit the ability to use it for such protected purposes.

115.   Plaintiff Bergman also desires and intends to purchase, acquire, possess, and transport in San Diego additional unfinished frames and receivers prohibited under the Ordinance in the future so she may construct other California-compliant firearms for her own self-defense, defense of others, and other lawful purposes in the exercise of his rights secured under the Second Amendment.

116.   But for the Ordinance and Defendants' enforcement of it, Plaintiff Bergman would exercise her constitutional right to purchase, acquire, possess, and transport in San Diego unfinished frames and receivers for the lawful and constitutionally protected purpose of constructing firearms in common use for self-defense, defense of others, and other lawful purposes.

### Colin Rudolph

117.   The foregoing paragraphs are incorporated herein as if set forth in full.

118.   Plaintiff Rudolph is not disqualified from exercising his Second Amendment right to acquire and possess firearms and ammunition.

119.   Plaintiff Rudolph is not a licensed firearms manufacturer, importer, or dealer.

120.   Plaintiff Rudolph is a member of Plaintiffs FPC and SDCGO.

121.   As resident of the City, Plaintiff Rudolph owns and possesses in the City of San Diego an unfinished frame or receiver now prohibited under the Ordinance, which he lawfully acquired before enactment of the Ban.

122.   Plaintiff Rudolph desires and intends to use his unfinished frame or receiver now prohibited under the Ordinance to construct a California-compliant firearm for his own self-defense, defense of others, and other lawful purposes in the future.

123.   Plaintiff Rudolph's unfinished frame or receiver now prohibited under the Ordinance are of a type that would allow for the construction of a California-compliant AR-15-platform semi-automatic rifle in common use for lawful purposes by citizens throughout California and the United States.

124.   Plaintiff Rudolph desires and intends to use for all lawful purposes, including self-defense, defense of others, and proficiency training at his local shooting range in the exercise of his rights secured under the Second

Amendment, the firearms that he would otherwise construct but for the Ban.

125. But for the Ordinance and Defendants' imminent enforcement of it, Plaintiff Rudolph would retain his now-prohibited unfinished frame or receiver and use it to construct such a firearm in common use for such purposes.

126. However, because of the Ordinance and Defendants' imminent enforcement of it, Plaintiff Rudolph must dispossess himself of the property within 30 days of the Ordinance's enactment or face criminal prosecution under § 53.18(c)(1) and thus forfeit the ability to use it for such protected purposes.

127. Plaintiff Rudolph also desires and intends to purchase, acquire, possess, and transport in San Diego additional unfinished frames and receivers prohibited under the Ordinance in the future so he may construct other California-compliant firearms for his own self-defense, defense of others, and other lawful purposes in the exercise of his rights secured under the Second Amendment.

128. But for the Ordinance and Defendants' enforcement of it, Plaintiff Rudolph would exercise his constitutional right to purchase, acquire, possess, and transport in San Diego unfinished frames and receivers for the lawful and constitutionally protected purpose of constructing firearms in common use for self-defense, defense of others, and other lawful purposes.

## COUNT ONE
### 42 U.S.C. § 1983
### Action for Deprivation of Plaintiffs' Rights under the
### Second and Fourteenth Amendments
### Facial and As-Applied
### (All Plaintiffs v. All Defendants)

129. The foregoing paragraphs are hereby incorporated herein as if set

forth in full.

130.   Under federal law, "a license is not required to make a firearm solely for personal use." *See*, *e.g.*, https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use. And that is true whether the firearm is based on an NFO, such as an "unfinished frame" or "unfinished receiver" proscribed by the Ordinance, a frame or receiver machined from a block of raw materials, or one stamped from a piece of sheet metal or fashioned from a tube.

131.   California law expressly provides that persons who can pass a background check may self-manufacture firearms for their own lawful use. *See generally* Cal. Penal Code § 29180, et seq. and 11 Cal. Code. of Regulations § 5505, et seq. ("These regulations apply to self-manufactured or self-assembled firearms made from any material, including wood, metal, or plastic, and made through any process, including those produced by 3D printers.").

