RAYMOND M. DIGUISEPPE
CA State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

JOHN W. DILLON
CA State Bar No. 296788
DILLON LAW GROUP, APC
2647 Gateway Rd.
Suite 105 #255
Carlsbad, CA 92009
P: 760.642.7150
E: jdillon@dillonlawgp.com

WILLIAM SACK*
PA STATE BAR NO. 325863
FIREARMS POLICY COALITION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149-4584
P: (916) 596-3492
E: wsack@fpclaw.org
* App. Pro Hac Vice Forthcoming
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

JAMES FAHR; DESIREE BERGMAN; COLIN RUDOLPH; SAN DIEGO COUNTY GUN OWNERS PAC; and FIREARMS POLICY COALITION, INC.,

                          Plaintiffs,

        v.

CITY OF SAN DIEGO, CALIFORNIA; and DAVID NISLEIT, in his official capacity as Chief of Police of San Diego City, California,

                          Defendants.

Case No.:  '21 CV1676 BAS BGS

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER; ALTERNATIVE MOTION FOR PRELIMINARY INJUNCTION; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

**Judge: Hon. _____**
**Date:**
**Time**
**Courtroom:**

## PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER; ALTERNATIVE MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs James Fahr, Desiree Bergman, Colin Rudolph, San Diego County Gun Owners PAC, and Firearms Policy Coalition, Inc. ("Plaintiffs"), by and through

their attorneys, and pursuant to Fed. Rule of Civ. Pro. 65, hereby and respectfully apply to this Court for the issuance of a temporary restraining order or, in the alternative, a preliminary injunction temporarily enjoining Defendants City of San Diego, California, and David Nislet, in his official capacity as the Chief of Police of San Diego City ("Defendants"), and all their respective employees, officers, agents, representatives, and those acting in concert or participation with them, from enforcing sections 53.18(c)(1) and (c)(2) of the San Diego Municipal Code ("SDMC") (the "Ordinance"), on the basis that the Ordinance is inflicting and will continue to inflict unless and until enjoined irreparable injury upon the fundamental rights secured under the Second and Fourteenth Amendments to the United States Constitution.

As an alternative form of relief, Plaintiffs respectfully request that the Court set and schedule a hearing and further briefing on their above-stated Application as a Motion for Preliminary Injunction pursuant to and under the standards of FRCP 65.

Both requests are based on the supporting memorandum of points and authorities, declarations, and exhibits, the Complaint and matters cited therein, and such other evidence and argument as may be permitted at the hearing.

Dated:          September 24, 2021          The DiGuiseppe Law Firm, P.C.
                                            */s/ Raymond M. DiGuiseppe*
                                            Raymond M. DiGuiseppe
                                            4320 Southport-Supply Road, Suite 300
                                            Southport, NC 28461
                                            P: 910-713-8804
                                            E: law.rmd@gmail.com

1
2

# TABLE OF CONTENTS

3   I.   INTRODUCTION .................................................................................. 1

4   II.   RELEVANT BACKGROUND ............................................................ 2

5   A.   The Ban ...................................................................................... 2

6   B.   The Impact on Plaintiffs............................................................ 7

7   III. GENERAL LEGAL STANDARDS .................................................... 9

8   IV.   ARGUMENT ...................................................................................... 10

9   A.   Plaintiffs Hold a Strong Likelihood of Success on Their
    Claims ....................................................................................... 10
10
11   1.   The Individual Second Amendment Right to Keep
    and Bear Arms   Protects All Firearms in Common
    Use for Lawful Purposes ............................................... 10
12
13   2.   This Right Has Always Secured the Ability to *Self-
    Manufacture* Firearms in Common Use for Lawful
    Purposes ......................................................................... 12
14
15   3.   The Proper Test for the Constitutional Analysis ...................... 15

16   4.   The Ban is Unconstitutional Under Any Standard .................. 16

17   5.   The Ban Also Unquestionably Effects an
    Unconstitutional Taking ................................................ 20

18   B.   The Remaining Factors All Further Compel Preliminary
    Relief ........................................................................................ 21
19
20   C.   Waiver of Bond is Proper and Appropriate Under These
    Circumstances .......................................................................... 23

21   V. CONCLUSION................................................................................... 23

22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page

CASES

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127, 1134-35 (9th Cir. 2011)………………………………...10

*Alvarez v. Larose,*
445 F.Supp.3d 861, 864 (S.D. Cal. 2020)………………………………...9

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
559 F.3d 1046, 1052 (9th Cir. 2009)……………………………………...9

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234, 245 (2002)………………………………………………..19

*Caetano v. Massachusetts,*
577 U.S. 411, 416 (2016)…………………………………………….11, 12

*Cedar Point Nursery v. Hassid,*
___ U.S. ___, 141 S.Ct. 2063, 2074 (2021)……………………………..20

*District of Columbia v. Heller,*
554 U.S. 570, 595 (2008)…………………………….10, 11, 12, 15, 18, 20

