RAYMOND M. DIGUISEPPE
CA State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Rd., Ste 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

JOHN W. DILLON
CA State Bar No. 296788
DILLON LAW GROUP, APC
2647 Gateway Rd., Ste 105 #255
Carlsbad, CA 92009
P: 760.642.7150
E: jdillon@dillonlawgp.com

WILLIAM SACK*
PA State Bar No. 325863
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Ste 320
Las Vegas, NV 89149-4584
P: (916) 596-3492
E: wsack@fpclaw.org
*Admitted Pro Hac Vice

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FAHR, et al, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN DIEGO, CA, et al, <br><br> Defendants. | Case No.: 21-cv-1676 BAS (BGS) <br><br> **PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER; ALTERNATIVE MOTION FOR PRELIMINARY INJUNCTION** <br><br> **Judge: Hon. Cynthia Bashant** <br> **Date: October 19, 2021** <br> **Time: 9:30 a.m.** <br> **Courtroom: 4B** |

## I.  <u>Introduction</u>

However laudable the goals of public safety and crime reduction may be, laws enacted in the name of such generalized interests that impose restraints on constitutional rights must be judged based on what they *actually* say and what they *actually* do, not what governments *claim* they do. The simple fact is that the plain text and effect of Defendants' Ordinance O-21367 (the "Ban") not only fail to advance but *undermine* the very interests Defendants claim it was enacted to achieve.

Defendants respond to Plaintiffs' motion by generically boasting about "crime prevention and investigating gun violence" for the sake of "public health, safety, and general welfare," and claim their enforcement of the Ban ensures private citizens who manufacture or assemble firearms are subject to background checks and produce only "traceable" firearms. Resp. at 1, 6, 9, 14. But as Plaintiffs show in their memorandum in support of their motion and *infra*, the real effect of the Ban is that it completely prohibits all self-manufacturing and self-assembling by law-abiding people. Defendants belittle the rights at stake, claiming that the Ban doesn't even *implicate*, much less violate, the Second Amendment because people could buy commercially manufactured, serialized firearms as fully finished frames or receivers, or scrap the whole self-building process and *buy* fully commercially produced firearms. *Id*. at 1, 8, 9. But that misses the point entirely, since Plaintiffs have a longstanding, historically supported right to self-build arms for self-defense and other lawful purposes.

Defendants blithely reframe Plaintiffs' claim—that they have a right to self-

1

construct arms in accordance with State law, which subjects them to the DOJ's strict background check and serialization requirements—as "circumvent[ing]" background checks to produce "untraceable ghost guns" that pose the "threat" supposedly targeted by the Ban. *Id.* at 1, 10, 14. Defendants also argue that "none of the Individual Plaintiffs stated that if they dispose of their unfinished frames and unfinished receivers, they will lack any firearms to defend their homes." *Id*. At 8. But that gets the analysis exactly backwards, because "the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms," not merely the ones a person is actively using for self-defense in a particular moment—or those that Defendants' believe are "good enough." Defendants go on to argue that their Ban is a "longstanding," "presumptively" lawful regulation insulated from judicial scrutiny and would pass the Ninth Circuit's test anyway because their claimed interests far outweigh any infringement on the individual constitutional rights of San Diegans. *Id.* at 7, 9-11. But as Plaintiffs' evidence shows, Defendants are wildly wrong about each such argument. And even if the Ban were "presumptively" lawful, Plaintiffs have rebutted any such presumption, compelling a finding of unconstitutionality.

Plaintiffs' motion should be granted to preserve the status quo *ante*.

## II. <u>Defendants' Response *Strengthens* Plaintiffs' Second Amendment Claim</u>

### A.   <u>Defendants' Defense of the Ban Rests on Fundamental Fallacies</u>

Defendants attempt to spin their Ban as "no big deal" because people can just put "*a* serial number" on their unfinished frames or receivers and go on with their self-

2

building. Resp. at 5, 10. Obfuscating its effects, Defendants' Ordinance suggests it may be enough to merely obtain any random number from a firearms importer or manufacturer. *See* SDMC § 53.18(c)(1) (prohibiting unfinished frames or receivers except those that include a serial number issued by the California Department of Justice or "<u>a</u> serial number issued to that unfinished frame or receiver" by a federal firearms importer or manufacturer) (emphasis added). But the firearms manufacturing industry is highly regulated by the federal government, and all licensed importers and manufacturers are bound to strictly follow its laws and regulations. And no regulation permits them to serialize non-firearms (such as "unfinished" firearm frames or receivers) as firearms, nor can they provide any regulated serial numbers to buyers of non-firearms. Indeed, as the ATF's proposed (but not adopted) rule to extend serialization to such precursor parts shows, the current regulatory scheme must be *affirmatively modified* to create any legitimate process for it.[1] And even if importers or manufacturers were to ignore federal law and start adding their own "serial numbers" to unfinished frames or receivers in compliance with the Ordinance, there would still be *nothing* for law enforcement to trace, as these "serial numbers" would fall outside any regulatory scheme—and recordkeeping—and provide no traceable link for law enforcement from the manufacturer to the owner/purchaser.

