# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

JAMES FAHR, *et al.*,

                Plaintiffs,

   v.

CITY OF SAN DIEGO, *et al.*,

                Defendants.

Case No. 21-cv-01676-BAS-BGS

**ORDER DENYING PLAINTIFFS' APPLICATIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF No. 9)**

     Before this Court is Plaintiffs' motion for a temporary restraining order or, in the alternative, a preliminary injunction to enjoin certain provisions of a recently enacted and soon-to-be enforced San Diego City ("City") Ordinance, which prohibits the possession, purchase, sale, receipt, and transportation of non-serialized firearms and firearm components known as "unfinished frames and unfinished receivers" ("Motion").  (Mot., ECF No. 9; Mem., ECF No. 2.)  Plaintiffs say that the Ordinance violates both the "Keep and Bear Arms" Clause of the Second Amendment and the "Takings" Clause of the Fifth Amendment.  Defendants opposed (Opp'n, ECF No. 15) and Plaintiffs replied (Reply, ECF No. 17.)  The Court also heard oral arguments on October 19, 2021.  (ECF Nos. 6, 20.) Because Plaintiffs have failed to show that they are likely to succeed on the merits with respect to either constitutional theory advanced, Plaintiffs' Motion is **DENIED**.

# I.   BACKGROUND

Ordinance No. O-21367 ("Ordinance") is a very narrow statute that closes a small loophole in the regulatory system, which the City, the State of California, and the federal government all perceive as increasingly threatening the public's safety and law enforcement's capability to solve and prevent crimes.  (Ordinance, Ex. A to *id.*, ECF No. 1.)[1]  Federal law has for over 50 years regulated the sale, manufacture, and import of firearms and firearm components.  *See Abramski v. United States*, 573 U.S. 169, 172 (2014) (citing 18 U.S.C. §§ 921 *et seq.* ("Gun Control Act")).  At its most basic level, the Gun Control Act and the regulations promulgated thereunder by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") do so by defining classes of individuals prohibited from possessing or purchasing firearms; instituting background checks; and mandating that federally licensed firearm manufacturers and importers implement methods to trace firearms, including serialization requirements.  Under ATF's regulatory regime, manufacturers and importers must impress unique serial numbers upon both completed "firearms" and any "firearm frame or receiver that is not a component of a complete weapon[.]"  27 C.F.R. § 478.92(a).

However, the ATF narrowly defines the terms "frames" and "receivers"—a definition that it currently is seeking to change—as firearm components that are readily operational without any additional modification.  *See* 27 C.F.R. §§ 478.11, 479.11. Consequently, the ATF's definition and, thus, its serialization system, do not extend to incomplete frames and receivers which require some degree of physical alteration. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720–01 (2021) (proposed) (acknowledging incomplete frames and receivers do not meet technical definition and proposing rule change).  Thus, individuals have found ways to obtain non-serialized firearms despite the ATF's regulations by "purchasing firearm parts kits with

---

[1] Citations to "Ordinance __" refer to the language in the Ordinance's preamble.  Citations to "SDMC § 53.18__" refer to the provisions set forth in the Ordinance that will be incorporated into Section 53.18 of the San Diego Municipal Code ("SDMC").

21CV1676

incomplete frames or receivers, commonly called '80% receivers,' either directly from manufacturers of the kits or retailers, without background checks or recordkeeping." 86 Fed. Reg. 27720–21. Some of these kits are designed precisely so the purchaser can "complete the weapon to a functional state with minimal effort, expertise or equipment." *Id.* at 27726. These non-serialized firearms and their component parts are known colloquially as "ghost guns" and "ghost gun kits," respectively.

Although California law provides its citizens with a legal path towards self-manufacturing firearms using incomplete frames and receivers by applying to the California Department of Justice ("DOJ") for a unique serial number, Cal. Penal Code § 29180 *et seq.*, as Defendants noted at the hearing, that system is based on the honor system. Despite California's efforts to bring self-manufactured firearms under a serialization regime, the seizure and recovery of ghost guns by law enforcement from individuals unauthorized to possess firearms has risen sharpy in recent years, as reflected by City and ATF statistics. (Ordinance 2.)

The Ordinance attempts to close the tapered but increasingly exploited loophole created by the ATF's definitions of "frames and receivers," which the ATF, itself, views as outmoded, by prohibiting the "possession, purchase, sale, receipt, and transportation" of non-serialized firearms and, moreover, non-serialized firearm components, namely incomplete frames and receivers. (SDMC § 53.18(a).)

Below, the Court recounts the Ordinance and the pertinent federal and state regulatory schemes with which it interrelates. Then, turning to the Motion, the Court describes the bases upon which Plaintiffs argue that the Ordinance must be enjoined in its entirety pending resolution of this action.

## A. The Ordinance

On September 23, 2021, Defendant City of San Diego enacted the Ordinance, which amends the SDMC by adding Section 53.18 thereto. The Ordinance will become enforceable by Defendant David Nisleit, Chief of San Diego Police Department ("SDPD"), on October 23, 2021. (Compl. ¶¶ 54–59, ECF No. 1.) The Ordinance is a countermeasure

to what is described therein as a City- and nationwide rise in the detection and seizure of non-serialized firearms, known as "ghost guns." (Ordinance 1.) The Ordinance cites a recent increase in ghost gun accessibility—particularly accessibility for individuals unauthorized to purchase or possess firearms—due to technical advances and internet sales; the City claims that this trend "threatens the public safety and welfare of [its] residents" and undermines "effective law enforcement." (*Id.* 3.)

Pursuant to its "police powers," the Ordinance renders it illegal for any person within the City to "[p]ossess, purchase, s[ell], recei[ve], and transport[t] non-serialized unfinished frames and receivers, and non-serialized firearms[.]" (SDMC § 53.18(a).)

Two sections of the Ordinance lie at the center of this litigation.

First, **Section 53.18(c)(1)** makes it unlawful for a person to:

> [p]ossess, purchase, transport, or receive an unfinished frame or unfinished receiver, unless the unfinished frame or unfinished receiver is imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearms Importer or Federal Firearms Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver.

