RAYMOND M. DIGUISEPPE
CA State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

JOHN W. DILLON
CA State Bar No. 296788
DILLON LAW GROUP, APC
2647 Gateway Rd.
Suite 105 #255
Carlsbad, CA 92009
P: 760.642.7150
E: jdillon@dillonlawgp.com

WILLIAM SACK*
PA STATE BAR NO. 325863
FIREARMS POLICY COALITION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149-4584
P: (916) 596-3492
E: wsack@fpclaw.org
*Appearing by Pro Hac Vice
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FAHR; DESIREE BERGMAN; COLIN RUDOLPH; SAN DIEGO COUNTY GUN OWNERS PAC; and FIREARMS POLICY COALITION, INC.,<br><br>                              Plaintiffs,<br><br>    v.<br><br>CITY OF SAN DIEGO, CALIFORNIA; and DAVID NISLEIT, in his official capacity as Chief of Police of San Diego City, California,<br><br>                              Defendants. | Case No.: 21-CV-1676-BAS-BGS<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Judge: Hon. Cynthia Bashant<br>Date: February 7, 2022<br>Courtroom: 4B<br>Trial: Not Set |

1
2

# **TABLE OF CONTENTS**

Page

I.    Introduction .........................................................................1

II.   The Lenient Standards of Review ......................................1

III.  The Prohibitions Effected by Ordinance O-21367 ...........2

IV.   The Second Amendment Claim Easily Satisfies the Motion...........3

   A. The Targeted Arms and Precursor Parts are
      Constitutionally Protected.............................................3

   B. The Undisputed Right to Self-Construct Protected Arms ..........5

   C. The Ordinance's Prohibitions Render It Categorically
      Unconstitutional, and Subject It to the Strictest Form
      Of Scrutiny ....................................................................7

   D. The Ordinance Flatly Fails Any Form of Heightened
      Scrutiny ........................................................................10

      1.  The Proper Standards of Constitutional Scrutiny ...............11

      2.  The Claimed Interest is a Pretextual Justification
          Resting on a False Narrative ..............................................12

      3.  The Ordinance's Destructive Effect Sweeps Far Too
          Broadly................................................................................17

V.    The Takings Claim Also Stands on Solid Ground........................21

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I

# **TABLE OF AUTHORITIES**

**Cases**                                                                     **Page**

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) ..............................13, 21

*Americans for Prosperity Foundation v. Bonta*, __ U.S. __,
41 S.Ct. 2373 (2021)..................................................................................10

*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*,
648 F.3d 986 (9th Cir. 2011) .....................................................................1, 5

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ....................11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................1

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994) ...........................................2

*Caetano v. Massachusetts*, 577 U.S. 411 (2016).......................................3, 17

*Cedar Point Nursery v. Hassid*, ___ U.S. ___,
141 S.Ct. 2063 (2021)..................................................................................23

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009) .......................................1

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................3, 4, 5, 10, 16

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014)...................................11, 12, 20

*Dore v. U.S.*, 97 F.Supp. 239 (Ct. Cl. 1951)................................................24

*Ezell v. City of Chicago*, 651 F.3d 684 (9th Cir. 2011).................................6

*Goldblatt v. Hempstead*, 369 U.S. 590 (1962) ............................................22

*Heller II*, 670 F.3d 1244 (D.C. Cir. 2011)...................................................16

*Jackson v. City and County of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ...................................................................6, 11

*Knick v. Township of Scott*, 139 S. Ct. 2162 (2019).....................................21

*Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528 (2005) ..............................23, 24

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992)...............................................................................22, 23

*Luis v. United States*, __ U.S. __, 136 S.Ct. 1083 (2016) .............................6

*Mai v. United States*, 952 F.3d 1106 (9th Cir. 2020) ...................................11

*McCullen v. Coakley*, 573 U.S. 464 (2014)............................................10, 11

1    *McDougal v. County of Imperial*, 942 F.2d 668 (9th Cir. 1991) ...................1

2    *McDougall v. County of Ventura*, ___ F.4th __,
3    2022 WL 176419 (Jan. 20, 2022) ...................................................................11

4    *Miller v. Bonta*, __ F.Supp.3d__, 2021 WL 2284132 (S.D. Cal. 2021) .....3, 4

     *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192
5    (9th Cir. 2013) ...........................................................................................11

6    *Mugler v. Kansas*, 123 U.S. 623 (1887) ........................................................21

7    *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*,
8    961 F.3d 1062 (9th Cir. 2020) .......................................................................12

9    *Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730 (2017)............11

10   *Patel v. American National Property and Casualty Company*
     367 F.Supp.3d 1186 (9th Cir. 2019).................................................................1

11   *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018)..........................................7, 16

12   *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)...............24

13   *Robb v. Hungerbeeler*, 370 735 (8th Cir. 2004).............................................13

14   *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546 (1975) ...................................13

15   *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016).....................................7, 10

16   *Stanley v. Georgia*, 394 U.S. 557 (1969) .....................................................13

17   *Staples v. United States*, 511 U.S. 600 (1994)................................................4

18   *Teter v. Connors*, 460 F.Supp.3d 989 (D. Haw. 2020) .................................10

19   *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)...............5, 6, 7

20   *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994)...............11

21   *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997))................................12

22   *United Broth. of Carpenters and Joiners of America Local*
     *586 v. N.L.R.B.*, 540 F.3d 957 (9th Cir. 2008) ..............................................11

23   *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ...........................20

24   *United States v. Riverside Bayview Homes, Inc.*,
25   474 U.S. 121 (1985)........................................................................................21

26   *Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007) .....................................13

27   *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566 (9th Cir. 2014)...........11

28   *Ward v. Rock Against Racism*, 491 U.S. 781 (1989).....................................11

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) ................................................5

**Rules**

*Federal Rules of Civil Procedure*

Rule 12(b)(6) ................................................................................................1, 3

*Federal Rule of Evidence*

201 ..............................................................................................................2

**U.S. Code**

18 U.S.C §§ 922(b)(2), 922(d), 922(g)...........................................................20

18 U.S.C. § 922(k).........................................................................................20

18 U.S.C. § 923..............................................................................................9

**CFR**

27 C.F.R. § 478.11(f).......................................................................................9

**Local Regulations**

San Diego Ordinance O-21367...................................................................1, 2

*San Diego Municipal Code*

§§ 53.18(a), (c)(1), (c)(2)............................................................................2, 3