132.   In fact, there are no restrictions on non-prohibited persons from possessing, purchasing, transporting, receiving, or selling unfinished frames or unfinished receivers under California law. As stated above, the ability to purchase and possess unfinished frames or receivers is *necessary* in order to self-manufacture a firearm in accordance with state law. *See* Cal. Pen. Code § 29180(b) & (b)(2)(A); *see also* 11 CCR § 5518(b)(2).

133.   Defendants' Ban unconstitutionally requires that all ordinary, law-abiding citizens *dispossess* themselves of all proscribed items within thirty days of the Ordinance's enactment and final passage.

134.   Defendants' Ban unconstitutionally prohibits all ordinary, law-abiding citizens from ever again purchasing, receiving, possessing, or transporting all proscribed items after the Ordinance's enactment and final passage.

135.   Defendants' Ban imposes a blanket prohibition against not only constitutionally protected conduct—self-manufacturing arms for one's own lawful purposes, including self-defense in the home—but a vast category of materials and parts necessary to engage in that conduct, and thus prohibits a class of protected arms in common use for self-defense and other lawful purposes by ordinary law-abiding citizens like the Individual Plaintiffs in this case, including AR-15-platform semi-automatic rifles.

136.   The Second Amendment guarantees ordinary law-abiding citizens the right to acquire, possess, use, and self-manufacture *all* firearms in common use for self-defense and other lawful purposes, *Caetano*, 577 U.S. at 420, including AR-15 semi-automatic rifles.

137.   Because Defendants' Ban outlaws all parts, materials, and inherent conduct necessary to self-manufacture constitutionally protected arms by outlawing it all, the Ban is categorically unconstitutional and must be enjoined as such. *Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021) (quoting *Silvester v. Harris*, 843 F.3d 816, 824 (9th Cir. 2016) ("If a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny.").

138.   If any tiers-of-scrutiny analysis were to apply, only the highest level—strict scrutiny—could be applied since the Ban unquestionably "'implicates the core of the Second Amendment right and severely burdens that right.'" *Young*, 992 F.3d at 784 (quoting *Silvester*, 843 F.3d at 824). Whatever public safety interest Defendants may claim in enacting this Ban, there has been no effort to tailor it so as to minimize imposing unnecessary or overly broad restraints—much less to establish "the least restrictive means" of achieving any "compelling" interests—as the law requires.

139.   But the lack of tailoring in the Ordinance's broad prohibition

renders the Ban unconstitutional even under intermediate scrutiny, because that test requires at least "a means narrowly tailored to achieve the desired objective." *Bd. of Trustees of State Univ. of New York*, 492 U.S. 468, 480 (1989).

140.   There has been no showing that *any* of the countless law-abiding San Diego residents and visitors targeted under this Ban has had any involvement in any crime associated with any unserialized firearm or any unserialized firearm component, much less any significant number of these individuals, so as to somehow justify dispossessing them of all such firearm parts and prohibiting them from exercising their fundamental right to possess, use, and self-manufacture protected arms in common use for self-defense and lawful purposes.

141.   The answers to the questions of law in this case require a textual and historical inquiry into original meaning of the Second Amendment, *Heller*, 554 U.S. at 634-35, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."

142.   The Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

143.   Plaintiffs have a right to self-manufacture arms for protection and all lawful purposes, including those arms and precursor materials, including but not limited to NFOs, prohibited under Defendants' Ban. The right to self-manufacture arms "wouldn't mean much" without the right to own, possess, and use the constituent parts necessary to engage in such activity—and, of

course, the firearm itself as the end product of this protected activity—for lawful purposes. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011) (explaining the corollary principle that the right to bear arms "wouldn't mean much without the training and practice that make it effective").

144.  Defendants' Ban prohibits law-abiding citizens from acquiring, possessing, and transporting materials and supplies necessary to self-manufacture, construct, and/or assemble constitutionally protected arms of designs and functions—including but not limited to California-compliant AR-15-platform semi-automatic rifles[2]—that are commonly possessed and used for self-defense and other lawful purposes.