*Doe v. Harris,*
772 F.3d 563, 576-77 (9th Cir. 2014)…………………………………16, 18

*East Bay Sanctuary Covenant v. Trump,*
349 F.Supp.3d 838, 869 (N.D. Cal. 2018)………………………………23

*Ezell v. City of Chicago,*
651 F.3d 684, 704 (9th Cir. 2011)…………………………………...14, 22

*F.C.C. v. League of Women Voters of California,*
468 U.S. 364, 380 (1984)………………………………………………..16

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,*
5 F.4th 407, 418 (4th Cir. 2021)………………………………………..12, 13

*Horne v. Dept. of Agriculture,*
576 U.S. 350, 361-62 (2015)……………………………………………..21

*In re National Security Letter*,
863 F.3d 1110, 1121 (9th Cir. 2017)…………………………………………15

*Jackson v. City and County of San Francisco*,
746 F.3d 953, 967 (9th Cir. 2014)…………………………………………13

*Johnson v. Couturier*,
572 F.3d 1067, 1086 (9th Cir. 2009)………………………………………23

*Klein v. City of San Clemente*,
584 F.3d 1196, 1208 (9th Cir. 2009)………………………………………23

*Lingle v. Chevron U.S.A., Inc.*,
544 U.S. 528, 538 (2005)…………………………………………………20, 21

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003, 1019 (1992)………………………………………………..21

*Luis v. United States*,
__ U.S. __,136 S.Ct. 1083, 1097 (2016)………………………………...13

*McDonald v. City of Chicago*,
561 U.S. 742, 749 (2010)……………………………………………….10, 11, 12

*Miller v. Bonta*,
__ F.Supp.3d __, 2021 WL 2284132 at *16 (S.D. Cal. June 4, 2021)…12, 17

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702, 715 (9th Cir. 1997)…………………………………………21

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*,
961 F.3d 1062, 1068 (9th Cir. 2020)…………………………………...18, 19

*Pena v. Lindley*,
898 F.3d 969, 977 (9th Cir. 2018)…………………………………………...15, 18

*People of the State of Cal. ex rel. Van De Kamp v. Tahoe Regency Planning Agency*,
766 F.2d 1319, 1326 (9th Cir. 1985)………………………………………23

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155, 163 (2015)…………………………………………………..15

*Rodriguez v. Robbins*,
715 F.3d 1127, 1145 (9th Cir. 2013)…………………………………………22

*Sierra Club v. Hickel*,
433 F.2d 24, 33 (9th Cir. 1970)……………………………………………10

*Silvester v. Harris*,
843 F.3d 816, 821 (9th Cir. 2016)…………………………………………15

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
968 F.3d 738, 747 (9th Cir. 2020)……………… …....……………………...2

*Staples v. United States*,
511 U.S. 600, 603 (1994)…………………………………………………..17

*Stimmel v. Sessions*,
879 F.3d 198, 204 (6th Cir. 2018)…………………………………………12

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*,
240 F.3d 832, 839 n.7 (9th Cir. 2001)………………………………………9

*South Bay United Pentecostal Church v. Newsom*,
508 F.Supp.3d 756, 767 (S.D. Cal. 2020)…………………………10, 20, 21

*Teixeira v. County of Alameda*,
873 F.3d 670, 677 (9th Cir. 2017)………………………...………………..13

*Teter v. Connors*,
460 F.Supp.3d 989, 1001 (D. Hawaii 2020)………………………………15

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180, 195 (1997)…………………………………………………..18

*United Broth. of Carpenters and Joiners of America Local 586 v. N.L.R.B.*,
540 F.3d 957, 967 (9th Cir. 2008)…………………………………………18

*Valle del Sollnc. v. Whiting*,
732 F.3d 1006, 1029 (9th Cir. 2013)………………………………………22

*Vivid Entertainment, LLC v. Fielding*,
774 F.3d 566, 580 (9th Cir. 2014)…………………………………………16

*Ward v. Rock Against Racism*,
  491 U.S. 781, 791 (1989)……………………………………………………16

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*,
  526 F.2d 86, 88 (9th Cir. 1975)……………………………………………10

*Winter v. Natural Res. Defense Council, Inc.*,
  555 U.S. 7, 20 (2008)………………………………………………………..9

*Young v. Hawaii*,
  992 F.3d 765, 783 (9th Cir. 2021)……………………………12, 15, 18

**CONSTITUTIONAL PROVISIONS**
U.S. Const., amend. II……………...…………………………………11

**STATUTES**
Cal. Pen. Code, § 29180……………………………………………...4,5
Cal. Pen. Code, § 29182……………………………………………..4

**REGULATIONS**
C.F.R. § 478.92……………………………………………………...4
11 CCR § 5518……………………………………………………4,5

**ORDINANCES**
SDMC § 53.18…………………………………………………...2,3,6
SDMC § 12.0201…………………………………………………7

**OTHER PUBLICATIONS**
https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use................................................................................14

## SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Defendant City of San Diego enacted Ordinance Number O-2022-7 (the "Ordinance" or "Ban") on September 14, 2021. It was signed into law by Mayor Gloria on September 23, 2021, rendering it fully effective on October 23, 2021. The Ban must be enjoined, immediately, because it is inflicting irreparable injury to the fundamental rights of law-abiding San Diegans every moment it remains in effect. Under the Ban, these responsible citizens are being forced to dispossess themselves of constitutionally protected property that they lawfully acquired before the Ban for constitutionally protected purposes, and they are being barred from ever again acquiring or using any such property for these protected purposes. Such a broad prohibition against the exercise of constitutional rights, untailored in any way and untethered from any legitimate interest that could be achieved, wouldn't be tolerated for a moment if the rights being targeted were secured under the First Amendment. Just the same, it cannot be tolerated here, where it targets rights of equal importance secured under the Second Amendment—specifically, the right to keep and bear arms.

The Ban outlaws all "unfinished frames or receivers" and any other precursor firearm parts necessary to manufacture or assemble a firearm (hereinafter "non-firearm objects" or "NFO"s) within San Diego, forcing San Diegans to rid themselves of any NFOs they previously acquired for purposes of exercising their right to self-manufacture firearms in common use for lawful purposes, without any compensation, and barring them from ever again lawfully acquiring or using any NFOs for such

purposes. All this despite the fact that California has actually established a regulatory path for all its law-abiding citizens to lawfully self-manufacture firearms—a path that the Ban perversely cuts off, leaving San Diegans out in the pasture with no ability to lawfully exercise this important right recognized throughout the history and tradition of this Nation and clearly enshrined under the Second Amendment.

The Constitution's text, our Nation's history and tradition, and the Supreme Court's binding precedents all command the Ban be struck down as unconstitutional. Because they unquestionably face "a realistic danger of sustaining a direct injury as a result of the law's operation or enforcement," *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020), for so long as this Ban remains enforceable, Plaintiffs seek to vindicate their rights and to immediately enjoin its enforcement through this request for preliminary relief.

## II.   RELEVANT BACKGROUND

### A.   The Ban

The Ordinance bans the possession, purchase, sale, receipt, and transportation of non-serialized, "unfinished frames or receivers," as well as non-serialized firearms. Specifically, with few exceptions not relevant here, it is unlawful for any person to "[p]ossess, purchase, transport, or receive," or to "[s]ell, offer to sell, transfer, or offer to transfer" an "unfinished frame or unfinished receiver," "unless the unfinished frame or unfinished receiver is imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearms Importer or Federal Firearms

Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver." SDMC § 53.18(c)(1)-(2). The Ordinance sweepingly defines the terms "unfinished frame" and "unfinished receiver" so as to capture all parts and components necessarily required for the manufacture or assembly of a firearm, and virtually anything else that *could* be "shaped or formed" into such an object. SDMC § 53.18(b)(11)-(12).[1]

And the Ban's purported exception for the possession, purchase, receipt, or transport of an unfinished frame or receiver "imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearms Importer or Federal Firearms Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver," is no refuge from the Ban's criminal proscriptions. No legal or practical means exist to lawfully self-manufacture a firearm with a *pre-serialized* unfinished frame or receiver under federal or state law—it's impossible.

The federal firearms regulatory regime only recognizes—and thus federal firearms importers or manufacturers only place—serial numbers *required* by federal

---

[1]     "Unfinished frame" means "a piece of any material that does not constitute the completed frame of a firearm, but that has been shaped or formed in any way for the purpose of becoming the frame of a firearm, and which may be made into a functional frame of a firearm through milling, drilling, or other means." SDMC § 53.18(b)(11). "Unfinished receiver" means "a piece of any material that does not constitute the completed receiver of a firearm, but that has been shaped or formed in any way for the purpose of becoming the receiver of a firearm, and which may be made into a functional receiver of a firearm through milling, drilling, or other means." SDMC § 53.18(b)(12).

law. Such serialization is currently limited to *firearms* as defined under federal law. No statutory or regulatory scheme currently exists for serialization of NFOs. *See* 27 C.F.R. § 478.92(a)(1) and (a)(2) (firearms importers and manufacturers "must legibly identify each *firearm* manufactured or imported" through serialization).[2] Indeed, ATF has proposed modifying its regulatory definitions to create a serialization requirement for such components *specifically because* no such requirement and thus no mechanism for serialization exists. Proposed Rules, United States Dept. of Justice, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27722-27.

California's regulatory regime provides a statutory mechanism for its citizens to lawfully engage in the self-manufacturing or assembly of a firearm (excluding firearms statutorily defined as an "unsafe handgun," Cal. Pen. Code, § 29182(e)(2)) when they apply for and obtain a serial number after passing a background check. Cal. Pen. Code, § 29180, et seq. However, as the express language of this scheme provides, one must *personally* apply for and obtain the serial number, *personally* manufacture or assemble the firearm, and then *personally* engrave or permanently affix the serial number (or *personally* have it engraved or permanently affixed) within ten days of completing the firearm. *Id.* at § 29180(b) & (b)(2)(A); *see also* 11 CCR § 5518(b)(2).