---

[1] Proposed Rules, U.S.D.O.J., Bureau of Alcohol, Tobacco, and Firearms ("ATF"), Definition of "Frame or Receiver," 86 Fed. Reg. 27720 et seq. (2021).

There is no such thing as a *pre*-serialized unfinished frame or receiver under California's regulatory scheme, either. All DOJ-issued serial numbers are *personal* to the applicant who seeks the number. Indeed, the only way to lawfully invoke the State's process is to *personally* apply for and obtain a serial number, *personally* build the firearm, and then *personally* affix the number within ten days of completing the firearm, beyond which time the number expires. Cal. Pen. Code, § 29180(b) & (b)(2)(A); 11 CCR § 5518(b)(2). Importers and manufacturers can't obtain DOJ-issued serial numbers and pre-engrave unfinished frames or receivers under California's regulatory scheme because these serial numbers are required to be applied for and linked to the actual person who manufacturers or assembles the firearm. *See* Cal. Pen. Code, § 29180. Any pre-engraved serial number would be invalid, have no link to the purchaser, and not satisfy the State's requirements that the intended individual manufacturer apply for, obtain, and affix a DOJ-issued serial number to that person's personally manufactured firearm. Thus, no frames or receivers bearing a State-issued serial number are available for lawful sale to or purchase by Plaintiffs.[2]

So, it's simply not true that Plaintiffs still have the ability to lawfully construct their own firearms, because *no* means exist to do so without violating their Ban. And whatever Defendants' reasons for falsely claiming otherwise in defense of their Ban,

---

[2] In fact, transfers of such firearms are generally illegal under the State's regulatory scheme. *See* Cal. Pen. Code, § 29180(d)(1).

Resp. at 8, 9, 10,[3] the real-world operation of their Ban reveals that their stated justifications for it ring hollow and their claimed interests are *not* being advanced. Indeed, that the Ban *precludes* San Diegans from being able to access California's regulatory process for the self-construction of *legally compliant* firearms—which requires passing a background check and affixing a serial number (to enable "tracing")—is particularly perverse. And the perversity of the Ban devolves into sheer absurdity when one considers that neither the federal Gun Control Act nor ATF has *ever* regulated the self-manufacture or self-assembly of firearms for personal use by law-abiding people. In fact, ATF has preserved an express exception for such activities in the proposed rule that, if enacted, would add unfinished frames and receivers to the definition of "firearm." 86 Fed. Reg. at 27725, 22732 ("nothing it this rule would restrict persons not otherwise prohibited from possessing firearms from making their own firearms at home without markings solely for personal use (not for sale or distribution)."). This reveals yet another fallacy in Defendants' defense of their Ban—that Plaintiffs seek to exploit a "loophole" in the federal law and "circumvent the requirements of the Gun Control Act." Resp. 4, 14.

---

[3] Either Defendants do not understand firearms regulations and how their Ban works, and thus fail to appreciate the actual impact of their own Ordinance, or they are mischaracterizing the laws to suit their purposes. Neither is a constitutionally acceptable justification for their broad and unconstitutional Ban.

**B.      The Ban Targets Clearly Protected Conduct and Property Interests**

Defendants do not dispute that the Ban targets all manner of firearms, including the California-compliant rifles that Plaintiffs intend to build; nor do they dispute that these and untold other arms targeted by the Ban are in common use for lawful purposes, and are not subject to being banned as "dangerous and unusual." Instead, they spend their energy attempting to minimize the nature and significance of the right, characterizing the right to "keep and bear arms" as a *homebound* right to *possess* a single, commercially manufactured firearm for "defense of hearth and home." Resp. at 1, 8, 11. Through the same myopic lens, Defendants disparage any interest in building one's own arms from "unserialized" components as not "necessary or superior for home defense" given the other purported options. Resp. at 9.

But Plaintiffs' rights are broader than that. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *District of Columbia et al. v. Heller*, 554 U.S. 570, 634-35 (2008). And the Second Amendment's guarantee extends to *all* firearms in common use for lawful purposes that are not both "dangerous and unusual," *Caetano v. Mass.*, 577 U.S. 411, 416 (2016) (Alito, J., concurring), which include semi-automatic AR-15 rifles, *Staples v. United States*, 511 U.S. 600, 603 (1994); *see also Miller v. Bonta*, Case No.: 19-cv-1537 (S.D. Cal. June 4, 2021). "Serialization" and "traceability" are not part of the *Heller* test. Rather, "the Second Amendment extends, prima facie, to *all* instruments

6

that constitute bearable arms." *Heller* at 582 (italics added); *accord Caetano* at 416.

And, as Plaintiffs have shown, the Second Amendment does protect the right to self-manufacture and self-assemble firearms. As the Ninth Circuit itself has instructed, we are to look to the "historical understanding of the scope of the right" in discerning what it protects. *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021). The relevant historical record is detailed in the Complaint, ¶¶ 37-47, and demonstrates that the ability to make one's own arms for lawful purposes has always been respected—and part and parcel of the rights law-abiding people have always enjoyed. And, this right is necessarily included among the "ancillary rights" and "closely related acts" protected as necessary to fully exercise the right to keep and bear arms. *See Teixeira v. County of Alameda*, 873 F.3d 670, 677, and *Jackson v. City and County of San Francisco*, 746 F.3d 953, 957 (9th Cir. 2014). That both ATF and California have, unlike Defendants, *always* preserved regulatory paths for the lawful exercise of this activity underscores and cements that the Second Amendment protects it.