The terms "unfinished frame" and "unfinished receiver" are defined in the Ordinance as "a piece of any material that does not constitute the completed [frame/receiver] of a firearm, but that has been shaped or formed in any way for the purpose of becoming the [frame/receiver] of a firearm, and which may be made into a functional [frame/receiver] of a firearm through milling, drilling, or other means." (SDMC § 53.18(b)(11), (12).) Section 53.18(c)(1) is inapplicable to federally licensed firearm manufacturers and importers; peace and law enforcement officers; and common carriers. (*See* SDMC § 53.18(c)(1)(A)–(C).)

Second, **Section 53.18(c)(2)** makes it unlawful for a person to:

> [s]ell, offer to sell, transfer, or offer to transfer an unfinished frame or unfinished receiver, unless the unfinished frame or unfinished receiver is

- 4 -

1
2
3
4

imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearm Importer or Federal Firearm Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver.

5
6

The Ordinance explicitly provides that it is "to be applied and interpreted consistent with state and federal law." (SDMC § 53.18(a).)

7
8
9
10
11
12
13
14
15
16

Notably, neither federal nor state law fully regulate non-serialized firearms and their essential components. (Ordinance 2.) Indeed, under the regulatory regime promulgated pursuant to the federal Gun Control Act by ATF, federally licensed firearm importers and manufacturers must "engrav[e], cas[t], stam[p] (impres[s]), or otherwise conspicuously place" a serial number upon the frame or receiver of a completed firearm. 27 C.F.R. § 478.92(a)(1). More important for the purpose of resolving this Motion, importers and manufacturers are under the same obligation respecting a "firearm frame or receiver that is not a component of a complete weapon at the time [they are] sold, shipped, or otherwise disposed of[.]" *Id.* § 478.92(a)(2).[2] However, there is no dispute that "unfinished frames" and "unfinished receivers" do not fall under ATF's technical definition for "frames" or

17

18
19
20
21

    [2] Plaintiffs proffer a strained interpretation of this regulation. (Mem. 4 & n.2.) They argue that because 27 C.F.R. § 478.92(a)(2) provides that "frames and receivers" "must be identified *as required by this section*," and because the serialization requirements are set forth in subdivision (a)(1) only, "no serialization process exists" for even *finished* frames and receivers "and none will exist unless and until the regulatory scheme is changed to specifically require it." (Mem. n.2.) However, this interpretation is belied by Plaintiffs' admission at the hearing that pre-serialized finished receivers and frames are available for individuals to purchase for "self-assembling" firearms.

22
23
24
25
26
27
28

    Furthermore, this interpretation turns the plain language of the regulation on its head. It is not as though 27 C.F.R. § 478.92(a)(2) states that frames and receivers shall be serialized in accordance with this "subdivision," yet provides no further information regarding the parameters of such serialization. There is no ambiguity that "as required by this section" refers to the only serialization requirement set forth in 27 C.F.R. § 478.92(a), located at *id.* § 478.92(a)(1). Moreover, Plaintiffs' interpretation is contrary to ATF Ruling 2012-1, which holds that licensed manufacturers "have seven days following the date of completion (to include a firearm in knockdown condition, *i.e.*, complete as to all component parts, *or a frame or receiver to be sold, shipped, or disposed separately*) in which to mark a firearm manufactured, and record its identifying information in the manufacturer's permanent records." Firearm Marking Requirements, Firearms Law Deskbook § 3:19 (2021) (citing ATF Ruling 2012-1, available at https://www.atf.gov/firearms/docs/ruling/2012-1-time-period-marking firearms-manufactured-download (visited Oct. 19, 2021) (emphasis added)).

21CV1676

"receivers."[3]  While the ATF proposed a rule change in May 2021 that, if passed, would extend "unfinished frames" and "unfinished" receivers under the panoply of ATF's serialization requirements, that proposal is pending.  *See* 86 Fed. Reg. at 27738 ("This proposed rule would update the existing definition of frame or receiver to account for the majority of technological advances in the industry ensuring that these firearms continue to remain under the regulatory regime as intended by the enactment of the [Gun Control Act].").  Thus, unfinished frames and unfinished receivers need not be serialized under federal law.

As it currently stands, federal law does not regulate the self-manufacture of firearms for personal use.  (Compl. ¶ 130 (citing https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use (noting that an individual seeking to self-manufacture a firearm does not need a license to do so)).)  California law does, however.  California Penal Code Section 29180 *et seq.* ("Section 29180") provides that individuals authorized to purchase or possess a firearm may self-manufacture firearms for their own lawful use.  *See also* Cal. Code Regs. tit. 11, § 5505 ("These regulations apply to self-manufactured or self-assembled firearms made from any material, including wood, metal, or plastic, and made through any process including those produced by 3D printers.").  Where the essential components of a self-manufactured firearm are not pre-serialized, *i.e.*, where an individual uses an unfinished frame or unfinished receiver, the person manufacturing the firearm must "[a]pply to the [California] Department of Justice [("DOJ")] for a unique serial number or other mark of identification" and imprint that serial number in a manner consistent with the Gun Control Act within 10 days of its manufacture or assembly.  Cal. Penal Code §§ 29180(b)(1), (b)(2)(A).  "The sale or transfer of

---

[3] The term "frame or receiver" is defined as "part of a firearm which provides housing for the hammer, bolt[,] or breechblock and firing mechanism, which is usually threaded at its forward position to receive the barrel."  27 C.F.R. §§ 478.11, 479.11.  Because "unfinished" frames and receivers first must be modified to be functional (SDMC § 53.18(b)(11), (12)), they indisputably fall outside the ATF's definition.

21CV1676

ownership of a firearm manufactured pursuant to [Section 29180] is prohibited." *Id.* 29180(d)(1).

### B.   Plaintiffs' Motion

On September 23, 2021, Plaintiffs James Fahr, Desiree Bergman, and Colin Rudolph ("Individual Plaintiffs"), each a resident of the City, along with Plaintiffs San Diego County Gun Owners PAC and Firearms Policy Coalition ("Organizational Plaintiffs" and, together with Individual Plaintiffs, "Plaintiffs"),[4] commenced this action in federal court pursuant to 28 U.S.C. § 1983, seeking to invalidate the Ordinance as violative of the Second and Fifth Amendments. (Compl. ¶¶ 129–66.) That same day, Plaintiffs moved *ex parte* for a temporary restraining order or, in the alternative, a preliminary injunction, on an expedited basis. (Mot.; Mot. to Shorten Time to Hear Mot., ECF No. 5.) Finding Plaintiffs' moving papers failed to justify the *ex parte* nature of the relief sought, this Court ordered Plaintiffs to serve Defendants with the pleadings. (ECF No. 6.) Having served Defendants pursuant to the Court's Order, Plaintiffs renewed their Motion on September 28, 2021. (*See* ECF No. 9.)