§ 53.18(b)(4)..................................................................................................2

§ 53.18(b)(3)..................................................................................................2

§ 53.18(b)(8)..................................................................................................2

§ 53.18(b)(11)-(12)........................................................................................2

**Cal. Pen. Code**

Section 16520(a)............................................................................................2

Section 16531(a)...........................................................................................16

Section 29180.......................................................................................2, 3, 15

Section 29800...............................................................................................20

Section 29805...............................................................................................20

Section 29815...............................................................................................20

Section 29825...............................................................................................20

Section 30412...............................................................................................15

**Other Sources**

M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON
HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980).......................6

Secretary of State Thomas Jefferson, letter to George Hammond, British
Ambassador to the U.S., May 15, 1793, in 7 THE WRITINGS OF THOMAS
JEFFERSON 325, 326 (Paul Ford ed., 1904) ............................................6, 7

*5 American Archives, Fourth Series*, 1418 (Peter Force ed. 1844)................6

*Proposed Rules, United States Dept. of Justice, Definition*
*of "Frame or Receiver" and Identification of Firearms,*
86 Fed. Reg. 27720, 27722-27 ........................................................8

86 Fed. Reg. at 27721 & n. 9, 27722...........................................14

86 Fed. Reg. 27722 n. 17.............................................................18

86 Fed. Reg. 27722 n. 18.............................................................18

86 Fed. Reg. at 27722-23.............................................................18

86 Fed. Reg. at 27725, 22732.......................................................15

California Assembly Bill No. 857 .................................................17

California Assembly Bill No. 879 ............................................15, 16

Connecticut (2019, P.A. 19-6, § 2, eff. Oct. 1, 2019) ...................17

New Jersey (L.2019, c. 165, § 3, eff. July 16, 2019) ....................17

Hawaii (2019 HI H.B. 2744) ........................................................17

Rhode Island (2020 R.I. HB 7102)...............................................17

District of Columbia (Apr. 27, 2021, D.C. Law 23-274, § 201(b),
68 DCR 1034)...............................................................................17

H.R. Rep. No. 116-88, Part 2, at 2...............................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  Introduction

Defendants' Motion to Dismiss ("MTD") the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") must be denied. The Complaint states strong, indeed meritorious, constitutional challenges to San Diego Ordinance O-21367 (September 23, 2021) ("Ordinance"), which easily survive the lenient standards of review on a Rule 12(b)(6) motion.

## II.  The Lenient Standards of Review

In any challenge to the Complaint as failing to sufficiently state claims for relief, "we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to Plaintiffs and "draw[] all reasonable inferences in their favor." *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 990 (9th Cir. 2011). The Complaint "need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *McDougal v. County of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991); *Butcher v. City of Marysville*, 398 F.Supp.3d 715, 722 (E.D. Cal. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Rule 12(b)(6)'s plausibility standard 'is not akin to a probability requirement, but asks for more than a sheer possibility that a defendant has acted unlawfully.'").

This inquiry is based on the face of the complaint and any attachments to it. *Patel v. American National Property and Casualty Company*, 367 F.Supp.3d 1186, 1191 (9th Cir. 2019). "Similarly, 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.'" *Id.* (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

1    Additionally, the court may consider matters that are proper subjects for judicial

2    notice under Federal Rule of Evidence 201. *Id.*

3    **III.   The Prohibitions Effected by Ordinance O-21367**

4           Under the Ordinance, with few exceptions unavailable to most average

5    citizens, it is unlawful to "*[p]ossess, purchase, transport*, or receive," or to "*[s]ell,*

6    *offer to sell, transfer, or offer to transfer*," any "unfinished frame or unfinished

7    receiver," "unless the unfinished frame or unfinished receiver is imprinted with a

8    serial number issued to that unfinished frame or unfinished receiver by a Federal

9    Firearms Importer or Federal Firearms Manufacturer, or engraved or permanently

10   affixed with a serial number provided by the California Department of Justice for

11   that unfinished frame or unfinished receiver." San Diego Municipal Code

12   ("SDMC") § 53.18(c)(1)-(c)(2) (emphasis added). Compl. ¶¶ 60, 61.

13          "Unfinished" for these purposes means any "piece of any material that does

14   not constitute the completed" frame or receiver of a firearm but "that has been

15   shaped or formed in any way for the purpose of becoming" a frame or receiver of a

16   firearm and which "may be made into a functional" frame or receiver "through

17   milling, drilling, or other means." SDMC § 53.18(b)(11)-(12). Compl. ¶¶ 65, 67.

18   "Frame means the primary structural component of a firearm to which the fire

19   control components are attached." SDMC § 53.18(b)(4). Compl., ¶ 66. "Receiver

20   means the primary structural component of a firearm to which the fire control

21   components are attached." SDMC § 53.18(b)(8). Compl., ¶ 68. "Firearm" has "the

22   same meaning as in California Penal Code section 16520(a)" and includes a

23   handgun, rifle, or shotgun. SDMC § 53.18(b)(3). Compl. ¶ 64.

24          In net effect then, as this Court has explained, the Ordinance imposes a blanket

25   prohibition against all self-built modern operable firearms of any type:

26          To be sure, the Ordinance is not merely a serialization scheme. Unlike
             [Cal. Pen. Code] Section 29180, the Ordinance neither expressly
27          imposes serialization requirements nor delineates serialization

28

1
2
3
4
5
6
7

guidelines by which one who seeks to manufacture or assemble a firearm must abide. Rather, the Ordinance institutes a prohibition against non-serialized firearms and the self-manufacture of firearms using non-serialized firearm components. (See SDMC §§ 53.18(a), (c)(1), (c)(2).)  Defendants do not—nor can they—dispute that unlike other Californians, residents of the City will be unable to exercise the option set forth in Section 29180 to manufacture a firearm using unfinished receivers or unfinished frames and apply to the DOJ for a serial number to imprint upon the finished weapon.  In both a technical and operational sense, the Ordinance is a prohibition.

8

Order Denying TRO-MPI, Dkt. No. 21 at 14 ("TRO Order"); Compl. ¶¶ 72-85.

9

### IV.  The Second Amendment Claim Easily Satisfies the Motion

10

11

Plaintiffs' more than "*plausible*" Second Amendment claim must be allowed proceed under the lenient standards of review on Rule 12(b)(6) motions.