145.  Defendants' Ban prohibits law-abiding citizens from self-manufacturing, constructing, and/or assembling constitutionally protected arms of designs and functions, including but not limited to AR-15 semi-automatic rifles, that are commonly possessed and used for self-defense and other lawful purposes in California and the vast majority of states.

146.  Defendants' Ban prohibits law-abiding citizens from possessing self-manufactured, constitutionally protected arms of designs and functions, including but not limited to AR-15-platform semi-automatic rifles that are commonly possessed and used for self-defense and other lawful purposes in California and the vast majority of states.

147.  The AR-15-platform rifle is an incredibly common and constitutionally protected firearm. Over 25 years ago, the Supreme Court recognized the AR-15 as a common firearm possessed by *regular individuals* (not military or law enforcement) when it held: "The AR-15 is the civilian

---

[2] *See, e.g.*, https://www.polymer80.com/RL556v3-80-AR15-Lower-black_2 (NFO is "Mil-spec," allowing self-manufacturers to use parts compatible with the "open source" AR-15 design) (last accessed September 23, 2021).

version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Staples*, 511 U.S. at 603. So even in 1994, it was widely known that the common AR-15 rifle was a firearm commonly possessed for lawful purposes by non-government "civilian" individuals.

148.   "The AR-15 platform in particular, is an 'open source' design … with countless variations and adaptations. In fact, the platform's ability to accept modifications with ready-made retail parts without the need for specialized tools or expertise, is part of what makes these rifles popular." *Miller,* 2021 WL 2284132 at *12-14. "Furthermore, the modularity and standardization of the AR-15, its ubiquity, commonality, and widespread ownership in common ammunition sizes such as .223 and 5.56 x 45mm, and the interchangeability of parts, including magazines, makes it ideal." *Id*. at *108.

149.   Because it is "open source" in nature, has a large volume of (constitutionally protected) educational materials on manufacturing and construction dedicated to it readily available on the Internet, is relatively easily constructed, has excellent availability of parts, and is a modular design ready and able to be configured in countless lawful ways for many lawful purposes, "the popular AR-15 rifle is a perfect combination of home defense weapon and homeland defense equipment. Good for both home and battle, the AR-15 is the kind of versatile gun that lies at the intersection of the kinds of firearms protected under *District of Columbia v. Heller* and *United States v[.] Miller*," *Id.* at *2 (internal citations omitted).

150.   Defendants' Ban inflicts irreparable harm on Plaintiffs by prohibiting property and conduct protected under the Second Amendment individual right to keep and bear arms. Plaintiffs lack an adequate remedy at law for this burden on their Second Amendment rights, and the harm Plaintiffs

1    would suffer from denial of an injunction exceeds any legally cognizable harm
2    an injunction may inflict upon Defendants. The public interest favors enjoining
3    enforcement of unconstitutional laws such as Defendants' Ban.

4        151.   Therefore, as a direct and proximate result of the above
5    infringements of and impermissible burdens on the rights of Plaintiffs
6    protected under the Second and Fourteenth Amendments, Plaintiffs and all
7    similarly situated members of FPC and SDCGO who reside in or travel through
8    the City of San Diego in possession of proscribed items, or who desire and
9    intend to self-manufacture arms in common use for lawful purposes, have
10   suffered an unlawful deprivation of their fundamental constitutional right to
11   keep and bear arms, and they will continue to suffer such injury unless and
12   until granted the relief they seek herein.

**COUNT TWO**
**42 U.S.C. § 1983**
**Action for Deprivation of Plaintiffs' Rights under the**
**Fifth and Fourteenth Amendments**
**Facial and As-Applied**
**(All Plaintiffs v. All Defendants)**

18       152.   The foregoing paragraphs are hereby incorporated herein as if set
19   forth in full.

20       153.   Defendants' Ban requires that the Individual Plaintiffs and
21   similarly situated members of FPC and SDGCO dispossess themselves of all
22   unfinished frames or receivers previously lawfully acquired and possessed in
23   the City of San Diego no later than thirty days following the enactment and
24   final passage of the Ordinance.