---

[2]     Under subdivision (a)(2), "[a] firearm frame or receiver that is not a component part of a complete weapon at the time it is sold, shipped, or otherwise disposed of by [the importer or manufacturer] must be identified *as required by this section*." 27 C.F.R. § 478.92(a)(2) (italics added). Nothing within subdivision (a)(2) or any other part of this section creates any serialization or other specific identification requirement for such components. Thus, no serialization process exists for such components, and none will exist unless and until the regulatory scheme is changed to specifically require it.

In other words, the California scheme *solely* authorizes the issuance of a serial number to the person or entity who applied and was approved for it, and thus it *solely* authorizes the approved applicant to engage in the self-manufacturing process. It does not permit or even envision a situation where a person could lawfully acquire, through purchase, receipt, or other transfer, a *pre-serialized* NFO from some third-party individual or entity and then lawfully manufacture or assemble a firearm with *that* NFO, since California issues these serial numbers *solely* to the approved applicant. Indeed, it is unlawful for the applicant to thereafter sell or transfer the self-built firearm to anyone else. Cal. Pen. Code § 29180(d)(1).

Indeed, "[i]f *the applicant* fails to engrave, cast, stamp (impress), or permanently place the unique serial number in a conspicuous location on the receiver or frame of the firearm and upload the required digital images before the end of the tenth day, the unique serial number will become invalid." 11 CCR § 5518(b)(2)(B) (italics added). So, the serial number on any pre-serialized NFO that one *could* acquire from a third party would invariably be invalid and thus useless for purposes of being able to lawfully self-manufacture a firearm, 11 CCR § 5518(b)(2)(B), *and*, in all such events, the acquisition, possession, and transport of the NFO would be unlawful under the Ordinance because it would lack a *valid* serial number. Thus, the Ordinance expressly and completely bans anyone in San Diego from purchasing, receiving, possessing, and transporting the very items one would engrave onto or permanently affix the State-issued number for purposes of otherwise lawfully self-manufacturing a

firearm compliant with State law and the Ordinance itself.

So, despite the City's claim that it "is intended to be applied and interpreted consistent with state and federal law," SDMC § 53.18(a), the Ban's very text effectively precludes any path for any San Diego resident to self-manufacture her own firearm under either state or federal law. The one *theoretical* exception is illusory, rendering the general prohibition set forth in SDMC § 53.18(c) total and complete.

In net effect then, all those San Diegans who lawfully acquired and possess NFOs for the purpose exercising their rights to self-manufacture a firearm in common use before the Ban was enacted, including the named individual Plaintiffs herein and similarly situated members of Plaintiffs FPC and SDCGO, must dispossess themselves of this valuable personal property—and any other item that could be construed as an "unfinished frame" or "unfinished receiver" under the Ban's sweeping reach—within no more than 30 days of the Ban's final passage. *And* the Ban forevermore prohibits everyone in San Diego from acquiring the necessary products for self-manufacturing firearms—even in strict compliance with State law. Notably, the Ban even specifically limits any "affirmative defense" based on being "in compliance with" State law to non-serialized *firearms* and affords no protection for any possession, purchase, transport, or receipt of non-serialized unfinished frames or receivers. *Compare* SDMC § 53.18(c)(3)(D), creating such a defense for the possession, purchase, transport, or receipt of non-serialized firearms, with 53.18(c)(1), which provides no such defense for non-serialized unfinished frames or receivers.

The Ban has real teeth as a criminal law too. Unless an offense is traffic-related or unless the City Attorney exercises her sole discretion to charge it as an infraction, "[a] violation of any of the provisions or failing to comply with any of the mandatory requirements of this Code shall constitute a misdemeanor." SDMC § 12.0201. Anyone convicted of a misdemeanor violation of the Code is subject to a fine up to $1,000, imprisonment in the county jail for up to six months, or both. *Id.* And, as with all misdemeanors, San Diegans are subject to *multiple* such convictions *and* punishments for "each and every day during any portion of which any violation of any provision of this Code is committed, continued or permitted by such person." *Id.*

## B.   The Impact on Plaintiffs

All the individual Plaintiffs in this case are responsible, peaceable citizens of San Diego City who are not disqualified from exercising any of their rights to possess firearms or ammunition. Cmplt. ¶¶93, 105, 118; Dec. of J. Fahr ¶¶ 1-2; Dec. of D. Bergman ¶¶ 1-2; Dec. of C. Rudolph ¶¶ 1-2. They all own and possess in the City of San Diego one or more unfinished frames or receivers now prohibited under the Ban, which they lawfully acquired before enactment of the Ban. Cmplt. ¶¶ 96, 109, 121; Dec. of J. Fahr ¶¶ 1, 5; Dec. of D. Bergman ¶¶ 1, 6; Dec. of C. Rudolph ¶¶ 1, 6. All their unfinished frames or receivers are of a type that would allow for the construction of California-compliant AR-15-platform semi-automatic rifles in common use for lawful purposes throughout California and the United States. Cmplt. ¶¶ 98, 111, 123; Dec. of J. Fahr ¶ 7; Dec. of D. Bergman ¶ 8; Dec. of C. Rudolph ¶ 8. Further, they all

desire and intend to use their unfinished frames or receivers to construct such firearms for their own self-defense, defense of others, and proficiency training at their local shooting ranges. Cmplt. ¶¶ 99, 112, 124; Dec. of J. Fahr ¶¶ 6, 8; Dec. of D. Bergman ¶¶ 7, 9; Dec. of C. Rudolph ¶¶ 7, 9.