**C.   Nothing About the Ban is "Presumptively" Lawful or "Longstanding"**

The history alone shows there is no refuge for Defendants' Ban as some supposed "longstanding," "presumptively lawful" regulation. Resp. at 8. As *Heller* itself articulated, such a presumption only applies to discrete categories of regulations—those concerning "the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the

7

commercial sale of arms." *Heller*, 554 U.S. at 626. But Defendants' Ban is not any of those, and in any case, Plaintiffs' evidence rebuts any such presumption.

Moreover, a regulation of *this* type—a total ban on self-manufacturing and self-assembly—is neither common (let alone prolific) nor "longstanding" under the most generous definition of the term. Only a small number of other jurisdictions regulate home-built firearms for personal use at all, and they began doing so only within the last few years.[4] "The more relevant statistic" is that "private citizens may lawfully possess" self-built semi-automatic firearms based on tried-and-true designs, like the Plaintiffs' intended AR-15-platform rifles—a large and growing class of firearms in the United States—in most all states, including California. *Caetano*, 577 U.S. 411.

## D.    The Ban is Unconstitutional Under Any Heightened Scrutiny

While the *Heller* decision makes very clear that an "interest-balancing inquiry" is neither necessary nor appropriate to dispose of a ban like this, *Heller*, 554 U.S. at 634, the Ninth Circuit's cases get us to the same place here—"if a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny," *Young*, 992 F.3d at 783 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016))—because the Ban destroys the right to self-manufacture and self-

---

[4] These jurisdictions include California (Stats. 2016, c. 60 (A.B. 857), § 4, eff. Jan. 1, 2017); Connecticut (2019, P.A. 19-6, § 2, eff. Oct. 1, 2019); New Jersey (L.2019, c. 165, § 3, eff. July 16, 2019); Hawaii (2019 HI H.B. 2744); Rhode Island (2020 R.I. HB 7102); the District of Columbia (Apr. 27, 2021, D.C. Law 23-274, § 201(b), 68 DCR 1034); and Nevada (2021 A.B. 286).

8

assemble protected arms in common use for lawful purposes.[5] But even to pass muster under intermediate scrutiny, Defendants must "identify the interests served by the restriction" and "provide evidence" that the targeted conduct "endangers those interests." *United Broth. of Carpenters and Joiners of America Local 586 v. N.L.R.B.*, 540 F.3d 957, 967 (9th Cir. 2008). This Defendants cannot do when they claim to be ensuring background checks and serialization for "tracing" home-built firearms, but then completely cut off Plaintiffs from doing both. They also necessarily cannot show the Ban does not burden "substantially more" protected conduct "than necessary" to further the claimed interests, *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020), as they must, when the Ban imposes a blanket prohibition against *all* self-manufacturing and self-assembly by *all* citizens, including law-abiding individuals like Plaintiffs, who make up the majority of all San Diego residents. That is not a "reasonable fit"—nor any fit at all.

### III.  The Ban Necessarily Effects an Unconstitutional Taking

Defendants cannot relegate the entire class of affected individuals to state court inverse condemnation proceedings. Resp. at 11. The cases on which they rely do not involve the taking of property interests protected under enumerated *federal* constitutional rights; they solely concern state law property rights. *See id.* Defendants'

---

[5] Plaintiffs maintain that a categorical approach based on the Second Amendment's text, as informed by history and tradition, is the proper mode of scrutiny under *Heller*, and reserve the right to argue for such scrutiny.

"police power" claim doesn't work either because it's axiomatic that private property interests cannot be taken without compensation on "nuisance" grounds unless the property or its intended use was clearly established as a nuisance *before* the taking. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029 (1992) and *Cedar Point*, 141 S.Ct. at 2079. The property interests at stake here have never before been deemed or classified a "nuisance" or "dangerous" to the public in California. As discussed, Defendants have not shown and cannot show that the targeted property is "dangerous *and* unusual" so as to be the subject of any general ban. And because their entire defense here rests on this unsupported claim, it fails. "[W]hatever might be the [City's] authority to ban the sale or use of [unfinished frames or receivers], the Takings Clause prevents it from compelling the physical dispossession of such lawfully-acquired private property without just compensation." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1185 (S.D. Cal. 2019). The Defendants' Ban is a taking, period.

## IV.  Conclusion

Injunctive relief is necessary to end the ongoing irreparable harm inflicted by the Defendants' unconstitutional Ban, which they cannot legitimately defend.

Dated: October 12, 2021

THE DIGUISEPPE LAW FIRM. P.C.                    DILLON LAW GROUP, APC
*/s/ Raymond M. DiGuiseppe*                      */s/ John W. Dillon*
Raymond M. DiGuiseppe                            John W. Dillon

FIREARMS POLICY COALITION
*/s/ William Sack*