Plaintiffs now seek to enjoin Defendants from enforcing Sections 53.18(c)(1) and (c)(2) of the Ordinance before they become effective October 23, 2021. (*See* Mem. 1–2.) Individual Plaintiffs each allege that they own and possess items that would be considered unfinished frames or unfinished receivers under Sections 53.18(b)(11) and (12) of the Ordinance, with which they each intend to construct a California-compliant ArmaLite 15-style rifle ("AR- 15") for lawful recreational and home-bound self-defense purposes. (Fahr Decl. ¶¶ 5–7, ECF No. 2-1; Bergman Decl. ¶¶ 6–8, ECF No. 2-2; Rudolph Decl. ¶¶ 6–8, ECF Nos. 2-5.) Individual Plaintiffs claim that the Ordinance mandates they dispossess themselves of these items or risk criminal sanction. (Fahr Decl. ¶ 10; Bergman Decl. ¶ 11; Rudolph Decl. ¶ 11.) Furthermore, Individual Plaintiffs allege that the Ordinance forevermore bans them from self-manufacturing California-compliant firearms for lawful

---

[4] Organizational Plaintiffs claim standing in a representative capacity. (Combs Decl. ¶ 16, ECF No. 2-3; Schwartz Decl. ¶ 16, ECF No. 2-4.)

21CV1676

purposes in the future because it effectively prohibits them from obtaining unfinished frames and unfinished receivers, as it is impossible to purchase or obtain those items pre-serialized. (Fahr Decl. ¶ 12; Bergman Decl. ¶ 13; Rudolph Decl. ¶ 13.) Organizational Plaintiffs claim to have members who are similarly situated to Individual Plaintiffs. (*See* Combs Decl. ¶¶ 7–15; Schwartz Decl. ¶¶ 7–15.)

As mentioned above, the asserted bases for enjoinment of the Ordinance are predicated upon two constitutional theories: that the Ordinance violates the Keep and Bear Arms Clause of the Second Amendment and the Takings Clause of the Fifth Amendment. (Mem. 10–21.)

## II.    LEGAL STANDARD

### A.    Pre-Trial Injunctive Relief

It is well-settled that the standards for issuing a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 & n.7 (9th Cir. 2001). "'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24, 32 (2008) (holding a preliminary injunction is "an extraordinary remedy never awarded as of right."). A district court should issue a temporary restraining order only when there is "clear showing that plaintiff is entitled to such relief." *Id.* at 22. Movants seeking a temporary restraining order "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest" ("*Winter* Test"). *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* [T]est are also met." *All. for the Wild Rockies v. Cottrell*, 632

F.3d 1127, 1132 (9th Cir. 2011) (interpreting *Winter* and explaining that the 'sliding scale' test for preliminary injunctive relief remains valid).  A "serious question" is one which the movant "has a fair chance of success on the merits."  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

### B.   Constitutional Challenge to Act of Legislature

"A facial challenge is a claim that the legislature has violated the constitution, while an as applied challenge is a claim directed at the execution of the law as to plaintiff." *Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021) (en banc) (citing Nicholas Quinn Rosenkranz, *The Subjects of the Const.*, 62 STAN. L. REV. 1209, 1235–42 (2010)).  Although the Complaint purports to assert both as-applied and facial challenges to the Ordinance, because the Motion seeks to enjoin the Ordinance outright, the Court construes Plaintiff's challenge as a facial one.  *See Ass'n. of Am. Physicians & Surgeons, Inc. v. Rouillard*, 392 F. Supp. 3d 1151, 1157 (E.D. Cal. 2019); (*see* Mem. 2).

It is no secret that a plaintiff's burden is heavier when it mounts a facial—as opposed to an as-applied—challenge.  *Young*, 992 F.3d at 779 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  "'Because a facial challenge is directed to the legislature, the plaintiff must show that 'no set of circumstances exists under which the [statute] would be valid.'"  *Id.* (citing *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003) (alteration in original); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep'" (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring))).

## III.   ANALYSIS

As mentioned above, Plaintiffs claim that by prohibiting possession and purchase of unfinished frames and unfinished receivers, the Ordinance "imposes a blanket prohibition" upon citizens' Second Amendment right to "self-manufacture all firearms in common use for self-defense and other lawful purposes."  (Compl. ¶¶ 135–36; *see id.* 129–51; Mem.

- 9 -

10–20.) Plaintiffs also assert that the Ordinance effects an unlawful taking because it forces City residents to dispossess themselves of unfinished frames and unfinished receivers without "fair and just compensation from the City[.]" (Compl. ¶¶ 155, 152–66; Mem. 20–21.) Plaintiffs argue that these constitutional deprivations are particularly intolerable given violations of the Ordinance could entail criminal sanctions. (Mem. 21–22; Compl. ¶¶ 86–91.)

For the reasons set forth below, the Court finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits of either claim and, thus, denies the Motion.

## A.    Second Amendment Claim

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the United States Supreme Court undertook its "first in-depth examination of the Second Amendment" in assessing the constitutionality of several gun control laws imposed by the District of Columbia, the net effect of which was to completely ban the possession of operable handguns within the jurisdiction, including in the confines of one's home.[5] *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("*Heller*"). Drawing upon a historical and textual analysis of the Amendment, the *Heller* Court expatiated that the Second Amendment confers—and had always

---

[5] As explained by Professor Adam Winkler of the University of California Los Angeles School of Law:

> Commentators have characterized the D.C. law as a complete ban on handguns, but the law was not that simple. Formally, the District of Columbia only prohibited people from having handguns if the weapons were registered. One might infer that the District permitted registered handguns, but a different provision of the D.C. Code prohibited the registration of handguns. Another provision outlawed the carrying of handguns, either openly or concealed, without a license. But the District did not issue licenses. And despite the common understanding of "carrying" a pistol to refer to possessing the weapon in public, rather than at home, the District stretched the term well beyond that meaning and defined "carrying" to include moving handguns from one room to another within one's house.