12

### A.   The Targeted Arms and Precursor Parts Are Constitutionally Protected

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Complaint is replete with assertions, grounded in Supreme Court precedent, that the self-built arms targeted for prohibition and dispossession by the Ordinance are in common use for lawful purposes and are thus protected by the Second Amendment. The Supreme Court "has held that 'the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). Compl. ¶¶ 1, 28. Thus, it "guarantees the right to carry weapons '*typically possessed* by law-abiding citizens for lawful purposes,'" *id.* (quoting *Heller* at 625) (italics added), which extends to all arms currently in common use that are not "dangerous per se" and "unusual," *id.* at 417 ("A weapon may not be banned unless it is both dangerous *and* unusual."). Compl. ¶¶ 2, 29; *see also Miller v. Bonta*, __ F.Supp.3d__, 2021 WL 2284132, *45 (S.D. Cal. 2021) ("Fortunately, no legislature has the constitutional authority to dictate to a good citizen that he or she may not acquire a modern and popular gun for self-defense.").

As the Complaint further details—also based on sources not subject to reasonable dispute—both handguns and AR-15 rifles are unquestionably in common use and are neither "dangerous" *nor* "unusual." Handguns in fact have been recognized, by the Supreme Court itself, as "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense. *Heller*, 554 U.S. at 628-29. Compl. ¶¶ 3, 98, 134-35. And, over 25 years ago, the Supreme Court recognized the AR-15 as a common firearm possessed by *ordinary people*, finding, "[t]he AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Staples v. United States*, 511 U.S. 600, 603 (1994). Compl. ¶¶ 3,98,134-35, 146; *see also Miller v. Bonta*, 2021 WL 2284132 at *6 (finding such rifles are "commonly owned by law-abiding citizens" and "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home"). Defendants do not even contest the point.

This is significant because, as the Complaint plausibly alleges, Plaintiffs James Fahr, Desiree Bergman, and Colin Rudolph lawfully acquired and possessed before the Ordinance's ban multiple unfinished frames or receivers from which they could have constructed California-compliant AR-15-platform semi-automatic rifles "of a type commonly possessed by law-abiding citizens for lawful purposes today," Compl. ¶¶ 92-103, 104-116, 117-128. They all rightfully desire to continue owning, possessing, acquiring, using, and self-building such arms along with their constituent parts for self-defense and other lawful purposes. Plaintiffs would do so but for the Ordinance's ban which prohibits all such activity and property interests without providing any pathway for ordinary law-abiding City residents to *lawfully* construct arms in common use for lawful purposes. Compl. ¶¶ 92-103, 104-116, 117-128.

On this basis, and in an assertion of standing which has never been challenged by anyone, Plaintiffs FPC and SDCGO bring this action on behalf of their many

members, including Plaintiffs Fahr, Bergman, and Rudolph, who are left with no pathway to lawfully self-construct firearms in common use for lawful purposes— even in compliance with state law. Compl. ¶¶ 129-150, 151-165.

Plaintiffs have individually and collectively asserted that, absent the requested judicial relief, they and all such City residents have been and will continue to be adversely and directly harmed by Defendants' actual and threatened administration, implementation, and enforcement of the Ordinance. Compl. ¶¶ 129-150, 151-165. Thus, the Complaint has plausibly alleged that the Ordinance targets arms and firearm precursor parts protected under the Second Amendment, and any lingering doubt on that point must be resolved in Plaintiffs' favor because their allegations must be taken as true and construed in the light most favorable to them. *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d at 990.

**B.  The Undisputed Right to Self-Construct Protected Arms**

The Complaint also sets forth a solid, unrefuted case that the Second Amendment secures the closely related, historically recognized right to self-construct firearms in common use for lawful purposes. Compl. ¶¶ 31-47. This is drawn from Supreme Court authority and the historical record. The *Heller* court itself emphasized that the contours of the Second Amendment's protection must be defined by its founding-era origins, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35; Compl. ¶ 140; *see also Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (quoting *Heller* at 625) ("Courts must look at the "historical understanding of the scope of the right."); *accord Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017). Compl. ¶¶ 31-47 (detailing the relevant history).

This right necessarily includes the right to own, possess, and use unfinished frames and unfinished receivers (i.e., non-firearm objects or "NFOs") and precursor parts necessary for the construction and thus the exercise of the right to build arms

in common use for lawful purposes. The Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira*, 873 F.3d at 677; Compl. ¶ 141; *Luis v. United States*, __ U.S. __, 136 S.Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise ... The right to keep and bear arms, for example 'implies a corresponding right to obtain the bullets necessary to use them.'"). Much as the right to keep and bear arms "wouldn't mean much without the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011), the right to self-construct arms "wouldn't mean much" without the right to own, possess, and use the constituent parts necessary to engage in such activity—and the firearm itself as end product of this protected activity—for lawful purposes. Compl. ¶ 142.

"'The influence of the gunsmith and *the production of firearms* on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era.'" Compl. ¶ 39 (quoting M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980) (italics added). In March 1776, a committee of New York's Provincial Congress actively sought to enlist and reward all those "'willing to engage in *manufacturing* good Muskets, or the Locks, Barrels, or any necessary parts thereof.'" Compl. ¶ 43 (quoting *5 American Archives, Fourth Series*, 1418 (Peter Force ed. 1844) (italics added). A month later, the North Carolina Provincial Congress called for "'all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in *making* Muskets.'" Compl. ¶ 44 (quoting *id.* at 1338) (italics added). As Thomas Jefferson summed it up in 1793, "'Our citizens have always been free to *make*, vend, and

export arms. It is the constant occupation and livelihood of some of them."' Compl. ¶ 46 (quoting Secretary of State Thomas Jefferson, letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) (italics added).

This right and "constant occupation" is clear in the relevant historical record, and controls in "determining the scope of the Second Amendment's protections." *Teixeira*, 873 F.3d at 682. Defendants offer nothing to the contrary, and any question on the point must be resolved in Plaintiffs' favor under the lenient standards.