25       154.   These unfinished frames or receivers have substantial value as
26   personal property interests to Plaintiffs and other similarly situated law-
27   abiding individuals who have lawfully acquired and possessed them for lawful

purposes protected under the Second Amendment.

155.  At the least, fair and just compensation from the City for this forced dispossession of protected arms and their constituent parts is required to ensure the minimum that due process requires. In fact, such compensation is absolutely required because the Defendants' Ban completely deprives the property owners of "*all* economically beneficial us[e]' of [their] property," and causes them to "suffer a permanent physical invasion of their property interests." *Lingle*, 544 U.S. at 538 (quoting *Lucas*, 505 U.S. at 1019).

156.  Yet, the Defendants' Ban provides no form of compensation whatsoever. Such compensation was never even considered. Instead, it is clear that all ordinary law-abiding citizens swept up into this Ban are expected to just dispossess themselves of the property in response to a mandate of a government that not only pays them nothing for their property but threatens to jail them, fine them, or jail and fine them for failing to comply.

157.  Thus, Plaintiffs are not required to exhaust any administrative remedies, as no such administrative remedies even exist because the City of San Diego has not created or established, nor has there even been any established process, remedy, or administrative body through which one may seek compensation for the forced dispossession of this property.

158.  The Supreme Court has established basic two guides for determining when government regulation constitutes a taking.

159.  "First, with certain qualifications … a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942-43 (2017) (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001), quoting *Lucas*, 505 U.S. at 1015). The "regulatory taking" label "can mislead" in this context because the more lenient *Penn Central* test for less invasive

1    regulations "has no place." *Cedar Point*, 141 S.Ct. at 2072.

2        160.   "Second, when a regulation impedes the use of property without

3    depriving the owner of all economically beneficial use, a taking still may be

4    found based on a complex of factors (i.e., the *Penn Central* test), including (1)

5    the economic impact of the regulation on the claimant; (2) the extent to which

6    the regulation has interfered with distinct investment-backed expectations; and

7    (3) the character of the governmental action." *Murr*, 137 S.Ct. at 1938

8    (citations and quotation marks omitted).

9        161.   And "a physical *appropriation* of property g[ives] rise to a *per se*

10   taking, without regard to other factors." *Horne v. Dep't of Agric.*, 135 S. Ct.

11   2419, 2427 (2015).

12       162.   Here, Defendants' Ban will not just deprive Plaintiffs of the use

13   of their property, but of its possession, one of the most essential sticks in the

14   "'bundle' of property rights," which consists of "the rights to possess, use and

15   dispose of" property. *Horne*, 576 U.S. at 361-62 (quoting *Loretto v.

16   Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). Thus,

17   whatever might be the City's claim interests in the Ban, it cannot compel

18   physical dispossession of it without just compensation.

19       163.   And "[g]uns in general are not 'deleterious devices or products or

20   obnoxious waste materials.' " *Staples*, 511 U.S. at 610-11 (quoting United

21   States v. *International Minerals & Chemical Corp.*, 402 U.S. 558, 565 (1971)).

22   Nor could they be under *Heller*.

23       164.   The Ban's confiscatory process of mandating forfeiture to law

24   enforcement, destruction, or forced dispossession of this constitutionally

25   protected and previously lawfully acquired and possessed property, with no

26   just compensation, inflicts irreparable harm on Plaintiffs.

27       165.   Therefore, as a direct and proximate result of the Ban's

28

confiscatory nature, mandating forfeiture to law enforcement, destruction, or forced dispossession of this property with no just compensation in violation of the rights of Plaintiffs protected under the Fifth and Fourteenth Amendments, Plaintiffs and all similarly situated San Diego resident members of FPC and SDCGO have suffered and will continue to suffer injury unless and until granted the relief they seek herein.