But for the Ban, all Plaintiffs would retain their now-prohibited unfinished frames or receivers and use them for these constitutional and lawful purposes. Cmplt. ¶¶ 100, 113, 125; Dec. of J. Fahr ¶ 9; Dec. of D. Bergman ¶ 10; Dec. of C. Rudolph ¶ 10. However, because of the Ban, all these Plaintiffs must dispossess themselves of this property within 30 days of the Ban's enactment or they all face criminal prosecution under § 53.18(c)(1) and thus forfeit the ability to use it for such protected purposes. Cmplt. ¶¶ 101, 114, 126; Dec. of J. Fahr ¶ 10; Dec. of D. Bergman ¶ 11; Dec. of C. Rudolph ¶ 11.

Plaintiffs Fahr, Bergman, and Rudolph also desire and intend to purchase, acquire, possess, and transport within San Diego City additional unfinished frames and receivers prohibited under the Ordinance in the future for the same lawful and constitutionally protected purposes. Cmplt. ¶¶ 102, 115, 127; at Dec. of J. Fahr ¶ 11; Dec. of D. Bergman ¶ 12; Dec. of C. Rudolph ¶ 12. But for the Ban's restraints, they would all exercise their constitutional right to purchase, acquire, possess, and transport such additional unfinished frames and receivers for these purposes. Cmplt. ¶¶ 103, 116, 128; Dec. of J. Fahr ¶ 12; Dec. of D. Bergman ¶ 13; Dec. of C. Rudolph ¶ 13.

Plaintiffs FPC and SDCGO are non-profit entities whose core organizational

purposes include protecting and preserving the constitutional rights enshrined under the Second Amendment for law-abiding individuals in the City of San Diego, including the right to self-manufacture firearms in common use for lawful purposes. Cmplt. ¶¶ 17, 18; Dec. of B. Combs ¶¶ 4-7; Dec. of M. Schwartz ¶¶ 4-6. They both bring this action on behalf of Plaintiffs, Fahr, Bergman, and Rudolph, and their similarly situated members in San Diego City who wish to construct a California-compliant firearm in common use for lawful purposes with unfinished frames or receivers they lawfully acquired before enactment of the Ban but now face dispossession of this property, and such members who wish to acquire additional such NFOs for the same purposes but now face criminal sanction under the Ban for any attempt to acquire such component parts. Cmplt. ¶¶18-19; Dec. of B. Combs ¶¶ 8-16; Dec. of M. Schwartz ¶¶ 7-15.

### III. GENERAL LEGAL STANDARDS

"The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment." *Alvarez v. Larose*, 445 F.Supp.3d 861, 864 (S.D. Cal. 2020). "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Id.*; *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

To obtain preliminary relief, a plaintiff "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## IV.   ARGUMENT

### A.   Plaintiffs Hold a Strong Likelihood of Success on Their Claims

"[A] party seeking preliminary injunction must establish that it will prevail on the merits with a 'reasonable certainty.'" *South Bay United Pentecostal Church v. Newsom*, 508 F.Supp.3d 756, 767 (S.D. Cal. 2020) (quoting *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970)). "While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek." *Alvarez*, 445 F.Supp.3d at 865. And "[i]n this circuit, the burden is lessened to a fair chance of success on the merits in cases in which the harm that may occur to the plaintiff is sufficiently serious." *Id.* (citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86, 88 (9th Cir. 1975)).

### 1.   The Individual Second Amendment Right to Keep and Bear Arms Protects All Firearms in Common Use for Lawful Purposes

Incorporated against the states and local governments through the Fourteenth

Amendment in *McDonald v. City of Chicago*, 561 U.S. 742, 749 (2010), the Second Amendment guarantees "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), through its declaration that "[a] well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not* be infringed, U.S. Const., amend. II (italics added). The "central" holding of the Supreme Court in *Heller* is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald* at 780. The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *id.*, and it cannot "be singled out for special—and specially unfavorable—treatment," *id.* at 778–79. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller* at 634. Thus, it "elevates above all other interests"—including any interest San Diego may claim in advancing "public safety"—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635.

And "[j]ust as the First Amendment protects modern forms of communications, … and the Fourth Amendment applies to modern forms of search, … the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (internal citations omitted); *accord Caetano v. Massachusetts*, 577 U.S. 411, 416

(2016) (Alito, J., concurring). "*Heller* defined the 'Arms' *covered by* the Second Amendment to include ""any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."" *Id.* (quoting *Heller* at 581) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). Thus, "[a] weapon may not be banned unless it is both dangerous *and* unusual." *Caetano* at 417. To be "dangerous" in this sense requires substantially more than a firearm's mere potential to cause injury, and a firearm is not "unusual" so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id.* at 420.