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1553 (2009).

- 10 -

conferred—an individual right to keep and bear arms entirely detached from military service, despite the Amendment's prefatory clause. *Id.* at 599 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right [to keep and bear Arms]; most undoubtedly thought it even more important for self-defense and hunting.").

The *Heller* Court further elucidated the scope of that individual Second Amendment right by concluding that the "central component" of the right to bear arms is for self-defense, particularly defense of the home. *Id.* 628–29 ("[T]he inherent right of self-defense [is] central to the Second Amendment Right.").[6]  The *Heller* Court then held that because the District of Columbia's "handgun ban amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose," the legislation failed constitutional muster "under any of the standards of scrutiny[.]" *Id.* at 628–29.

Plaintiffs argue that the sole question before this Court is a simple "hardware test." Mem. 12 (quoting *Miller v. Bonta*, No. 19-CV-1537-BEN-JLB, 2021 WL 2284132, at *6 (S.D. Cal. June 4, 2021), *appeal docketed* No. 21-55608 (9th Cir. June 10, 2021)).)[7] Specifically, Plaintiffs aver that this Court need only ask, as the *Heller* Court did of the District of Columbia's handgun prohibition, does the Ordinance "ba[n] a firearm that is commonly owned by law-abiding citizens for lawful purposes." (*Id.* (quoting *Miller*, 2021 WL 2284132, at *6).)  This the Court need not do.

---

[6] Two years after *Heller*, the Court held in *McDonald v. City of Chicago* ("*McDonald*") that the Second Amendment is fully applicable to states and municipalities through the Fourteenth Amendment. 561 U.S. 742, 790–91.

[7] The Court in *Miller v. Bonta*, which involved a constitutional challenge to California's "assault weapon" ban, described the test *Heller* applied to the District of Columbia's handgun ban as "a hardware test." 2021 WL 2284132, at *6 ("*Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes . . . . *Heller* draws a distinction between firearms commonly owned for lawful purposes and unusual arms adapted to unlawful uses as well as arms solely useful for military purpose.").

Unlike the legislation at issue in *Heller*, the Ordinance does not prohibit an "entire class of 'arms[.]'" [8]  *See Heller*, 554 U.S. at 629.  The Ordinance neither strips persons of access to any serialized, California-compliant firearm, including AR-15s, nor does it prevent persons from assembling any class of California-compliant firearm using pre-serialized frames or receivers.  The *Heller* Court expressly recognized that gun-regulations can run the gamut, from prohibitions on classes of weapons to far less restrictive (and presumptively constitutional) bans, such as prohibitions on gun ownership based on an individual's status, time and place restrictions on carrying firearms, "and conditions and qualifications on the commercial sale of arms." [9]  *Id.* at 627–28 & n.26.  *Heller* does not support—and Plaintiffs do not provide a single case that persuades this Court of—the notion that any law that abridges any ancillary Second Amendment right must pass the "hardware test" set forth therein.  *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 959 (9th Cir. 2014) ("*Heller* . . . does not provide explicit constitutional guidance of the constitutionality of regulations which are less restrictive than the near-total ban at issue in that case.").

Operationally, strict application of the "hardware test" would be nonsensical to gun control laws that do not regulate weapons themselves, but some ancillary component or feature, *i.e.,* ammunition or, as here, serialization.  *See United States v. Marzzarella*, 614 F.3d 85, 96–97 (3d Cir. 2010) (observing "[t]he District of Columbia's handgun ban is an example of a law at the far end of the spectrum of infringement of protected Second Amendment rights" and applying intermediate scrutiny to serialization requirement under the Gun Control Act); *Jackson*, 746 F.3d at 960–61 (applying intermediate scrutiny to an

---

[8] Nor is the Ordinance like the regulation at issue in *Miller v. Bonta*, to which Plaintiffs cite.  2021 WL 2284132, at *1.  That case involved a constitutional challenge to California's ban on an entire class of firearms meeting the statutory definition of "assault weapons" under the Roberti-Roos Assault Weapons Control Act of 1989.  *Id.* 2021 WL 2284132, at *41 ("Today, the Attorney General . . . suggests that intermediate scrutiny should permit a class-wide ban on extremely popular assault rifles, assault shotguns, and assault handguns . . . .  This is too far.").

[9] The Court observes that prohibitions on the possession of non-serialized arms and component parts were not among the gun-control regulations listed in *Heller*, though the Court also notes that that list was explicitly inexhaustive.  *Heller*, 554 U.S. at 626–27 & n.26.

ammunition regulation because it "d[id] not impose the sort of severe burden imposed by the handgun ban at issue").   Moreover, such application would be contrary to the *Heller* Court's disclosure that it did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626.

This is not to say that the Court reads *Heller* to instruct district courts to apply strict scrutiny review only to complete prohibitions on a class or classes of firearms.  Rather, the Court finds Plaintiffs' proposed approach deficient because it fails to follow the two-step framework adopted by the Ninth Circuit to evaluate Second Amendment claims, as exemplified in the recent decision *Young v. Hawaii*.  992 F.3d at 783–84; *see also Pena v. Lindley*, 898 F.3d 969, 981–82 (9th Cir. 2018); *Silvester v. Harris*, 843 F.3d 816, 820–21 (9th Cir. 2016); *Peruta v. Cnty. of San Diego*, 824 F.3d 919 (9th Cir. 2016); *Jackson*, 746 F.3d at 960–61; *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).  Under this standard, the Court first asks "if the challenged law affects conduct that is protected by the Second Amendment."  *Young*, 992 F.3d at 784.  "If the challenged restriction burdens conduct protected by the Second Amendment . . . [courts] move to the second step of the analysis and determine the appropriate level of scrutiny." *Id.* (citing *Silvester*, 843 F.3d at 821).