## C.   The Ordinance's Prohibitions Render It Categorically Unconstitutional, and Subject It to the Strictest Form of Scrutiny

As this Court has recognized, "to be sure," in practical effect, "the Ordinance is a prohibition," TRO-MPI Order at 14, which effectively bans City residents from building their own firearms pursuant to State law. And any flat ban on the exercise of conduct guaranteed to law-abiding citizens under the Second Amendment is unconstitutional—full stop. Moreover, as the Ninth Circuit itself has instructed, "[i]f a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). At a minimum, such prohibitions must be subjected to the highest degree of scrutiny in any tiers-of-scrutiny analysis because, as the Ninth Circuit has also recognized, any law that "implicates the core of the Second Amendment right and severely burdens that right" must survive strict scrutiny. *Id.* at 824; *accord Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018).

The Ordinance here unquestionably *destroys* fundamental guarantees of the Second Amendment for all ordinary law-abiding San Diegans otherwise fully entitled to exercise this entire bundle of constitutional rights. It declares unlawful, on pain of criminal penalty and a mandate of property dispossession without any compensation, an entire spectrum of protected conduct along with the full gamut of

the related protected property interests: the acquisition, possession, sale, and use for self-building of "unfinished" frames or receivers.

Defendants offer only two meager retorts in addressing the obvious concerns about the breadth of the Ordinance, both of which ignore or distort the truth about its sweeping reach. First, they say Plaintiffs and the rest of the countless law-abiding San Diegans being treated like criminals can just purchase a *completed* firearm that already contains a serial number imprinted by the manufacturer. MTD at 9. This, of course, ignores the entire point that they have a constitutional right to *self*-construct arms in common use for lawful purposes and the Ordinance's ban *destroys* that right. Second, Defendants say all these individuals can alleviate their woes by just purchasing NFOs imprinted with the required serial numbers and use those to manufacture or assemble firearms. MTD at 9. This ignores the reality that such parts are only lawful to acquire, own, possess, or use at all under the Ordinance if they are serialized either "by a Federal Firearms Importer or Federal Firearms Manufacturer, or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver."

As plausibly alleged in the Complaint, Federal Firearms Importers and Manufacturers cannot simply imprint *random* serial numbers on "unfinished" frames or receivers because such serial numbers would fall outside of any established regulatory scheme. Rather, they can only properly imprint a serial number on completed "firearms" in accordance with federal law, which by definition do not include unfinished frames, receivers, or other NFOs, as evidenced by the need for an affirmative modification of the federal regulations before the federal serialization scheme would extend to any such firearm precursor parts.  Proposed Rules, United States Dept. of Justice, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27722-27 (proposing to modify the definition to create a serialization requirement for such components because no such requirement,

and thus no mechanism for serialization, currently exists under federal law).[1]

Moreover, the Ordinance's requirement that "unfinished" frames or receivers be "permanently affixed with a serial number provided by the California Department of Justice" is similarly *impossible* to satisfy. Only the individual applicant can request and obtain such a serial number for a self-constructed firearm under State law. Compl. ¶¶ 74-81. There is no existing mechanism and thus no real possibility for all the NFOs targeted by the Ordinance to be imprinted with a unique DOJ issued serial number before the point of sale. *Id*. This is particularly true when the Ordinance's definition of "unfinished" frame or receiver captures any and all materials that *could be* "shaped or formed" and "may be made into a functional" frame or receiver.

Consequently, not only does the Ordinance effectively block the sole avenue for law-abiding City residents to lawfully self-construct their own arms *with* a "background check," but it ultimately offers no "tracing" benefit whatsoever, contrary to the Defendants' claims. Compl. ¶¶ 72-73. Serial numbers that are not tied to the purchaser or to any regulatory scheme cannot be used to trace anything.

By its design, the scheme cuts off all opportunity for ordinary, law-abiding City residents to *lawfully* self-construct any firearms unless and until—*if ever*—the federal or state regulatory scheme is formally modified to require serialization of unfinished firearm frames or receivers or other NFOs, to mention nothing of the sweepingly broader class of precursor parts targeted by the Ordinance's ban. For this reason, it is simply not the case that the Ordinance only "restricts the self-

---

[1]     Indeed, the Ordinance's definition of "unfinished" frame or receiver is sweepingly broader than the definition of "firearm frame or receiver" under federal law. *See* 27 C.F.R. § 478.11(f) (including within this definition only parts of a firearm which actually "provide[] housing for the hammer, bolt or breechblock, and firing mechanism," not simply any "piece of material" that "has been shaped or formed" and "may be made into a functional" frame or receiver).

9

manufacturing of firearms using unfinished frames and unfinished receivers only." TRO-MPI Order at 15. The breadth of the ban necessarily infringes the individual right to lawfully manufacture *and* to lawfully assemble firearms, by outlawing the mere possession of any "piece of material" that "has been shaped or formed" and "may be made into a functional" frame or receiver unless it bears the required serial number, which *cannot* be obtained for anything but a "firearm" as specifically defined under the current law (which *excludes* any NFOs).

Ultimately, Defendants' arguments refuse to recognize the fundamental and controlling precept solidified in *Heller*: *even assuming there exists some other option for lawfully acquiring firearms, that does not and cannot justify or excuse the destruction of the rights being eliminated under the Ordinance*. *Heller*, 554 U.S. at 629 (flatly rejecting as "no answer" the District of Columbia's attempt to justify its handgun ban with the argument that the District had not *also* banned residents from possessing long guns). That destruction renders the Ordinance "unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d at 821. At a minimum, it subjects the Ordinance to strict scrutiny, *id.* at 824, which Defendants cannot survive because they have not even articulated much less proven any claim that they have "adopt[ed] 'the least *restrictive* means of achieving a *compelling* state interest.'" *Americans for Prosperity Foundation v. Bonta*, __ U.S. __, 141 S.Ct. 2373, 2383 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014) (italics added).

**D.   The Ordinance Flatly Fails Any Form of Heightened Scrutiny**

*Heller* makes clear that "rational basis is not appropriate" and "some degree of heightened scrutiny applies" to restraints imposed on Second Amendment rights. *Teter v. Connors*, 460 F.Supp.3d 989, 1001 (D. Haw. 2020). Thus, even assuming strict scrutiny does not apply, the Ordinance must at a minimum survive intermediate scrutiny, which it cannot do.