166. Thus, injunctive relief is appropriate to protect against the irreparable harm of compelled destruction of or damage to valuable property interests.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, as follows:

a) Declare that Ordinance O-2022-7, San Diego Municipal Code §§ 53.18(c)(1) and 53.18(c)(2), and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate Plaintiffs' rights guaranteed by the Second and Fourteenth Amendments to the United States Constitution;

b) Declare that Ordinance O-2022-7, San Diego Municipal Code §§ 53.18(c)(1) and 53.18(c)(2), and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate Plaintiffs' right to due process of the law and to just compensation as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution;

c) Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, and all persons who have notice of the injunction, from enforcing Ordinance O-2022-7, San Diego Municipal Code §§ 53.18(c)(1) and 53.18(c)(2), and Defendants' derivative laws, regulations, policies,

procedures, enforcement practices, and customs;

        d)      Award Plaintiffs nominal damages;

        e)      Award Plaintiffs' costs, attorney fees, and all other allowable expenses pursuant to 42 U.S.C. § 1988 and all applicable laws; and,

        f)      Grant any and all other equitable and/or legal remedies this Court may see fit.

Dated: September 23, 2021        THE DIGUISEPPE LAW FIRM, P.C.

                                  By /s/ Raymond M. DiGuiseppe
                                    RAYMOND M. DIGUISEPPE

                                  Attorney for Plaintiffs

1

## <u>TABLE OF CONTENTS OF EXHIBITS</u>

2

**Exhibit A**            **Ordinance Number O-2022-7**            **Pages 1-9**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Ordinance Number O-2022-7

(O-2022-7)

ORDINANCE NUMBER O-_____ (NEW SERIES)

DATE OF FINAL PASSAGE _____

AN ORDINANCE AMENDING CHAPTER 5, ARTICLE 3,
DIVISION 00, OF THE SAN DIEGO MUNICIPAL CODE BY
ADDING SECTION 53.18, RELATING TO NON-SERIALIZED,
UNFINISHED FIREARM FRAMES OR RECEIVERS AND
NON-SERIALIZED FIREARMS.

WHEREAS, San Diego is experiencing a rise in detection and seizure of firearms lacking

serial numbers or other identifying markings, commonly known as "ghost guns"; and

WHEREAS, a ghost gun is a firearm constructed using unfinished firearm parts,

including unfinished frames or receivers, which house the operating parts of the firing

mechanism; and

WHEREAS, ghost gun kits contain all necessary parts to complete assembly and turn an

unfinished frame or receiver into a functional firearm; and

WHEREAS, numerous online videos illustrate how to easily assemble a ghost gun; and

WHEREAS, a firearm assembled from a ghost gun kit is non-serialized and untraceable

through law enforcement databases; and

WHEREAS, ghost gun kits are widely available for purchase, circumventing the

background check process, allowing individuals who are prohibited from possessing or

purchasing firearms due to criminal history, restraining orders, or mental illness to easily obtain

them; and

WHEREAS, the majority of ghost guns recovered by the San Diego Police Department

(SDPD) are seized from individuals prohibited from legally possessing or purchasing firearms;

and

(O-2022-7)

WHEREAS, evidence suggests that ghost gun kits and parts are often sold through the internet; and

WHEREAS, the increased availability of ghost guns threatens the public safety and welfare of the residents of San Diego; and

WHEREAS, SDPD recovered 211 ghost guns in calendar year 2020, and has recovered 233 ghost guns through mid-July 2021, an increase from 77 ghost guns in 2019, and 58 in the second half of 2018; and

WHEREAS, ghost guns have been linked to multiple shootings in San Diego between 2018 and 2021; and

WHEREAS, the increase of ghost guns in San Diego is consistent with national trends. Between 2016 and 2020, law enforcement agencies across the country reported approximately 23,906 ghost guns to the Bureau of Alcohol, Tobacco, Firearms, and Explosives as having been recovered from crime scenes, including 325 homicides or attempted homicides; and

WHEREAS, federal law does not fully regulate ghost gun kits or parts; and

WHEREAS, the Congress of the United States has not, expressly or by implication, preempted additional regulation of firearms by state and local authorities; and

WHEREAS, state law regulates some, but not all, aspects of ghost gun kits or parts; and

WHEREAS, state law provisions regulating the sale and purchase of firearm precursor parts do not become effective until July 1, 2022; and

WHEREAS, the Legislature of the State of California has not, expressly or by implication, preempted the entire field of firearms regulation not in conflict with state law; and