"The *Heller* test is a test that any citizen can understand. *Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes. It is a hardware test." *Miller v. Bonta*, __ F.Supp.3d __, 2021 WL 2284132 at *16 (S.D. Cal. June 4, 2021). That is, if the arm is commonly owned by law-abiding citizens for lawful purposes, it is protected by the federal Constitution, full stop.

## 2. This Right Has Always Secured the Ability to *Self-Manufacture* Firearms in Common Use for Lawful Purposes

The nature and scope of the Second Amendment's protection must be defined by its founding-era origins, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35; *id.* at 598-599, 600-01, 627 (focusing on the meaning of the amendment's text at the time of its ratification); *McDonald*, 561 U.S. at 768-69 (same); *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (quoting *Heller* at 625)

("Courts must look at the "historical understanding of the scope of the right.""); *accord Stimmel v. Sessions*, 879 F.3d 198, 204 (6th Cir. 2018) and *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives (BAFTE)*, 5 F.4th 407, 418 (4th Cir. 2021).

Throughout American history and our nation's traditions of robustly exercising the right to keep and bear arms, people have been free to personally manufacture, construct, or otherwise assemble arms in common use for lawful purposes, including lawful self-defense and defense of others, such that the ability to do so has become firmly entrenched and now enshrined under the Second Amendment. This rich history and tradition are detailed in the Complaint, Cmplt. ¶¶ 37-47, incorporated herein, and, succinctly stated, confirm that the relevant historical record plainly shows our earliest governments and societal institutions significantly relied upon and indeed incentivized citizens to build their own firearms for the benefit of themselves and society as a whole in securing both the individual and collective welfare through the same quintessentially lawful firearm uses for which so many law-abiding citizens use firearms today—i.e., in the lawful defense of oneself, others, and property. *Id.*

Necessarily following from this right to self-manufacture firearms in common use is the right to possess, own, purchase, receive, and use the constituent parts required to construct such a firearm, including the NFOs targeted by the Ban. The Second Amendment jurisprudence, including that of the Ninth Circuit, dictates this, through its recognition that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense."

*Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *Luis v. United States*, __ U.S. __, 136 S.Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise ... The right to keep and bear arms, for example 'implies a corresponding right to obtain the bullets necessary to use them.'"). Much as the right to keep and bear arms "wouldn't mean much without the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011), the right to self-manufacture "wouldn't mean much" without the right to own, possess, and use the constituent parts necessary to engage in such activity—and, of course, the firearm itself as end product of this protected activity—for lawful purposes.

Notably, ATF itself has historically recognized the individual right to self-manufacture firearms for personal use in having never attempted to bar or even directly regulate the activity, *see e.g.*, https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use ("a license is not required to make a firearm solely for personal use"), *and* it would continue to leave this activity completely unregulated even under its proposed new rules which preserve an *express* exception for the building of homemade firearms for personal use (*without* serial numbers), 86 Fed. Reg. at 27725, 22732 ("nothing it this rule would restrict persons not otherwise prohibited from possessing firearms from making their own firearms at home without markings solely for personal use (not for sale or distribution))." And

California obviously recognizes this right as well through its own regulatory scheme.

### 3.     The Proper Test for the Constitutional Analysis

The *Heller* opinion does not prescribe any tiers of scrutiny for analyzing the constitutionality of such restrictions. It expressly rejects any use of "rational basis" scrutiny, *Heller*, 554 U.S. at 628, n. 27, and emphasizes that any "judge-empowering interest-balancing inquiry" is inappropriate because the Second Amendment is "the very *product* of an interest balancing by the people" already solidified at the time of the founding, which is not subject to second-guessing based on "future judges' assessments of its usefulness," *id.* at 634. And, in any event, "[i]f a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny." *Young,* 992 F.3d at 784 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).

Further, because the high court has expressly rejected any "rational basis" testing, "some degree of heightened scrutiny applies" in any "interest balancing." *Teter v. Connors*, 460 F.Supp.3d 989, 1001 (D. Hawaii 2020). Courts must "strictly scrutinize any "'law that implicates the core of the Second Amendment right and severely burdens that right.'" *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester*, 843 F.3d at 821). "Under strict scrutiny, restrictions 'may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *In re National Security Letter*, 863 F.3d 1110, 1121 (9th Cir. 2017) (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).