"The level of scrutiny depends upon (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Jackson*, 746 F.3d at 963 (internal quotes and citation omitted).  A law that imposes a severe restriction on a core right is "unconstitutional under any level of scrutiny." *Id.* at 961.  However, "if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, [courts] may apply intermediate scrutiny." *Id.*[10]

---

[10] This Court finds instructive to its analysis *Palmer et al. v. Sisolak et al.*, No. 3:21-cv-00268-MMD-WGC (D. Nev.), in which the Honorable Miranda M. Du of the District of Nevada applied the Ninth Circuit's standard to an identical constitutional challenge launched by Plaintiff Firearm Policy Coalition (among others) against a substantially similar Nevada law.  Citations to "*Palmer* at __" refer to

1

### 1.      Burden on Protected Conduct

2      Plaintiffs argue that the Court should evaluate the Ordinance with strict scrutiny

3 because the Ordinance severely burdens the ancillary Second Amendment rights to possess

4 and purchase essential firearm components and, thus, "to self-manufacture firearms in

5 common use," without which Plaintiffs say the Second Amendment right to protect self

6 and home "would[d] [not] mean much."[11]   (Mem. 13–14.)   Defendants counter that the

7 Ordinance does not infringe upon Second Amendment-protected conduct because the

8 serialization requirements "are properly classified as 'longstanding' gun-control measures

9 that are 'presumptively lawful' and thus do not burden the Second Amendment."   (Opp'n

10 8 (quoting *Heller*, 554 U.S. at 635).)

11      To be sure, the Ordinance is not merely a serialization scheme.   Unlike Section

12 29180, the Ordinance neither expressly imposes serialization requirements nor delineates

13 serialization guidelines by which one who seeks to manufacture or assemble a firearm must

14 abide.   Rather, the Ordinance institutes a prohibition against non-serialized firearms and

15 the self-manufacture of firearms using non-serialized firearm components.   (*See* SDMC

16 §§ 53.18(a), (c)(1), (c)(2).)   Defendants do not—nor can they—dispute that unlike other

17 Californians, residents of the City will be unable to exercise the option set forth in Section

18 29180 to manufacture a firearm using unfinished receivers or unfinished frames and apply

19 to the DOJ for a serial number to imprint upon the finished weapon.   In both a technical

20 and operational sense, the Ordinance is a prohibition.

21      This Court declines at this early phase of litigation to consider whether this

22 Ordinance's prohibition falls outside the Second Amendment considering the scant

23

24 the Order dated July 26, 2021, located at ECF No. 51 on the docket of that case, which can be accessed

25 using the Public Access to Court Electronic Records service.

[11] Importantly, the Court observes that the term "self-manufacture" used by Plaintiffs is narrower

26 than the plain meaning ordinarily attributed to the term "create." Specifically, as Plaintiffs affirmed at the

27 hearing, it is the right to self-manufacture, meaning to physically modify or alter unfinished firearm

component parts in order to create a complete firearm with which they exclusively are concerned, not a

28 right to "self-assemble" firearms with pre-serialized, finished frames and receivers, which Plaintiffs

acknowledge the Ordinance does not abridge.

historical record the parties placed before it, and assumes that the Ordinance does, in fact, regulate conduct within the scope of the Second Amendment. *Jackson*, 746 F.3d at 968 (finding regulation restricting certain ammunition sales did not fall outside the scope of the Second Amendment, for, "without bullets, the right to bear arms would be meaningless"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("After *Heller*, this court and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense.").

However, the analysis does not end there. This Court must next turn to "the severity of [the Ordinance's] burden on [the Second Amendment] right [to self-defense]." *Id.* Because the burden imposed by the Ordinance is minimal, intermediate scrutiny is appropriate. Despite the Ordinance's prohibitions, Plaintiffs' "ability to use any and all serialized firearms to defend their homes remains unchanged." *Palmer* at 6; *see Jackson*, 746 F.3d at 968 ("A ban on the sale of certain types of ammunition does not prevent the use of handguns or other weapons in self-defense. The regulation . . . limits only the manner in which a person may exercise Second Amendment rights by making it more difficult to purchase certain types of ammunition."). "[A] person is just as capable of defending [themselves] with a marked firearm as with an unmarked firearm. With or without a serial number, a pistol is still a pistol." *Marzzarella*, 614 F.3d at 94.

Plaintiffs—and all San Diegans for that matter—may still acquire serialized versions of the firearms they seek to self-manufacture from licensed sellers under the Ordinance. Moreover, the Ordinance does not completely prohibit, as Plaintiffs suggest, the right to possess frames and receivers necessary create one's own firearm, but rather restricts the self-manufacturing of firearms using unfinished frames and unfinished receivers only. As Plaintiffs affirmed at the hearing, the Ordinance leaves completely unrestricted Plaintiffs' right to "self-assemble" firearms using pre-serialized, finished frames or finished receivers, which they can acquire from licensed sellers for the lawful purpose of defense of self and home. All that the Ordinance forbids is the purchase, possession, and sale of non-serialized "unfinished frames" and "unfinished receivers," which an individual must physically

modify through milling, drilling, or other means in order to self-manufacture an operational firearm.

Finally, as Plaintiffs admit in their supporting papers, under City law, the Ordinance was not immediately effective; the Ordinance itself provides that it becomes enforceable one month after its enactment. (Compl. ¶¶ 58–59; Ordinance 9.) Plaintiffs' filing of this lawsuit and Motion did not hold the effective date in abeyance. As Plaintiffs affirmed at the hearing, it could take a matter of hours to self-manufacture a firearm using unfinished frames and unfinished receivers. Moreover, the ATF notes that some kits are exceedingly simple to put together. 86 Fed. Reg. at 27720-21. Thus, Plaintiffs and those similarly situated have had ample time since the Ordinance's enactment and prior to its enforcement to self-manufacture firearms using the unfinished frames and unfinished receivers they acquired before the Ordinance's effective date, and to apply to the DOJ for a serial number pursuant to Section 29180.[12]

The Court observes that Plaintiffs repeatedly analogize to the First Amendment in support of their Second Amendment claim. (Mem. 1, 11 & n.3.) In particular, Plaintiffs aver that just as "[i]n the First Amendment context, free speech rights include the ability to build one's own printing and communications devices, print one's own fliers, and utilize largely unregulated channels of speech in the exercise of the rights secured," so too must the Second Amendment protect the means by which the core right to self-defense is exercised, including the self-manufacture of firearms. (Compl. ¶ 34.) Yet this analogy fails to consider that just as the rights guaranteed under the First Amendment are "not absolute at all times and under all circumstances," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942), the Second Amendment does not bestow upon individuals the "right to

---

[12] Plaintiffs specifically attested that they seek to manufacture California-compliant AR-15s, which they admit they cannot sell once constructed and are limited to personal use under California's regulatory scheme. (Fahr Decl. ¶ 6; Bergman Decl. ¶ 7; Rudolph Decl. ¶ 7.) Plaintiffs did not attest that but for the Ordinance they would sell or transfer their non-serialized firearm components. Thus, the Court observes Plaintiffs could avoid entirely some of the constitutional intrusions they allege if Plaintiffs simply exercise their rights conferred by Section 29180 before the Ordinance takes effect.

keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626. Because they "leav[e] open alternative channels for self-defense in the home," prohibitions on non-serialized firearms and firearm components are akin to lawful "content-neutral time, place, and manner restriction[s.]" *Jackson*, 746 F.3d. at 968 (citing *Marzzarella*, 614 F.3d at 97).