### 1. The Proper Standards of Constitutional Scrutiny

Generally, "[t]o satisfy intermediate scrutiny, the government's statutory objective must be significant, substantial, or important, and there must be a reasonable fit between the challenged law and that objective." *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020). And more specifically, as the Ninth Circuit has explained, we are "guided by First Amendment principles" in analyzing the burdens imposed on the Second Amendment. *Jackson*, 746 F.3d at 961; *accord McDougall v. County of Ventura*, ___ F.4th __, 2022 WL 176419, *7, 9 (Jan. 20, 2022). Under these "strong analogies to the Supreme Court's free-speech caselaw," *Jackson*, 746 F.3d at 960, the law "must be 'narrowly tailored to serve a significant governmental interest'" to survive intermediate scrutiny, *McDougall* at *17 (Klienfeld, J., concurring) (quoting *Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730, 1736 (2017)); *accord McCullen*, 573 U.S. at 486, *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566, 580 (9th Cir. 2014), and *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1204 (9th Cir. 2013).

"[T]he government 'must affirmatively establish the reasonable fit we require.'" *McDougall*, ___ F.4th __, 2022 WL 176419, *16 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). To do this, the government must "'demonstrate that the recited harms are real ... and that the regulation will in fact alleviate these harms in a direct and material way.'" *Doe v. Harris*, 772 F.3d 563, 577 (9th Cir. 2014) (quoting *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)). In fact, it must prove "each activity targeted within the proscription's scope is an appropriately targeted evil." *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989). And it must do so by "provid[ing] evidence" that the targeted conduct "endangers those interests." *United Broth. of Carpenters and Joiners of America Local 586 v. N.L.R.B.*, 540 F.3d 957, 967 (9th Cir. 2008). "Speculation as to what might happen if the proposed activity was allowed is

insufficient." *Id.* Ultimately, the "narrowly tailored" fit requirement is designed to ensure—and thus the government must ultimately *prove*—the restraint does not burden "'substantially more'" protected conduct "'than necessary'" to further the asserted interest. *Pacific Coast Horeshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)); *accord Doe v. Harris*, 772 F.3d at 577.

### 2. The Claimed Interest is a Pretextual Justification Resting on a False Narrative

In articulating the City's purported interest in the Ordinance, Defendants fundamentally mischaracterize the purpose and function of the law, declaring "the Ordinance is intended to ensure that firearms ownership can be traced and to help prevent those who are barred from possessing a firearm from buying or building one." MTD at 7. They claim "[g]host gun kits are a threat to public safety because they circumvent background checks and are untraceable through law enforcement database." MTD at 8. Thus, they assert, the Ordinance is both necessary and effective in ensuring that the City can conduct "background checks" on those who seek to acquire firearms and "trace" firearms used in crimes. MTD at 3-4, 6-7.

Again, as this Court has said, "the Ordinance is *not* merely a serialization scheme." Order at 14 (italics added). It "neither expressly imposes serialization requirements nor delineates serialization guidelines by which one who seeks to manufacture or assemble a firearm must abide." *Id.* "Rather, the Ordinance institutes a prohibition against non-serialized firearms and the self-manufacture of firearms using non-serialized firearm components." *Id.* The Ordinance also effectively prohibits a wide range of firearm *assembly* activities. It is simply not the case that "the Ordinance leaves completely unrestricted Plaintiffs' right to 'self-assemble' firearms." TRO-MPI Order at 15. The Ordinance goes much further than requiring "*pre*-serialized, finished frames or finished receivers" for the lawful manufacture or

assembly of firearms within the City, *id.*—which are unattainable anyway. Rather, it outlaws the mere possession of essentially anything and everything that *could* be "shaped or formed" and "made into a functional" frame or receiver unless it bears the required serial number which *cannot* be obtained for anything but a specifically defined "firearm," clearly bringing within its scope a wide range of materials and products law-abiding citizens otherwise could and would use to *assemble* firearms.

If the true purpose and function of the Ordinance were to require firearms in the City "be serialized," it would have allowed self-building pursuant to State law, instead of cutting off the regulatory process that the State has created to permit the lawful manufacturing and assembly of firearms—*complete with* "background checks" and the assurance of "traceability." So, the City's justification is not just baseless, it's *false*. At the TRO-MPI hearing, Defendants conjured up an alternative justification: that the State's serialization requirements are insufficient as they are "based on an honor system" which presumes people will comply with the law by applying for the serial numbers required to lawfully construct their own arms, when they *could* evade the process by failing to apply for serial numbers *in violation* of the law. Governments can't completely ban activities simply because *some* people *might* violate laws regulating those activities or otherwise engage in criminal conduct, particularly when it comes to constitutionally protected activities. *See e.g., Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 735, 743 (8th Cir. 2004); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969). Computing devices connected to the Internet are now the most common tool for engaging in lawful, protected First Amendment activities, but are undoubtedly also the most common tool for engaging in many unprotected and sometimes illegal forms of speech (*e.g.*, defamation, true threats) and other illegal conduct (*e.g.*, child pornography, hacking, identity theft) as well. The latter hardly

1 can justify prohibiting *lawful* use of computers connected to the Internet by law-
2 abiding people who wish to publish their protected content and viewpoints.

3 Yet, that is what the City has done here. It perversely *bars* any opportunity for
4 City residents to demonstrate they are not "prohibited" persons or to obtain serial
5 numbers for purposes of facilitating "tracing" of their self-built firearms, by tying
6 the whole scheme to an unobtainable serialization requirement for all "unfinished"
7 frames or receivers as that term is sweepingly defined under the Ordinance.

8 As Defendants themselves admit, there is, at most, a *proposal* to *change* the
9 federal regulatory definitions of the Bureau of Alcohol, Tobacco, Firearms, and
10 Explosives ("ATF") to require serialization of "unfinished frames or receivers,"
11 because no such requirement currently exists. MTD at 5. It may *never* exist. The
12 same is true under California law, as the State has yet to mandate a serialization
13 requirement for any such parts.

14 Moreover, who knows if or when the *proposal* to change ATF's regulations
15 to expand the definition of "firearm" to include firearm precursor parts will ever be
16 formally adopted? In fact, the portions of the Federal Register on which Defendants
17 rely as support for their position show that ATF has recognized *since at least the*
18 *1970s* that "unfinished" frames or receivers have been excluded from the federal
19 regulatory regime, and that for the last several years (since at least 2016) ATF has
20 been monitoring the cases in which courts have strictly interpreted the existing
21 regulations so as to exclude "unfinished" frames or receivers, 86 Fed. Reg. at 27721
22 & n. 9, 27722. Yet, nothing has changed, indicating a lack of political support or will
23 to actually alter the regulatory scheme as proposed.