WHEREAS, the Council of the City of San Diego (Council) intends this Ordinance to be applied and interpreted consistent with federal and state law; and

WHEREAS, this Ordinance may be enforced by any remedy available in Chapter 1 of the San Diego Municipal Code; and

WHEREAS, the Council finds and declares this Ordinance necessary in order to eliminate non-serialized, untraceable firearms, thereby promoting and protecting the public health, safety, and general welfare of the residents of the City of San Diego; and

WHEREAS, the Council finds and declares this Ordinance will promote effective law enforcement by providing reasonable measures to address the dangers posed to the community by ghost guns; and

WHEREAS, the Council further finds it is within its police powers to implement and enforce the provisions of this Ordinance; NOW, THEREFORE,

BE IT ORDAINED, by the Council of the City of San Diego, as follows:

Section 1.          That Chapter 5, Article 3, Division 00 of the San Diego Municipal Code is amended by adding section 53.18, to read as follows:

**§53.18          Prohibition of Possession or Sale of Non-Serialized, Unfinished Firearm Frames or Receivers and Non-Serialized Firearms**

(a)          Purpose and Intent. It is the purpose and intent of this section that possession, purchase, sale, receipt, and transportation of non-serialized, *unfinished frames* and *unfinished receivers*, and *non-serialized firearms* within the City of San Diego be prohibited for the protection, health, and welfare of the public, to further effective law enforcement, and to provide the City with reasonable measures to address the dangers to the community posed by *non-serialized firearms*, commonly known as "ghost

guns." This section is intended to be applied and interpreted consistent with state and federal law.

(b)     Definitions. For the purposes of this section, defined terms appear in italics. The following definitions apply in this section:

    (1)     *Federal Firearms Importer* means a licensed *firearm* importer as defined in 18 U.S.C. § 921(a)(9) (2019), as may be amended.

    (2)     *Federal Firearms Manufacturer* means a licensed *firearm* manufacturer as defined in 18 U.S.C. § 921(a)(10) (2019), as may be amended.

    (3)     *Firearm* has the same meaning as in California Penal Code section 16520(a), as may be amended. As used in this section, *firearm* shall include a *handgun, rifle,* or *shotgun.*

    (4)     *Frame* means the primary structural component of a *firearm* to which the fire control components are attached.

    (5)     *Handgun* has the same meaning as in California Penal Code section 16640, as may be amended.

    (6)     *Non-serialized firearm* means a *firearm* that is not either imprinted with a serial number issued to that *firearm* by a *Federal Firearms Importer* or *Federal Firearms Manufacturer* in compliance with federal law or engraved or permanently affixed with a serial number provided by the California Department of Justice for that *firearm.*

(O-2022-7)

(7) *Person* has the same meaning as in San Diego Municipal Code section 11.0210.

(8) *Receiver* means the primary structural component of a *firearm* to which the fire control components are attached.

(9) *Rifle* has the same meaning as in California Penal Code section 17090, as may be amended.

(10) *Shotgun* has the same meaning as in California Penal Code section 17190, as may be amended.

(11) *Unfinished frame* means a piece of any material that does not constitute the completed *frame* of a *firearm*, but that has been shaped or formed in any way for the purpose of becoming the *frame* of a *firearm,* and which may be made into a functional *frame* of a *firearm* through milling, drilling, or other means.

(12) *Unfinished receiver* means a piece of any material that does not constitute the completed *receiver* of a *firearm*, but that has been shaped or formed in any way for the purpose of becoming the *receiver* of a *firearm,* and which may be made into a functional *receiver* of a *firearm* through milling, drilling, or other means.

(c) Prohibition. It is unlawful for any *person* to:

(1) Possess, purchase, transport, or receive an *unfinished frame* or *unfinished receiver,* unless the *unfinished frame* or *unfinished receiver* is imprinted with a serial number issued to that *unfinished frame* or *unfinished receiver* by a *Federal Firearms Importer* or

(O-2022-7)

*Federal Firearms Manufacturer*, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that *unfinished frame* or *unfinished receiver*.