Even under intermediate scrutiny, the State must affirmatively prove with "substantial evidence" that the restriction is "narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017). The Supreme Court has repeatedly said this. *See e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (same); *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 380 (1984) (same). So has the Ninth Circuit. *See e.g.*, *Doe v. Harris*, 772 F.3d 563, 576-77 (9th Cir. 2014) (quoting *Ward* in articulating this standard); *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566, 580 (9th Cir. 2014) (A law will survive intermediate scrutiny only if, *inter alia*, it "is designed to serve a substantial government interest" and "is narrowly tailored to serve that interest"); *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1204 (9th Cir. 2013) (same).[3]

### 4.    The Ban is Unconstitutional Under Any Standard

By enacting the Ordinance, the City of San Diego willfully and affirmatively disregarded the Supreme Court's well-known and binding *Heller*, *McDonald*, and *Caetano* decisions, which establish that the Second Amendment fully protects the right to self-manufacture, keep, and bear all such arms in common use for lawful purposes based on the amendment's text and the history and tradition of our Nation.

In fact, while California law establishes a regulatory path for the self-

---

[3]    First Amendment jurisprudence is a proper analogue here. *See Heller*, 554 U.S. at 582, 591, 595, 606, 625-26, 635 (analogizing to the First Amendment in analyzing the Second Amendment); *McDonald*, 561 U.S. at 759, 779, 782 (same); *Jackson*, 746 F.3d at 961 (we are "guided by First Amendment principles" in analyzing restraints on the Second Amendment).

manufacture of firearms, as well as the acquisition and ownership of the precursor parts and materials necessary to the self-manufacture of firearms, the Ban expressly bans the possession, purchase, sale, receipt, and transportation of the parts and materials necessary to undertake the constitutionally protected conduct of self-manufacturing arms for self-defense, defense of others, and other lawful purposes.

The Ban's broad sweep captures the full spectrum of protected conduct associated with self-manufacturing California-compliant AR-15-platform semi-automatic rifles, just like those that the individual Plaintiffs and all similarly situated individuals desire and intend to self-construct for lawful purposes using both the NFOs they currently own but which are now subject to confiscation and additional NFOs they would acquire but which they are now barred from ever again acquiring.

It is well-established that AR-15 semiautomatic rifles are in common use and are not "dangerous" *or* "unusual" so as to be subject to such a prohibition. *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."); *Miller*, 2021 WL 2284132 at *6 (finding such rifles are "commonly owned by law-abiding citizens" and that "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home"). The Supreme Court recognized the AR-15 as a common firearm possessed by *regular individuals* (not military or law enforcement) over 25 years ago. *Staples* at 603. In fact, "the modularity and standardization of the AR-15, its ubiquity,

commonality, and widespread ownership in common ammunition sizes . . . and the interchangeability of parts, including magazines, makes it ideal." *Miller* at *108.

Thus, this Ban prohibiting law-abiding citizens from acquiring and possessing the component parts necessary to construct and use such arms for lawful purposes in the exercise of their constitutionally protected right to keep and bear arms is unconstitutional—full stop, end of story. Further analysis, or "interest-balancing," is neither necessary nor appropriate. *Heller*, 554 U.S. at 634; *Young*, 992 F.3d at 784.

While it is clear that any interest-balancing must be conducted through the lens of strict scrutiny because the Ban so "severely burdens" the Second Amendment right, *Pena*, 898 F.3d at 977, it undoubtedly fails even the more lenient form of scrutiny. To carry its tailoring burden under intermediate scrutiny, Defendants must show that the Ban does not burden "substantially more" protected conduct "than necessary" to further the interest. *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020); *Doe v. Harris*, 772 F.3d at 577. Further, Defendants must "'demonstrate that the recited harms are real ... and that the regulation will in fact alleviate these harms in a direct and material way.'" *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). To do this, they must "identify the interests served by the restriction" and "provide evidence" that the targeted conduct "endangers those interests." *United Broth. of Carpenters and Joiners of America Local 586 v. N.L.R.B.*, 540 F.3d 957, 967 (9th Cir. 2008). Defendants can do none of this and haven't even tried. This is a flat ban on constitutionally protected conduct and

property interests that lacks any tailoring *at all*—much less anything *narrow*.

Any general public safety or crime reduction interest Defendants may cite cannot suffice to justify such a sweeping criminal prohibition against the exercise of fundamental constitutional rights. It's *always* true that *some* people will misuse or abuse the rights secured for us all, including the right to self-manufacture firearms in common use for lawful purposes, but that is certainly no reason to eliminate *everyone's* right to do so. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002) (internal quotations and citations omitted) ("The prospect of crime, however, by itself does not justify laws suppressing protected speech. … Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech."). This is especially true when the Ban targets numerous law-abiding citizens like Plaintiffs, who have only ever exercised and only ever intended to exercise the self-manufacturing right for self-defense and other lawful purposes, by constructing California-*compliant* firearms.

That the Ban bars all such individuals from exercising these rights *even though* they would necessarily have to follow a state regulatory process that includes the requirement of *passing a criminal background check* punctuates just how overbroad and unnecessary the prohibitions are. Any true public safety or crime reduction interests could be met by *tailoring* the scope of the prohibitions to *at least* permit San Diegans to acquire and possess NFOs in connection with the self-construction of a firearm *approved* under the State's regulatory scheme. In that way, Defendants might

have been able to carry their burden of proving the restraints do not burden "substantially more" protected conduct "than necessary" and that the restraints "in fact alleviate these harms in a direct and material way." *Kirchmeyer*, 961 F.3d at 1068. But no, Defendants have enacted a total ban, running roughshod over everyone's rights.