Accordingly, this Court finds that the Ordinance does not severely burden Second Amendment-protected conduct, but merely regulates it. Intermediate scrutiny rather than strict scrutiny is therefore appropriate for the Court's analysis of the Ordinance. *See Young*, 992 F.3d at 784 (stating that intermediate scrutiny applies to cases where Second Amendment rights are "affected in some lesser way").

### 2.      Stated Governmental Objective and Reasonable Fit

Plaintiffs argue that the Ordinance is unconstitutional even under the intermediate scrutiny standard because it prohibits individuals who can pass a background check from self-manufacturing firearms. As a blanket prohibition of unfinished receivers and unfinished frames, Plaintiffs aver that the Ordinance so disproportionately infringes upon Second Amendment protected conduct that no important governmental interest can justify the breadth of the intrusion. (Reply 9.) Conversely, Defendants argue that the Ordinance is a "reasonable fit" for achieving the City's objectives of public safety and enhanced law enforcement because the Ordinance targets only non-serialized firearms and unfinished frames and unfinished receivers not within a categorical exception. (Opp'n 10.)

"Courts have used various terminology to describe the intermediate review standard." *Chovan*, 735 F.3d at 1139; *see Jackson*, 746 F.3d at 965 (illustrating the two principal standards applied by the United States Supreme Court on intermediate scrutiny review (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) and *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989))). "But 'all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.'" *Id.* (quoting *Chovan*, 735 F.3d at 1139).

21CV1676

Turning to the first prong, the Court initially must define the City's objective and then determine whether that stated objective is significant, substantial, or important. *Id.* In considering whether these stated objectives are sufficient, the Court will not impose "an unnecessarily rigid burden of proof . . . so long as whatever evidence the [government] relies upon is reasonably believed to be relevant to the problem that the [government] addresses." *Id.* (quoting *Renton v. Playtime Theatres*, 475 U.S. 41, 50–52 (1986)).

Here, the Ordinance explicitly provides that its stated objectives are to "promot[e] and protec[t] the public health, safety, and general welfare of [City] residents" and to "promote effective law enforcement[.]" (Ordinance 3.)   In support of those stated objections, the Ordinance provides that ghost guns and ghost gun kits threaten those interests because they (1) enable individuals who are prohibited from possessing or purchasing firearms to "circumvent background check process[es]" and obtain operable firearms and (2) hinder law enforcement investigation into crimes in which a firearm was used because of the untraceable nature of ghost guns.  (*Id.* 2.)   The Ordinance cites technological advancements and internet sales as having "increased the availability of ghost guns" within the City—as reflected by the 211 ghost guns the SDPD recovered in 2020 and 233 through mid-July 2021, as compared to 77 in 2019 and 58 in the second half of 2018.   This trend is also seen nationwide—as reflected by ATF statistics which registered 23,906 ghost guns recovered from crime scenes, including 325 homicides or attempted homicides, between 2016 and 2020. (*Id.*)   Notably, the Ordinance declares that "[g]host guns have been linked to multiple shootings in San Diego between 2018 and 2021." (*Id.*.)

Defendants also cite to a House Committee on Homeland Security report on ghost guns published in 2019 that concludes non-serialized firearms are a present and increasing threat to public safety because they pose a "homeland security challenge" and "hamstrin[g] law enforcement's ability to investigate crimes committed with untraceable weapons." (Opp'n 4 (quoting H.R. Rep. No. 116-88 at 2 (2019).)   As demonstrated by Defendants, the ATF takes a similar view; in May 2021, the ATF proposed a rule change that would

21CV1676

bring the components of ghost gun kits—including "unfinished frames" and "unfinished receivers"—under its serialization requirements.  (*Id.* (quoting 86 Fed. Reg. at 27722–23.) The ATF expressed that the proposed rule is necessary because "maintaining the current definitions negatively affects both public safety and the regulated firearms industry."  *Id.* at 27726.  Citing the same congressional report as Defendants, the ATF explained that "[t]he problem of untraceable firearms being acquired and used by violent criminals and terrorists is international in scope."  *Id.* at 27723 (citing H.R. Rep. 116-88 at 2).

Public safety and crime-prevention undoubtedly are important government interests. *Pena*, 898 F.3d at 981–82 (citing *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (public safety) and *Salerno*, 481 U.S. 739, 750 (1987) (crime)); *see also Chovan*, 735 F.3d at 1139 (finding it "self-evident" that public safety is an important government interest); *Jackson*, 746 F.3d at 965.  Furthermore, the Ninth Circuit has expressly held "'preserving the ability of law enforcement to conduct serial number tracing—effectuated by limiting the availability of untraceable firearms—constitutes a substantial and important interest.'"  *Pena*, 898 F.3d at 982 (quoting *Marzzarella*, 614 F.3d at 98).  "Serial number tracing 'enabl[es] law enforcement to gather vital information about recovered firearms.'"  *Id.* at 982 (quoting *Marzzarella*, 614 F.3d at 98).  Accordingly, this Court finds that Defendants have satisfied the first prong of intermediate scrutiny by establishing that their governmental objectives are substantial and important.

Turning to the second prong of intermediate scrutiny, this Court must ask whether there is a "reasonable fit" between Defendants' substantial interest in public safety and crime prevention and investigation and the Ordinance's restrictions.  *See Chovan*, 735 F.3d at 1139.  Defendants articulate that the Ordinance addresses directly the threat posed by non-serialized, untraceable firearms.  (Opp'n 6.)  A plain reading of the text of the Ordinance establishes that it does so by prohibiting the possession and sale of firearms and constituent parts that lack serial numbers; by prohibiting a person from manufacturing or assembling a non-serialized firearm outside one of the delineated exceptions; and

21CV1676

prohibiting the possession of non-serialized firearms unless an exception applies.  (SDMC § 53.18(c)(1)–(3).)