24 Notably too, *even if* the proposed rule were adopted, that would not remove
25 the impossibility bar the City has imposed. The federal regime would *continue* to
26 permit self-building of firearms for personal use. What Defendants portray as a
27 "loophole" in the federal law has been the status quo for more than 50 years now—
28

prior to that, there were no such regulations at all—and the proposed new ATF rule continues to preserve an express exception for the building of homemade firearms for personal use. The language of the proposed rule expressly declares that "nothing in this rule would restrict persons not otherwise prohibited from possessing firearms from making their own firearms at home *without markings* solely for personal use (not for sale or distribution)." 86 Fed. Reg. at 27725, 22732 (italics added). That is, people would retain the means to lawfully own, possess, use, manufacture, and/or assemble firearms for personal use, regardless of serialization.

Similarly, under state law, the citizens of California—*except* San Diegans—will be able to continue lawfully building their own firearms even after Assembly Bill No. 879 goes into effect on July 1, 2022. *See* TRO-MPI Order at 22 (where this Court noted "California recently passed a bill to regulate firearm precursor parts, including unfinished frames and unfinished receivers, which will take effect on July 1, 2022. *See* Cal. Penal Code § 30412."). All that law will do is regulate the *sale* of "firearm precursor parts" by requiring "the sale of firearm precursor parts, as defined, to be conducted by or processed through a licensed firearm precursor part vendor." AB 879 (2019-2020), Leg. Counsel's Digest. It does not regulate the *manufacture or assembly* of firearms with such parts; nor does it impose any separate serialization or background check requirement in connection with this regulated sale of these parts. The *manufacture or assembly* of firearms remains regulated under Penal Code section 29180, which AB 879 does not change or modify in any way.

Thus, *unless and until* such licensees are *required* by state or federal law to sell only *pre*-serialized firearms precursor parts, Californians will retain the same statutory rights to engage in the lawful self-construction of firearms, by following the same regulatory process of applying for a serial number, passing a background check, and then imprinting the serial number to their self-built arms. Even then, the Ordinance would continue to *independently* infringe the constitutional rights of San

Diego City residents through its sweepingly broad definition of "unfinished" frames or receivers that outlaws a greater breadth of precursor parts than that which would fall within the scope of the state or federal serialization scheme.[2]

Ultimately then, the problem for City residents, both now and under any later expanded state or federal serialization scheme, is the Ordinance itself.

For these same reasons, Defendants' characterization of the Ordinance as "a longstanding, presumptively lawful regulation" somehow insulated from judicial review is just another part of the false narrative. MTD at 6-7 (citing *Heller*, 554 U.S. at 626-27 n.26). What they claim is "presumptively lawful" is a *serialization* requirement, which again the City itself affirmatively *precludes*. MTD at 7-8. The refusal to provide any mechanism to comply with the very procedure that the City claims is essential to protect the public safety certainly can have *no historic pedigree at all*. A mandate without available means of compliance cannot be presumptively lawful—it is presumptively *un*lawful and a disingenuous means of banning the underlying activity in toto. Any such regulation is necessarily stripped at the outset of any "presumptive" lawfulness it might otherwise hold. *See Pena*, 898 F.3d at 1010 (Bybee, J., concurring and dissenting in part) (quoting *Heller II*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (the plaintiff may '"rebut this presumption by showing the regulation does have more than a de minimis effect upon his [Second Amendment] right"'). And anyway, governmental restraints on the self-construction of firearms

---

[2]      Under AB 879, "firearm precursor part" is defined as "a component of a firearm that is necessary to build or assemble a firearm," in one of two categories: (1) "An unfinished receiver, including both a single part receiver and a multiple part receiver, such as a receiver in an AR-10- or AR-15-style firearm. An unfinished receiver includes a receiver tube, a molded or shaped polymer frame or receiver, a metallic casting, a metallic forging, and a receiver flat, such as a Kalashnikov-style weapons system, Kalashnikov-style receiver channel, or a Browning-style receiver side plate;" or (2) "An unfinished handgun frame." Cal. Pen. Code § 16531(a).

1  simply are not "longstanding" at all. They are instead of very recent advent among

2  the small handful of states that do impose such restrictions.[3]

3  **3.     The Ordinance's Destructive Effect Sweeps Far Too Broadly**

4  Even assuming Defendants have carried their primary burden of articulating

5  legitimate governmental interests, the Ordinance still necessarily fails any form of

6  heightened scrutiny for a clear absence of the required tailoring—much less *any*

7  tailoring. Again, Defendants must *prove* (1) the Ordinance does not burden

8  substantially more protected conduct than necessary, (2) the recited harms are real,

9  and (3) the Ordinance will in fact alleviate these harms in a direct and material way.

10 Any such scheme pushed forward on the basis of a false narrative and pretextual

11 justification like the one here necessarily burdens "substantially more" protected

12 conduct "than necessary"—a reality underscored by the regulatory schemes in both

13 California and Connecticut, which actually provide a realistic pathway to the lawful

14 self-construction of firearms through regulatory process that includes the very

15 background checks and serialization that Defendants falsely claim to be promoting.

16 Defendants also fail to carry their burden to show "the recited harms are real."

17 At the outset, it must be borne in mind that the mere propensity for or existence of

18 some misuse of a protected arm cannot suffice as a reason to ban or severely restrict

19 its availability for lawful purposes. The handgun ban struck down in *Heller* and the

20 stun gun ban called into serious question in *Caetano* were constitutionally

21 treacherous *despite* the propensity for misuse of these arms for the simple, yet

22 fundamental reason that they are in common use for lawful purposes and are not

23

24 [3]    According to Plaintiffs' research, only six other jurisdictions regulate self-
25 manufacturing of firearms, and they began doing so only within the last few years:
   California (Stats. 2016, c. 60 (A.B.857), § 4, eff. Jan. 1, 2017); Connecticut (2019,
26 P.A. 19-6, § 2, eff. Oct. 1, 2019); New Jersey (L.2019, c. 165, § 3, eff. July 16,
   2019); Hawaii (2019 HI H.B. 2744); Rhode Island (2020 R.I. HB 7102); and the
27 District of Columbia (Apr. 27, 2021, D.C. Law 23-274, § 201(b), 68 DCR 1034).
28

"dangerous" or "unusual" in the *constitutional* sense. The same is true here: the mere fact that *some* people may seek to misuse self-built arms, "circumvent" background checks, or avoid law enforcement detection with "ghost guns" cannot justify banning the whole class of arms and the full spectrum of constitutionally protected conduct. Further, the only data Defendants cite in support of their claim that the Ordinance combats a "threat to public safety" consists of references to two pages of the Federal Register where the ATF has compiled information about the supposed "ghost gun" phenomenon. Defendants claim this shows "[l]aw enforcement agencies recovered nearly 24,000 ghost guns at crime scenes between 2016 and 2020." MTD at 4 (citing 86 Fed. Reg. at 27722-23). But, as the ATF's own reference list shows, this information was largely drawn from newspaper and media publications, like the Baltimore Sun, the Wall Street Journal, NPR, and CBS News, which supposedly documented instances of crime involving "ghost guns" in a handful of other states, based on unknown and unidentified sources. 86 Fed. Reg. 27722 n. 17.