(A)     This subsection shall not apply to a *Federal Firearms Importer* or *Federal Firearms Manufacturer*.

(B)     This subsection shall not apply to an employee or sworn peace officer of a local, state, or federal law enforcement agency if the employee or sworn peace officer is acting within the scope of official duties.

(C)     This subsection shall not apply to a common carrier licensed or regulated under state or federal law or an authorized agent of a common carrier when acting in the course and scope of duties incident to the receipt, processing, transportation, or delivery of property.

(2)     Sell, offer to sell, transfer, or offer to transfer an *unfinished frame* or *unfinished receiver,* unless the *unfinished frame* or *unfinished receiver* is imprinted with a serial number issued to that *unfinished frame* or *unfinished receiver* by a *Federal Firearms Importer* or *Federal Firearms Manufacturer*, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that *unfinished frame* or *unfinished receiver*.

(O-2022-7)

(3)     Possess, purchase, transport, or receive *a non-serialized firearm.*

    (A)     This subsection shall not apply to an employee or sworn peace officer of a local, state, or federal law enforcement agency if the employee or sworn peace officer is acting within the scope of official duties.

    (B)     This subsection shall not apply to a common carrier licensed or regulated under state or federal law or an authorized agent of a common carrier when acting in the course and scope of duties incident to the receipt, processing, transportation, or delivery of property.

    (C)     This subsection shall not apply to a *non-serialized firearm* if any of the following conditions apply:

        (i)     The *non-serialized firearm* has been rendered permanently inoperable.

        (ii)     The *non-serialized firearm* is an antique firearm as defined in California Penal Code section 16170, as may be amended.

        (iii)     The *non-serialized firearm* was manufactured or assembled prior to 1968.

        (iv)     The *non-serialized firearm* has been determined to be a collector's item pursuant to 26 U.S.C. Ch. 53, including § 5845 (2019), as may be amended, or a curio or relic pursuant to 18 U.S.C. Ch. 44,

(O-2022-7)

including § 921(a) (2019), as may be amended, and 27 C. F. R. § 478.11 (2019), as may be amended.

(v)      The *non-serialized firearm* has been entered into the centralized registry set forth in California Penal Code section 11106, as may be amended, prior to July 1, 2018, as being owned by a specific individual or entity if that *firearm* has assigned to it a distinguishing number or mark of identification.

(D)      It shall be an affirmative defense to a violation of this subsection that the *person* is in compliance with California Penal Code section 29180, as may be amended.

(4)      Sell, offer to sell, transfer, or offer to transfer a *non-serialized firearm*. This subsection shall not apply to a *non-serialized firearm* if any of the following conditions apply:

(A)      The *non-serialized firearm* has been rendered permanently inoperable.

(B)      The *non-serialized firearm* is an antique firearm as defined in California Penal Code section 16170, as may be amended.

(C)      The *non-serialized firearm* was manufactured or assembled prior to 1968.

(D)      The *non-serialized firearm* has been determined to be a collector's item pursuant to 26 U.S.C. Ch. 53, including §

(O-2022-7)

5845 (2019), as may be amended, or a curio or relic

pursuant to 18 U.S.C. Ch. 44, including § 921(a) (2019), as

may be amended, and 27 C. F. R. § 478.11 (2019), as may

be amended.

Section 2.     That a full reading of this ordinance is dispensed with prior to passage, a

written copy having been made available to the Council and the public prior to the day of its

passage.

Section 3.     That this ordinance shall take effect and be in force on the thirtieth day

from and after its final passage.

APPROVED: MARA W. ELLIOTT, City Attorney


By     _____
       Michelle A. Garland
       Deputy City Attorney

MAG:hm
July 26, 2021
Or.Dept:CD5
Doc. No.: 2710879

I hereby certify that the foregoing Ordinance was passed by the Council of the City of
San Diego, at this meeting of _____ .

                                         ELIZABETH S. MALAND
                                         City Clerk


                                         By_____
                                              Deputy City Clerk


Approved: _____          _____
                   (date)                           TODD GLORIA, Mayor


Vetoed: _____          _____
                   (date)                           TODD GLORIA, Mayor