And the existence of other channels for the lawful acquisition of firearms, such as through lawful purchases or other transfers, is also no answer. A regulation eliminating one of the rights secured by the Second Amendment cannot be excused or overlooked on the basis that it does not eliminate *all* the rights secured thereunder. Were it otherwise, the District of Columbia would have won the day with its argument in *Heller* that its handgun ban was fine because residents could still possess long guns, but the Supreme Court flatly rejected this justification. *Heller*, 554 U.S. at 629.

Success on the merits of Plaintiffs' Second Amendment claim is thus inevitable, and they need only show a "reasonable certainty" of prevailing on the merits. *South Bay United Pentecostal Church*, 508 F.3d at 767. This they have done.

**5.     The Ban Also Unquestionably Effects an Unconstitutional Taking**

The Ban effectively mandates that all ordinary law-abiding San Diego residents dispossess themselves of all their unserialized "unfinished frames" or "unfinished receivers" (and the many other NFOs that fall within the Ban's sweepingly broad definition of these terms) without any compensation for the loss of this property.

"[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation."

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005); *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct. 2063, 2074 (2021) ("government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation"). The same is true of "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property," *id.* (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)), and that otherwise result in "the complete elimination of a property's value" or other "permanent physical invasion" of the property, *Lingle* at 539. The Ban effects a taking under any formulation of these rules because San Diegans are forced to dispossess themselves of the targeted property, depriving them of both its use and possession, essential sticks in the "'bundle' of property rights," *Horne v. Dept. of Agriculture*, 576 U.S. 350, 361-62 (2015), without any compensation. Starkly, the only benefit they realize in giving up their property is *avoiding criminal prosecution* by the City.

Such a taking is plainly unconstitutional and cannot be permitted. At the very least, it must be said that Plaintiffs hold a "reasonable certainty" of prevailing on the merits of this claim so as to warrant preliminary relief pending ultimate resolution of the merits. *South Bay United Pentecostal Church*, 508 F.3d at 767.

**B.      The Remaining Factors All Further Compel Preliminary Relief**

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles

Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). A deprivation of constitutional right "if-only-for-a-minute" exacts irreparable harm. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997); *Ezell,* 651 F.3d at 700 (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law").

Here, the deprivation is indisputable, and so is the irreparability of the harm. Much more than "a minute" is at stake, as these prohibitions are already in effect and they will remain in effect indefinitely because they are *permanent*. Irreparable harm is not just likely, it is certain, it has already occurred, and will persist *indefinitely* unless and until injunctive relief is obtained against the operation of the Ban.

And fundamentally, the State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Valle del Sollnc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable ... to allow the state ... to violate the requirements of federal law."). The illegality of the Ban and the significant, irreparable harm it forces upon countless law-abiding San Diegans are clear, and any potential harm to the City is comparatively minimal, if any exists at all. And whatever theoretical harm Defendants may be able to conjure would necessarily be of miniscule significance in comparison to the undeniably significant, and concrete, deprivation of constitutional rights—

particularly with the lack of any evidence that any of the targeted law-abiding citizens has ever or will ever attempt to engage in any criminal activities with any NFOs.

When the government action substantially impacts the exercise of constitutional rights, necessarily, "[t]he public interest … tip[s] sharply in favor of enjoining" the law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  Thus, for all the same reasons already discussed, this factor also weighs in Plaintiffs' favor and further compels preliminary injunctive relief pending resolution of the merits.

**C.     Waiver of Bond is Proper and Appropriate Under These Circumstances**

The Court may properly dispense with requirement of any preliminary injunction bond when "'the balance of ... equities weighs overwhelmingly in favor of the party seeking the injunction,'" *East Bay Sanctuary Covenant v. Trump*, 349 F.Supp.3d 838, 869 (N.D. Cal. 2018) (quoting *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996)), when "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct," *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotations omitted), and where the plaintiffs have a "likelihood of success on the merits," *People of the State of Cal. ex rel. Van De Kamp v. Tahoe Regency Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985). All these factors are true here, as illustrated above, thus rendering a waiver both proper and appropriate.

**V. CONCLUSION**

For these reasons, Plaintiffs respectfully request issuance of a temporary restraining order or, alternatively, a preliminary injunction after further proceedings.

Dated September 24, 2021

THE DIGUISEPPE LAW FIRM. P.C.

*/s/ Raymond M. DiGuiseppe*

Raymond M. DiGuiseppe
4320 Southport-Supply Road, Ste 300
Southport, NC 28461

DILLON LAW GROUP, APC

*/s/ John W. Dillon*

John W. Dillon
2647 Gateway Rd.
Ste 105 #255
Carlsbad, CA 92009

FIREARMS POLICY COALITION

*/s/ William Sack\**

5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149-4584
*\* App. Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*