Because the Ordinance targets only non-serialized firearms and unfinished frames and unfinished receivers that are not within a categorical exception, that bypass background checks by virtue of self-assembly, and that are untraceable for lacking a serial number, this Court finds that the Ordinance is a reasonable fit for achieving the City's objectives of decreasing the threat that ghost guns pose to the City's stated substantial and important interests.  In so holding, this Court observes that it joins other courts in concluding that broad regulation of non-serialized firearms fit closely with governments' interests in crime prevention and investigation.  *See, e.g.*, *Pena*, 898 F.3d at 987; *Marzzarella*, 614 F.3d at 99 (holding "[r]egulating the possession of [non-serialized] firearms" fits "closely with the interest in ensuring traceability of weapons"); *Palmer* at 8–10.

Plaintiffs contend that Defendants are precluded from establishing a "reasonable fit" because they have offered no evidence that ensuring the traceability of all firearms—including those possessed by law-abiding citizens—increases public safety.  (Mem. 18.) "It is a matter of common sense" that tracing firearms enhances public safety and aids crime solving.  *Palmer* at 9.  Since Congress passed the Gun Control Act over 50 years ago, federal law has regulated the sales, manufacture, and importation of firearms by licensed dealers, manufacturers, and importers, "principally to prevent guns from falling into the wrong hands."  *Abramski v. United States*, 573 U.S. at 172 (citing Gun Control Act).  Among those regulations is the requirement imposed upon all federally licensed firearm importers and manufacturers that they "identify by means of a serial number or cast on the frame of the weapon in such a manner as the Attorney General shall by regulation prescribe each firearm imported or manufactured by such importer or manufacturer."  18 U.S.C. § 923(i).  There is no exception for firearms which find themselves in the hands of individuals who are authorized at the time of purchase to possess firearms—the serialization requirement is categorical.

Indeed, "[f]irearms tracing has become a critical tool for modern firearms investigations and prosecutions," which the prevalence of ghost guns threatens to upend. Andrew W. Eichner, *Crime in the Age of Printable Guns: Methodologies & Obstacles to Prosecuting Federal Offenses Involving 3D-Printed Firearms*, 45 VT. L. REV. 189, 216 (2020); *see also Palmer* at 10. "At its simplest level, if a firearm is stolen, the victim of that crime files a police report detailing the firearm's make, model, and serial number; and when that firearm reappears at a later crime scene, investigators will be able to quickly and accurately determine at least some of the firearm's history." Eichner, *supra* at 213 (citing Philip J. Cook, *Gun Theft & Crime*, 95 J. URBAN HEALTH 305, 306 (2018)); *Palmer* at 10. Without serialization requirements, law enforcement and prosecutors are disabled from using some of the only accessible tools provided to them for ensuring criminals are held accountable and to prevent further, unnecessary crime. *Palmer* at 10. Simply put, serialization and identification of firearms are crucial to public safety. Defendants need not offer more specific evidence to show that tracing firearms reduces crime or increases public safety as common sense dictates it does so.

Plaintiffs further argue that the Ordinance is not a "reasonable fit" because it can be evaded easily and, thus, does not advance the City's substantial interest in public safety and crime solving. Specifically, at the hearing Plaintiffs asserted that an individual could inscribe a meaningless series of characters upon an unfinished frame or unfinished receiver and thereby comply with the Ordinance all while retaining the untraceable nature of that firearm component. Plaintiffs' argument is belied by the text of Sections 53.18(c)(1) and (c)(2), which expressly apply to unfinished frames and unfinished receivers that are not imprinted "with a serial number issued . . . by a Federal Firearms Importer or Federal Firearms Manufacture" or "the California Department of Justice." In other words, the Ordinance restricts a firearm or firearm component with a bogus serial number just as it restricts a firearm or firearm component with no serial number, plainly advancing the important interest in traceability by limiting the universe of firearms within the City to

those serialized pursuant to either the federal or state regulatory regime, unless some categorical exception applies.

Finally, Plaintiffs argue, in essence, that because the Ordinance forecloses Plaintiffs and similarly situated persons following the prescriptions set forth in Section 29180 to self-manufacture a firearm, it must fail for overbreadth. (Reply 5 ("Indeed, that the Ban *precludes* San Diegans from being able to access California's regulatory process for the self-construction of *legally compliant* firearms—which requires passing a background check and affixing a serial number (to enable 'tracing')—is particularly perverse.").) As an initial matter, it is worth noting that California recently passed a bill to regulate firearm precursor parts, including unfinished frames and unfinished receivers, which will take effect on July 1, 2022. *See* Cal. Penal Code § 30412. Thus, to the extent Plaintiffs insinuate that this Court should infer from the disparity between City and State law that the Ordinance is too sweeping, that argument appears undermined. Moreover, Plaintiffs do not cite any principal that preempts a municipality from regulating conduct that threatens public safety and fells criminal investigations more closely than the state in which it sits, so long as there is no conflict of law and the regulation passes constitutional muster.

Because Plaintiffs have failed to show that they are likely to succeed on the merits of their Second Amendment claim, no temporary restraining order or preliminary injunction shall issue on that basis.

## B.     Fifth Amendment Claim

The "Takings" clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. This right is applicable to states and municipalities through the Fourteenth Amendment. *See Chi., B & Q.R. Co. v. Chicago*, 166 U.S. 226, 239 (1987). A "taking" in violation of the Fifth Amendment is either a "physical" or "regulatory" one. A physical taking of property occurs "[w]hen the government physically takes possession of an interest in property for some public purpose." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). A "regulatory taking" occurs when a government regulation is so

21CV1676

onerous that it "will be recognized as a taking." *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

Plaintiffs argue that the real-world effect of the Ordinance is to "mandate[e] that all ordinary law-abiding San Diego residents dispossess themselves of all non-serialized 'unfinished frames' or 'unfinished receivers' that they currently own without any compensation for the loss of this property." (Mem. 21.) Defendants contend that there has been no physical taking because the City has neither taken nor will it take physical possession of non-serialized firearms or firearm components pursuant to the Ordinance. Defendants further argue that the Ordinance falls under a well-established "police power exception" to the Takings Clause. (Opp'n 12.)