Aside from being based on inherently unreliable hearsay information, Defendants misportray ATF's report as a declaration about the number of "ghost guns" found at *actual* crime scenes. But ATF itself only described the scenes as "*potential* crime scenes," acknowledging that "*ATF does not know if the firearm being traced by the law enforcement agency was found at a crime scene as opposed to one recovered by them that was stolen or otherwise not from at the scene of a crime.*" 86 Fed. Reg. 27722 n. 18 (italics added). Thus, the 24,000 "ghost guns" purportedly "recovered" represent nothing more than additional evidence of the growing popularity of the self-built arms. Moreover, while Defendants cite reports of the Department of Homeland Security stating "'[g]host guns' present a 'homeland security challenge,'" MTD at 3, they overlook the unfavorable aspects of it. A supplemental report published by other members of the same committee argued that "[a]vailability is not the issue" when it comes to "ghost guns," because what matters

is "the intent and actual usage of the devices," and the decision to conduct annual threat assessments concerning such devices "ignores the lack of evidence that ghost guns are being used in terrorist acts." H.R. Rep. No. 116-88, Part 2, at 2. Also, the "overly broad definitions in this bill will unfairly associate the legal acts of lawful gun owners, hobbyists, and gunsmiths with acts of terrorism." *Id.*

And whatever limited evidentiary value this information might have, *none* of it concerns the situation in *San Diego.* The only "evidence" concerning San Diego are basic and contextually shallow statistics regarding the raw number of so-called "ghost guns" that were "recovered" by San Diego Police Department from 2018 to the middle of 2021. However, these numbers provide no information whatsoever supporting the conclusion that the firearms recovered were an actual threat to public safety solely due to the characteristic of being a non-serialized "ghost gun."

First, the SDPD data does not state whether the guns that were recovered were *actually used in a crime.* Second, this data does not identify how many crimes these firearms are connected to. For example, were all 233 "ghost guns" recovered in 2021 from 233 different criminal investigations, or were 100 recovered from a single individual? Third, the SDPD data does not identify whether firearms tracing was needed or even attempted when these "ghost guns" were recovered. Thus, there is no actual evidence that law enforcement was unable to trace the recovered guns to their owner/manufacturer. Fourth, the SDPD data does not clarify whether the recovered ghost guns were taken from any prohibited people as opposed to non-prohibited people for other reasons. Finally, the data provided in the Ordinance does not clarify where any of these "ghost guns" were recovered and thus whether any were even recovered within the City limits. Like the ATF information discussed above, the SDPD data provides no actual evidence of any public threat. At most, it simply shows that more firearms were self-constructed than in previous years.

It follows that Defendants cannot carry their additional burden to show "the

regulation will in fact alleviate [the claimed] harms in a direct and material way." *Doe*, 772 F.3d at 577. The supposed evidence of the public safety threat is simply too attenuated from those law-abiding citizens actually impacted by the Ordinance. Defendants have not even attempted to show any of the numerous law-abiding citizens directly targeted by this law has ever misused, much less committed any crime with, any self-built firearm or firearm component, so as to somehow justify dispossessing them of all such firearms and firearm parts and prohibiting them from exercising their fundamental right to possess, use, and self-construct protected arms.

California *already* regulates the entire gamut of *prohibited* persons with its existing laws that criminalize possession by every class of individual whose use or possession of a firearm could conceivably pose a danger to themselves or others. *See e.g.*, Cal. Pen. Code §§ 29800, 29805, 29815, 29825; *see also* 18 U.S.C §§ 922(b)(2), 922(d), 922(g). Defendants have not, and cannot, show the Ordinance is *at all* necessary to alleviate the public safety concerns they claim to be addressing about self-built firearms in the hands of would-be wrongdoers, much less that it will *in fact* alleviate those harms in a *direct and material way*.[4] And, to whatever extent the Ordinance may operate to deter such conduct, the fact is, it unquestionably sweeps in "substantially more" protected conduct "than necessary" to further the claimed interest. Citing to the non-binding opinion of the Third Circuit in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *see* MTD at 9, is of no help to Defendants. *Marzzarella* involved a challenge to the federal prohibition of possessing firearms with *defaced* serial numbers, under 18 U.S.C. § 922(k). That is a world removed

---

[4]     Defendants have also ignored the reality that unserialized unfinished frames and receivers are still legal to own, possess, purchase, transfer, and sell outside of the City and throughout California. Defendants have offered no evidence whatsoever that prohibiting possession and sales of unserialized unfinished frames or receivers solely within the City limits will have any real effect in reducing the numbers of these products within the City.

from a ban on the full spectrum of constitutionally protected conduct and property interests involved in self-constructing firearms for lawful purposes under a scheme that makes it *impossible* to comply with the state's own serialization requirement.

Plaintiffs' claim is strong, indeed *compelling* relief. At the least, it must be said that they have demonstrated "more than a sheer possibility" of the asserted constitutional violations, *Ashcroft*, 556 U.S. at 678, which is enough alone.