Because this Court finds for the reasons stated below that the Ordinance does not constitute a taking under either the physical or regulatory formulation, Plaintiffs' claim for pre-trial injunctive relief on Fifth Amendment ground is denied.[13]

### 1. Physical Taking

Plaintiffs argue that the Ordinance amounts to a physical taking because it requires owners of non-serialized unfinished frames and unfinished receivers "to suffer a permanent physical invasion of . . . property" without just compensation. (Mem. 20–21 (citing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005) and *Cedar Point Nursery v. Hassid*, __ U.S. __, 141 S.Ct. 2063, 2073 (2021)).  Neither case upon which Plaintiffs rely support the notion that restricting the possession of items for the advancement of public safety and crime solving, without the government ever taking physical possession of or physically encroaching upon those items, constitutes a "physical taking" under the Fifth Amendment. Moreover, nowhere does the Ordinance expressly state, nor can it be implied, that the City is compelling the conveyance of the disputed property for public use.  Nor are persons denied possession or use of non-serialized firearms or firearm components, if they or the

---

[13] The Court need not determine the dispute over whether pre-trial injunctive relief is available to enjoin an alleged Taking Clause violation because it concludes Plaintiffs have failed to show a likelihood that such violation occurred.  (*See* Opp'n 11; Reply 9–10.)

21CV1676

disputed property, fall within an exception set forth in the Ordinance or have complied with the process set forth under Section 29180 to procure a serial number in the nearly month-long period between the Ordinance's enactment and its effective date.  Consequently, the Court does not find that the City is physically appropriating Plaintiffs' property, or property of other persons similarly situated, to constitute a physical taking.

Even if the Ordinance did authorize a physical taking of ghost guns and ghost gun kits, this Court's calculus would remain unchanged.  It is well-settled that just compensation is not required when the government uses its police power to effect a physical taking to prevent a perceived public harm.  *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (discussing eminent domain); *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887) (discussing police power exception).

### 2. Regulatory Taking

The Supreme Court has articulated two guidelines relevant to determining whether a government regulation is so onerous as to constitute a taking.  *See Murr v. Wisconsin*, __ U.S. __, 137 S. Ct. 1933, 1942–43 (2017).  "First, with certain qualifications … a regulation which denies all economically beneficial or productive use of [property] will require compensation under the Takings Clause.  Second, when the regulation impedes the use of the property without depriving the owner of all economically beneficial use, a taking may be found based on a complex of factors, including (1) the impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action" ("*Penn Cent.* Factors").  *Id.* (emphasis added and quotation marks omitted) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

As an initial matter, to the extent Plaintiffs, or any other similarly situated person suffer a loss of value of currently owned property, that loss is self-inflicted.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (holding "self-inflicted" constitutional injuries "are not fairly traceable to the Government's purported[ly] [unconstitutional] activities]" and thus do not give rise to standing).  As mentioned above, there has been a

month-long period between the Ordinance's enactment and its effective date on October 23, 2021, during which Plaintiffs have had ample time to use their non-serialized "unfinished frames" and "unfinished receivers" to construct California-compliant AR-15s as they had intended, and to apply to the DOJ pursuant to Section 29180 for a serial number to imprint upon those newly minted firearms.  (*See* Fahr Decl. ¶ 6; Bergman ¶ 7; Rudolph ¶ 7 (stating it was Plaintiffs' intent to use components to construct AR-15s, not to sell those components).)

Putting aside the murkiness of the ground upon which Plaintiff is permitted to pursue wholly self-inflicted constitutional violations, the Court finds that the first and second *Penn Cent.* factors militate against a finding of regulatory taking because it is unclear based on the record the extent or certainty of Plaintiffs' purported economic loss.  It is uncertain the extent to which, in the days leading up to the Ordinance's effective date, Plaintiffs and others similarly situated have used the unfinished frames and receivers they acquired prior to the Ordinance to self-manufacture firearms and subsequently procured a serial number under Section 29180.  Moreover, nothing in the Ordinance prohibits Plaintiffs or others similarly situated from selling outside of the City their non-serialized firearms and constituent parts to individuals who reside elsewhere.  In such instances, the value of non-serialized firearms and components likely will not be impacted by the Ordinance to recoup any alleged economic loss.  Accordingly, the economic impact of the Ordinance and the extent to which the Ordinance interferes with investment-backed expectations remain undetermined.

Turning to the final *Penn Cent.* factor, the Court agrees with Defendants that the Ordinance was a valid exercise of the government's police power and, thus, falls within the well-established police power exception to the Takings Clause.  "[A] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking[.]"  *Mugler*, 123 U.S. at 668; *McCutchen v. United States*, 145 Fed. Cl. 42, 51–52 (Fed. Cl. 2019) (holding bump-stock ban did not amount to a taking because devices "were

not 'taken for a public use,' within the meaning of the Takings Clause" but prohibited through a lawful exercise of police power).  "If [an] ordinance is otherwise a valid exercise of police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional."  *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 592 (1962). As Defendants correctly point out, "[s]everal other courts analyzing firearms regulations in the context of the police power exception to the Takings Clause have reached similar conclusions."  (Opp'n 13 (citing *Adkins v. United States*, 82 Fed. Cl. 619, 623–24 (Fed. Cl. 2008) (holding that prohibition on the sale of machine guns to anyone other than law enforcement agencies did not constitute regulatory or physical taking); *Rupp v. Becerra*, Case No. 8:17-cv-00746-JLS-JDE, 2018 WL 2138452, at *8–9 (C.D. Cal. May 9, 2018) (dismissing a Takings claim on the grounds that California prohibition on certain weapons represented an exercise of police power and not a taking)).

Accordingly, the Ordinance cannot be said to constitute a physical or regulatory taking of Plaintiffs or other similarly situated persons property in violation of the Takings Clause.  Because Plaintiffs have failed to show a likelihood of success on the merits respecting their Fifth Amendment claim, Plaintiffs are not entitled to a temporary restraining order or preliminary injunction.

## IV.   CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's Motion for a temporary restraining order and preliminary injunction.

**IT IS SO ORDERED.**

DATED: October 20, 2021

Hon. Cynthia Bashant
United States District Judge

21CV1676