## V.  The Takings Claim Also Stands on Solid Ground

Defendants cannot just sweep all this under a rug by trying to relegate the entire class of affected individuals to state court inverse condemnation proceedings. MTD at 10. Fundamentally, the cases on which Defendants rely here, *Knick v. Township of Scott*, 139 S. Ct. 2162, 2168 (2019), and *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127-28 (1985), do not involve a taking of property interests protected under separately enumerated *federal* constitutional rights; they concern property rights created and protected under state law alone.  Indeed, even though the property at issue in the *Knick* was not separately protected under an enumerated federal constitutional right, unlike the property rights at stake here, the Supreme Court still applied the fundamental due process principle that "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick* at 2167.  This fundamental right to due process of law takes center stage here with the Ordinance's mandate that all ordinary law-abiding City residents dispossess themselves of all "unfinished" frames or receivers that fall within the Ordinance's sweepingly broad prohibition and lack the required but unobtainable serialization requirement.

Beyond this, the essential thesis of Defendants' claim that no compensation at all is due rests on the notion that the City can treat all such objects as "injurious to the health, morals, or safety of the community" subject to complete destruction under the government's "police powers." MTD at 11 (citing *Mugler v. Kansas*, 123

U.S. 623, 668 (1887) and *Goldblatt v. Hempstead*, 369 U.S. 590, 592 (1962)). This is in stark contrast to their position concerning the Second Amendment claim, where they have not even attempted to claim, much less show, the targeted NFOs are *either* "dangerous" or "unusual"—let alone both—so as to be stripped of constitutional protection. Defendants certainly cannot do so when the arms that these parts are used to construct are themselves clearly constitutionally protected. More fundamentally, it is "well established that the police power, broad as it is, cannot justify the passage of a law or ordinance which runs counter to the limitations of the federal Constitution," *Buchanan v. Warley*, 245 U.S. 60, 74 (1917), and there is no exception when the regulatory object is property, *id.*

That Defendants affirmatively prohibit the only viable means of making the existing property "safe" pursuant to State law—*i.e.*, ensuring serialization and background checks—illustrates that the problem is not with the property itself. The problem is the restrictive regulatory regime that literally makes it impossible to comply with the stated aims of the law. This is no basis for invoking a public safety exception to the Takings Clause. It is equivalent to forbidding a homeowner from installing noise abatement technology on his or her vehicle and then claiming that the noisy car is now a nuisance.

Moreover, it is axiomatic that private property interests cannot be taken without compensation on "nuisance" grounds unless the property or its intended use was clearly established as a nuisance *before* the taking. "[R]egulations that prohibit all economically beneficial use" of property "cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029 (1992). That is, nuisance takings are proper only when the property or its intended use has *historically* been understood as prohibited; only then can it be fairly said the

property owner lacks investment-backed expectations. *Id.* at 1030; *accord Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct. 2063, 2079 (2021) (italics added) ("For example, the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because *he never had a right to engage in the nuisance in the first place*."). The property interests at stake here have never been *until now* deemed a "nuisance" to the public, nor could they ever be.

The settled law is clear: the government must provide just compensation for any "physical invasion" of private property interests. *Cedar Point*, 141 S.Ct. 2063 at 2074. This is true whether the invasion involves a classic exercise of eminent domain powers, an occupation or possession (even temporarily or intermittently), or "a regulation [that] results in a physical appropriation of property." *Id.* at 2071–2072. A regulation has this effect when it effectively deprives the owner of "all economically beneficial us[e]' of [their] property." *Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). A "regulatory" taking having such effect is no different than a "physical" taking, as it requires compensation *per se*. *Cedar Point* at 2072.

The numerous modern "unfinished" frames and receivers, and other NFOs targeted by the Ordinance were previously owned, possessed, used, and constructed for self-defense and other lawful purposes, but have now been dispossessed. Compl. ¶ 152. Yet, for the very reason of these investment-backed expectations, borne out of California law under which all these individuals were permitted to acquire and use these NFOs, this property has substantial value to all those who were forced to comply with the Ordinance, including Plaintiffs and all similarly situated City resident FPC and SDCGO members who had come to rely on their ability to self-construct protected arms with the now-banned constituent parts. Compl. ¶ 152-156.

Indeed, while the City's Ordinance prohibits unserialized "unfinished" frames and receivers, they are lawful to possess, buy, sell, and transfer, outside of the City

within California. Thus, while Plaintiffs and those similarly situated could remove these NFOs from City limits or sell them outside of the City limits, they are forced to either incur storage costs or receive less than fair market value. Further, whatever limited market may exist for the sale of such outlawed items, anyone forced to sell under such a legal compulsion surely will not garner the fair market value of these otherwise valuable and popular firearms and constituent components. "A 'sale' implies willing consent to the bargain. A transaction although in the form of a sale, but under compulsion or duress, is not a sale." *Dore v. U.S.*, 97 F.Supp. 239, 224 (Ct. Cl. 1951). The Ordinance has destroyed or significantly diminished the value of the property to any would-be purchasers and has thus destroyed the very market to which it has relegated the affected citizens. Consequently, the Ordinance completely deprives the affected property owners of "all economically beneficial us[e]' of [their] property," and causes them to "suffer a permanent physical invasion of their property interests," effecting a taking *per se*. *Lingle*, 544 U.S. at 538.

For all the same reasons, even assuming this situation does not rise to the level of a taking *per se*, it is still one requiring compensation under the *Penn Central* factors. The economic impact on this valuable constitutionally protected property is substantial, the extent of interference is great, and the character of the governmental action is in the general nature of a government-imposed invasion of property interests so as to compel compensation consistent with the purpose of the Takings Clause. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

At least, Plaintiffs have *plausibly* so alleged in the Complaint.


Dated: January 24, 2022

THE DIGUISEPPE LAW FIRM, P.C.          DILLON LAW GROUP, APC

*/s/ Raymond M. DiGuiseppe*          */s/ John W. Dillon*
Raymond M. DiGuiseppe                John W. Dillon
THE DIGUISEPPE LAW FIRM, P.C.          DILLON LAW GROUP, APC

| | | |
|---|---|---|
| 1 | 4320 Southport-Supply Road | 2647 Gateway Rd. |
| 2 | Suite 300 | Ste 105 #255 |
| | Southport, NC 28461 | Carlsbad, CA 92009 |
| 3 | P: 910-713-8804 | P: 760.642.7150 |
| 4 | E: law.rmd@gmail.com | E: jdillon@dillonlawgp.com |

5

6    FIREARMS POLICY COALITION

7    */s/ William Sack\**  
     FIREARMS POLICY COALITION

8    5550 Painted Mirage Road  
     Suite 320

9    Las Vegas, NV 89149-4584  
     P: (916) 596-3492

10   E: wsack@fpclaw.org

11   *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28