Chad Flores (Texas Bar. No 24059769)
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640
chad@chadflores.law

John W. Dillon (California Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road, Suite 105, No. 255
Carlsbad, California 92009
(760) 642-7150
jdillon@dillonlawgp.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF

# CALIFORNIA

| | |
|---|---|
| Desiree Bergman, et al.<br><br>Plaintiffs,<br><br>v.<br><br>City of San Diego,<br>County of San Diego, et al.,<br><br>Defendants. | No. 21-cv-1676-BJC-DTF<br><br>**Amended Complaint**<br><br>Hon. Benjamin J. Cheeks<br>Court Room: 3A<br>Trial: Not Set |

# Table of Contents

I.    Introduction ................................................................................. 3

II.   Jurisdiction & Venue .................................................................. 8

III.  Parties ......................................................................................... 8

    A.    Plaintiffs ........................................................................... 8

    B.    City Defendants ............................................................. 10

    C.    County Defendants ........................................................ 11

IV.   The Bans Violate the Right to Keep and Bear Arms ................ 12

    A.    The City's Ban. ............................................................... 20

    B.    The Consequences for Violating the City's Ban ............ 26

    C.    The County's Ban. ......................................................... 28

    D.    The Consequences for Violating the County's Ban ....... 33

V.    The Section 1021.11 Fee-Shifting Regime Violates the Constitution. ...... 34

    A.    The Section 1021.11 Fee-Shifting Regime. ................... 34

    B.    Section 1021.11 Violates the First Amendment ........... 37

    C.    Section 1021.11 is Preempted by 42 U.S.C. § 1988. ..... 42

    D.    Section 1021.11 Violates the Equal Protection Clause ...... 47

VI.   Facts as to the Individual Plaintiffs. ........................................ 48

    A.    Desiree Bergman ........................................................... 48

    B.    Colin Rudolph. .............................................................. 50

    C.    Section 1021.11 Injures Plaintiffs Now. ...................... 52

VII.  Causes of Action ...................................................................... 54

    A.    Count One—City and County Bans • Second Amendment ...... 54

    B.    Count Two—Section 2021 • First Amendment ............ 61

    C.    Count Three—Section 2021 • Supremacy Clause ......... 62

    D.    Count Four—Section 2021 • Equal Protection .............. 63

    E.    Count Five—Section 2021 • Due Process ..................... 63

Plaintiffs Desiree Bergman, Colin Rudolph, San Diego County Gun Owners PAC, and Firearms Policy Coalition, Inc., file this amended complaint with Defendant the City of San Diego's consent under Federal Rule of Civil Procedure 15(a)(2).

## I.    Introduction

1.    Throughout American history and our nation's traditions of robustly exercising the right to keep and bear arms, people have been free to personally manufacture, construct, or otherwise assemble arms in common use for lawful purposes, including lawful self-defense and defense of others.

2.    The Supreme Court "has held that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)), and that this "Second Amendment right is fully applicable to the States," *Id.* (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)).

3.    And the Second Amendment protects the right to keep and bear all "weapons 'typically possessed by law-abiding citizens for lawful purposes,'" *Caetano*, 577 U.S. at 416 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 625)), which includes all "typically possessed" firearms that are not both "dangerous per se and unusual," *id.* at 417. To be "dangerous" in this sense requires substantially

more than a firearm's mere potential to cause injury, and a firearm is not "unusual" so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id.* at 420 (italics original). "The *Heller* test is a test that any citizen can understand. *Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes. It is a hardware test." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1021 (S.D. Cal. 2021), *vacated and remanded*, No. 21-55608, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). In other words, if the arm is commonly owned by law-abiding citizens for lawful purposes, then it is protected by the Constitution, full stop.

4.      But in spite of the text of the Constitution and binding Supreme Court precedents, Defendant City of San Diego enacted into law Ordinance Number O-2022-7 (hereinafter the "City Ordinance," or the "City Ban"), which, *inter alia*, prohibits "possession, purchase, sale, receipt, and transportation of non-serialized, unfinished frames and unfinished receivers" (hereinafter "non-firearm objects" or "NFO"s) by the over one million residents of, and all those traveling through, the City of San Diego, under pain of criminal penalty. And in spite of the text of the Constitution and binding Supreme Court precedents, Defendant County of San Diego enacted into law Ordinance No. 10765 (hereinafter the "County Ordinance," or the "County Ban"), which, *inter alia*, makes it illegal to "possess, purchase, transport … receive …sell, offer to sell, transfer, [or] offer to transfer" a

"Non-Serialized Unfinished Frame or Non-Serialized Unfinished Receiver" (also "non-firearm objects" or "NFO"s), by an even wider swath of residents of, and all those traveling through, the County of San Diego, under pain of criminal penalty.

5.    In fact, while California law permits and creates a regulatory path for the self-manufacture of firearms (as well as the acquisition and ownership of the precursor parts and materials necessary to the self-manufacture of firearms), the City and County Bans expressly and completely ban the possession, purchase, sale, receipt, and transportation of the parts and materials necessary to undertake the constitutionally protected conduct of self-manufacturing arms for self-defense, defense of others, and other lawful purposes.

6.    Defendants' Bans completely and categorically prohibit individuals not prohibited from exercising their Second Amendment rights from acquiring and possessing the parts necessary to self-manufacture firearms, as well as possession of self-manufactured firearms that are constitutionally protected because they are both of categories, types, functions, and/or designs, and are themselves commonly owned and possessed by law-abiding citizens for lawful purposes across the country and which are in fact lawful under California's firearms regulatory regime.

7.    By enacting the City and County Bans, the City of San Diego and County of San Diego willfully and affirmatively disregarded the Supreme Court's well-known and binding *Heller*, *McDonald*, and *Caetano* decisions, which establish

that the Second Amendment fully protects the right to self-manufacture, keep, and bear all such arms in common use for lawful purposes based on the amendment's text and the history and tradition of our Nation.

8.      "But the enshrinement of constitutional rights necessarily takes certain policy choices"—including these—"off the table." *Heller*, 554 U.S. at 636.

9.      Plaintiffs therefore bring this challenge because they unquestionably face "a realistic danger of sustaining a direct injury as a result of the law's operation or enforcement," *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020), seek to vindicate their rights, and to preliminarily and permanently enjoin enforcement of the City and County Bans as required to conform the law to the Constitution's text, our Nation's history and tradition, and the Supreme Court's binding precedents.

10.      Plaintiffs also bring this suit to challenge the constitutionality of California Code of Civil Procedure section 1021.11's one-sided fee-shifting provisions and seek an injunction against the statute's application or enforcement. Before pressing their challenges to the City and County Bans, Plaintiffs must first remove the cloud hanging over those claims by virtue of the operation of Section 1021.11.

11.      Section 1021.11 is an unconstitutional attempt by the State of California to deter citizens and firearms advocacy groups—through a novel, one-

way fee-shifting penalty—from accessing the courts to litigate claims over firearms regulations. The decision in *Miller v. Bonta*, 646 F.Supp.3d 1218 (S.D. Cal. Dec. 19, 2022), enjoined the State from enforcing Section 1021.11 by holding that Section 1021.11 violated the First Amendment, *id.* at 1224-27, and the Supremacy Clause, *id.* at 1227-31, and noting that likewise ran afoul of the Due Process and Equal Protection Clauses, *id.* at 1225-26. "A state law that threatens its citizens for questioning the legitimacy of its firearm regulations may be familiar to autocratic and tyrannical governments, but not American government. American law counsels vigilance and suspiciousness of laws that thwart judicial scrutiny." *Id.* at 1226. Because "the purpose and effect of § 1021.11 is to trench on a citizen's right of access to the courts and to discourage the peaceful vindication of an enumerated constitutional right," the Court declared the statute invalid. *Id.* at 1227.

12.     Because the Defendant local jurisdictions were not defendants in *Miller*, they are not directly bound by the injunction. But Section 1021.11 is unconstitutional regardless of whether the State or these local-government Defendants seek to enforce it, so Plaintiffs now seek declaratory and injunctive relief a second time, to enjoin its application by the County Defendants.

## II.    Jurisdiction & Venue

13.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14.    This action, based on Defendants' violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Southern District of California.

## III.    Parties

### A.    Plaintiffs

16.    Plaintiff Desiree Bergman is a natural person and a citizen of the State of California, residing in the City of San Diego, California, and the County of San Diego, California.

17.    Plaintiff Colin Rudolph is a natural person and a citizen of the State of California, residing in the City of San Diego, California, and the County of San Diego, California.

18.    Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization incorporated under the laws of Delaware and operating in California and other states. The purposes of FPC include defending and promoting the People's

rights, especially First and Second Amendment rights, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in the State of California, including in the City of San Diego and San Diego County. FPC represents the interests of its members, including in individual plaintiffs herein, who wish to self-manufacture firearms for self- defense and lawful purposes in the exercise of the Second Amendment rights without being subjected to the threat of criminal sanction under the City and County Bans. The risk of fee liability imposed by Section 1021.11 has caused FPC to refrain from filing suits or litigating constitutional claims against Defendant County of San Diego that it is otherwise prepared to file and litigate, including litigation against Defendants as set forth below.

19. Plaintiff San Diego County Gun Owners PAC ("SDCGO") is a local political organization whose purpose is to protect and advance the Second Amendment rights of residents of San Diego County, California, through their efforts to support and elect local and state representatives who support the Second Amendment right to keep and bear arms. SDCGO's membership and donors consist of Second Amendment supporters, people who own guns for self-defense and sport, firearms dealers, shooting ranges, and elected officials who want to restore and protect the right to keep and bear arms in California. SDCGO has members in the

City of San Diego and San Diego County. SDCGO represents the interests of its members, including in individual plaintiffs herein, who wish to self-manufacture firearms for self-defense and lawful purposes in the exercise of the Second Amendment rights without being subjected to the threat of criminal sanction under the City and County Bans. The risk of fee liability imposed by Section 1021.11 has caused SDCGO to refrain from filing suits or litigating constitutional claims against Defendant County of San Diego that it is otherwise prepared to file and litigate, including litigation against Defendants as set forth below.

**B.    City Defendants**

20.    Defendant City of San Diego is a municipal corporation and a chartered city, organized and existing under the laws of the States of California. Under its City Charter, the City of San Diego is granted "the right and power to make and enforce all laws and regulations in respect to municipal affairs," is "authorized to exercise any and all rights, powers and privileges," and "generally shall have all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever," now or hereafter granted or prescribed or authorized to be granted or prescribed by the laws and Constitution of the State of California. City of San Diego, City Charter, art. I, §§ 1-2 (2025), https://bit.ly/3VycIZb.

21.    Defendant Scott Wahl is the Chief of Police of San Diego and the chief law enforcement official in and for the City of San Diego, who has all power and

authority necessary for the operation and control of the City's Police Department. City of San Diego, City Charter, art. V, § 57 (2025); *see also* San Diego Police Dep't, Organizational Chart (2025), https://bit.ly/3EJCuQp.

22.     Defendant Wahl is sued in his official capacity.

23.     Defendant City of San Diego and Scott Wahl are referred to as the "City Defendants."

### C.     County Defendants

24.     Defendant County of San Diego is a political subdivision of the State of California, organized and existing as a general law county under the laws of the State of California. Under Article XI of the California Constitution and California Government Code Title 3, the County of San Diego, acting through its Board of Supervisors, has the authority to enact ordinances governing persons that reside and travel there, provided that any such ordinaces accord with the state's general laws.

25.     Defendant Kelly Martinez is the San Diego County Sheriff and chief law enforcement official in and for the County of San Diego, who has all power and authority necessary for the operation and control of the San Diego County Sheriff's Office. *See* Cal. Gov't Code §§ 26600–04; San Diego County Code § 87.102. Defendant Martinez is sued in her official capacity.

26.     Defendant County of San Diego and Kelly Martinez are referred to as the "County Defendants."

## IV. The Bans Violate the Right to Keep and Bear Arms

27. The Second Amendment to the United States Constitution provides (italics added): "A well-regulated *Militia* being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

28. Incorporated against the states and local governments through the Fourteenth Amendment in *McDonald*, 561 U.S. \2at 749, the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595.

29. The "central" holding of the Supreme Court in *Heller* is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. It "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

30. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634.

31. The Second Amendment "elevates above all other interests"— including any interest San Diego may claim in advancing "public safety"— "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635.

32.    The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780, and it cannot "be singled out for special—and specially unfavorable—treatment," *Id.* at 778–79.

33.    Even purported "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment[.]" United States v. Marzzarella, 614 F.3d 85, 92, n. 8 (3d Cir. 2010). Indeed, "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *Id.*

34.    Instead, "[j]ust as the First Amendment protects modern forms of communications, … and the Fourth Amendment applies to modern forms of search, … the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (internal citations omitted); accord *Caetano*, 577 U.S. at 416 (Alito, J., concurring).

35.    Thus, the Second Amendment "guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes,'" Caetano, 577 U.S. at 416 (quoting *Heller*, 554 U.S. at 625), and its protection extends to all firearms currently in common use that are not both "dangerous per se" and "unusual," *Id.* at 417 ("A weapon may not be banned unless it is both dangerous and unusual.").

36.    "Dangerous per se" does not mean the mere inherent propensity of a firearm to cause injury. *Caetano*, 577 U.S. at 418 ("firearms cannot be categorically prohibited just because they are dangerous"). In fact, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* "*Heller* defined the 'Arms' covered by the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *Id.* (quoting *Heller*, 554 U.S. at 581) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)) (italics original in *Caetano*).

37.    It is well-established that AR-15 type semiautomatic rifles are in common use and are not "dangerous" or "unusual" in this sense. *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."); *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1023 (S.D. Cal. 2021) (finding such rifles are "commonly owned by law-abiding citizens" and that "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home"), *vacated and remanded*, No. 21-55608, 2022 WL 3095986 (9th Cir. Aug. 1, 2022).

38.    Defendants' Bans do not merely prohibit the conduct of making and keeping firearms by dangerous convicted felons and other dangerous persons otherwise prohibited from exercising their Second Amendment rights.

39.    Rather than attempt to regulate the conduct and instruments in a targeted, tailored manner, the City and County completely ban all conduct and possession in toto, forcing all law-abiding people to purchase pre-manufactured commercial firearms, often more expensive than what can be constructed at home, and cutting off their ability to lawfully self-manufacture arms in common use for lawful purposes in the exercise of their constitutional rights under the Second Amendment.

40.    The City and County Bans on the self-manufacture of firearms are notably more expansive than the State of California's regulations, which, by contrast, at least establishes a path for the lawful self-manufacture of firearms, and the ongoing possession and use of the end-product self-manufactured firearms.

41.    In the First Amendment context, free speech rights include the ability to build one's own printing and communications devices, print one's own fliers, and utilize largely unregulated channels of speech in the exercise of the rights secured. In that context, it is well established and readily accepted that the government cannot lawfully narrow the channels for exercising the right to freely speak through

government-approved gatekeepers who create or provide limited channels of speech and limited means of distribution for a beholden populace.

42.    Likewise, in the Second Amendment context, the government cannot lawfully narrow the channels for exercising the right to keep and bear arms by limiting one's access to the instruments essential to self- manufacturing in the exercise of that right, by forcing people to exercise it solely through the acquisition of firearms from limited, government-approved manufacturers of firearms and firearm predecessor materials.

43.    The Second Amendment right necessarily includes and thus guarantees the ability of ordinary law-abiding citizens to self-manufacture firearms in common use for self-defense and other lawful purposes.

44.    The ability to self-manufacture arms has always been part of the Second Amendment right, as well as American history and tradition, so as to become firmly entrenched and now enshrined under the Second Amendment.

45.    The colonists in the first permanent English settlements had the express right to import arms and the items necessary to make them. Binding his "Heirs and Successors," King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND

OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3787–88 (Francis Thorpe ed., 1909). And the 1620 Charter of New England granted colonists the right "to take, load, carry, and transports in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1834–35 (Francis Thorpe ed., 1909). And "[f]rom the earliest periods American gunsmiths had made and repaired military firearms." Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 178 (1956).

46.    "The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era." M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980).

47.    As historian Charles Winthrop Sawyer explained, "in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." 1 Charles

Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 145 (1910). Moreover, many gunsmiths worked primarily in other trades and built or repaired firearms as a hobby. See James Whisker, THE GUNSMITH'S TRADE 145–63 (1992).

48.    During the Revolutionary War, many colonies relied on and incentivized people outside of the firearms industry to produce firearms. For example, on August 2, 1775, a Committee appointed by Maryland's Provincial Convention "to enquire into the practicability of establishing a manufactory of Arms within this Province" determined that "Arms may be furnished sooner, and at less expense by engaging immediately all Gun Smiths, and others concerned in carrying on that business." JOURNAL OF THE MARYLAND CONVENTION JULY 26 – AUGUST 14, 1775, at 64–65 (William Hand Browne ed. 1892) (italics added).

49.    In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications. "[E]very good firearm Manufactured in this Colony" was rewarded with "three pounds for each." 8 DOCUMENTS AND RECORDS RELATING TO THE STATE OF NEW-HAMPSHIRE DURING THE PERIOD OF THE AMERICAN REVOLUTION, FROM 1776 TO 1783, at 15–16 (Nathaniel Bouton ed., 1874).

50.    In March 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or Persons who are

willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof." 5 AMERICAN ARCHIVES, FOURTH SERIES, 1418 (Peter Force ed. 1844). The Provincial Congress offered rewards for the manufacturers who could produce the greatest number of arms for the colony, but excluded "any person with whom the Congress or Committee of Safety have already contracted"—thus incentivizing those capable of manufacturing arms but not necessarily in the firearms business.

51.    A month later, the North Carolina Provincial Congress called for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony. 5 AMERICAN ARCHIVES, FOURTH SERIES, 1338 (Peter Force ed. 1844). And further, "that they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.*

52.    Certainly, the ratifiers of the Bill of Rights remembered that the young country depended on the manufacture of firearms by those outside of the formal firearms industry for survival and intended to protect such activity through the Second Amendment. Indeed, building firearms was entirely unregulated during the colonial and founding eras in America. And there were no restrictions on who could be a gunsmith or make guns.

53.    "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Secretary of State Thomas Jefferson, letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

54.    Thus, no history or precedent exists for extinguishing citizens' ability to self-manufacture firearms for self-defense or other lawful purposes— and rightly so, since the Second Amendment, through its text, as it is informed by history and tradition, and as interpreted by the Supreme Court, is intended to guarantee this right as part of the fundamental liberty it secures.

**A.    The City's Ban.**

55.    City of San Diego Ordinance Number O-2022-7, a copy of which is attached as Exhibit A, prohibits, *inter alia*, the possession, purchase, sale, receipt, and transportation of non-serialized, unfinished frames and receivers, as well as non-serialized firearms.

56.    The City Ordinance was passed by the City Council on September 14, 2021, and signed into law by Mayor Gloria on September 23, 2021.

57.    "The date of approval by the Mayor pursuant to section 280(c) shall be deemed the date of its final passage." City of San Diego City Charter, art. XV, § 295(a)(1).

58.    "Ordinances making the annual tax levy, the annual appropriation ordinances, ordinances calling or relating to elections, and emergency measures, shall take effect at the time indicated therein. All other ordinances passed by the Council shall take effect at the time indicated therein, but not less than thirty calendar days from the date of their final passage. Ordinances adopted by vote of the electors shall take effect at the time indicated therein or the date the final canvass is issued by the County Registrar of Voters, whichever occurs later." City of San Diego City Charter, art. XV, § 295(d).

59.    Consistent with the foregoing, the Ban "shall take effect and be in force on the thirtieth day from and after its final passage." City Ordinance § 3.

60.    Thus, the City Ordinance is effective and enforceable by Defendants against all persons in the City of San Diego, including named Plaintiffs herein, by no later than October 23, 2021, leaving those who already lawfully acquired and possess proscribed items before the City Ordinance was enacted only 30 days to dispossess themselves of their personal property, and it forevermore prohibits all persons in San Diego from acquiring the necessary products for and self-manufacturing firearms in compliance with State law.

61.    Under the City Ordinance, with few exceptions not relevant to the instant action, it is unlawful for any person to "[p]ossess, purchase, transport, or receive an unfinished frame or unfinished receiver, unless the unfinished frame or

unfinished receiver is imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearms Importer or Federal Firearms Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver." San Diego Municipal Code ("SDMC") § 53.18(c)(1).

62.    Under the City Ordinance, with few exceptions not relevant to the instant action, it is unlawful for any person to "[s]ell, offer to sell, transfer, or offer to transfer an unfinished frame or unfinished receiver, unless the unfinished frame or unfinished receiver is imprinted with a serial number issued to that unfinished frame or unfinished receiver by a Federal Firearms Importer or Federal Firearms Manufacturer, or engraved or permanently affixed with a serial number provided by the California Department of Justice for that unfinished frame or unfinished receiver." SDMC § 53.18(c)(2).

63.    Under the City Ordinance, the term "Person" has "the same meaning as in San Diego Municipal Code section 11.0210." SDMC § 53.18(b)(7).

64.    San Diego Municipal Code § 11.0210 provides that the term "person" means "any natural person, firm, joint venture, joint stock company, partnership, association, club, company, corporation, business trust, organization, or the manager, lessee, agent, servant, officer or employee of any of them or any other entity which is recognized by law as the subject of rights or duties."

65.    Under the City Ordinance, the term "Firearm" has "the same meaning as in California Penal Code section 16520(a)" and includes a handgun, rifle, or shotgun. SDMC § 53.18(b)(3).

66.    Under the City Ordinance, the term "unfinished frame" means "a piece of any material that does not constitute the completed frame of a firearm, but that has been shaped or formed in any way for the purpose of becoming the frame of a firearm, and which may be made into a functional frame of a firearm through milling, drilling, or other means." SDMC § 53.18(b)(11).

67.    "Frame means the primary structural component of a firearm to which the fire control components are attached." SDMC § 53.18(b)(4).

68.    Under the City Ordinance, the term "unfinished receiver" means "a piece of any material that does not constitute the completed receiver of a firearm, but that has been shaped or formed in any way for the purpose of becoming the receiver of a firearm, and which may be made into a functional receiver of a firearm through milling, drilling, or other means." SDMC § 53.18(b)(12).

69.    "Receiver means the primary structural component of a firearm to which the fire control components are attached." SDMC § 53.18(b)(8).

70.    The City Ordinance's definitions of "unfinished frame" and "unfinished receiver" are so broadly defined as to sweep into their net virtually all conceivable forms and types of firearm precursor parts, as well as even raw

materials. Indeed, based on the City Ordinance's expansive definitions, even raw materials, such as a uniform block of metal or plastic, would be captured by the City Ordinance—and therefore subject a buyer, seller, or possessor to criminal prosecution if the materials had been "shaped or formed in any way" for the purpose of becoming" the frame or receiver of a firearm.

71.    The phrase "shaped or formed in any way" is undefined in the City Ordinance.

72.    The City Ordinance's proviso for items serialized pursuant to federal law, SDMC § 53.18(c)(1), is illusory because the City Ordinance proscribes far more than federal law would ever allow. Whereas the City Ordinance proscribes *anything* that has been formed "in any way" and "may be made" into a frame or receiver, SDMC § 53.18(b), the federal regime covers only certain unfinished frames and unfinished receivers that "may *readily* be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). Everything not meeting the federal definition—most if not all of what Plaintiffs seek to keep and bear—is outside of the federal licensing scheme and therefore not subject to the City Ordinance's proviso about federal law. And because the federal rule's application turns on a multi-faceted test consisting of myriad objective and subjective factors, it cannot be said with any certainty—especially not by laypeople or courts lacking the technical expertise in the industry—whether any particular

materials, parts, or components that a San Diego City resident may have or seek to obtain in the future individually or collectively constitute an "unfinished frame or receiver" within the revised definition of a "firearm" under this regime.

73.     Likewise, the City Ordinance's proviso for items serialized pursuant to California state law, SDMC § 53.18(c)(1), is illusory because the City Ordinance proscribes far more than California state law would ever allow. Whereas the City Ordinance proscribes *anything* that has been formed "in any way" and "may be made" into a frame or receiver, SDMC § 53.18(b), the state regime covers only unfinished frames and unfinished receivers that "may readily be completed, assembled or converted to be used as the frame or receiver of a functional firearm" or are marketed or sold as such. Cal. Penal Code § 16531. Everything not meeting that latter definition—most if not all of what Plaintiffs seek to keep and bear—is outside of the state licensing scheme and therefore not subject to the City Ordinance's proviso about state law.

74.     Rather than tailor its laws, as the Constitution requires, the City elected to take an overbroad, categorical approach that unquestionably infringes on the rights of San Diego residents, businesses, and visitors, and empowers Defendants to use criminal sanctions and impose by such force the City's policy preferences on individuals in San Diego, denying them access to and the exercise of their right to keep and bear protected arms.

**B.    The Consequences for Violating the City's Ban.**

75.    The City Ordinance may be enforced "by any remedy available in Chapter 1 of the San Diego Municipal Code." Ordinance recitals, p.3.

76.    18 SDMC § 12.0105 provides:

The City Manager, the City Clerk or any of their designated Enforcement Officials have the authority and powers necessary to gain compliance with the provisions of the Municipal Code and applicable state codes. These powers include the power to issue Notices of Violation and field citations, inspect public and private property and use whatever judicial and administrative remedies are available under the Municipal Code or applicable state codes.

77.    18 SDMC § 12.0105 provides:

A Director or any designated Enforcement Official is authorized to arrest without a warrant any person whenever the Enforcement Official has reasonable cause to believe that the person has committed a violation of the Municipal Code or applicable state codes in his or her presence. Pursuant to Penal Code Section 836.5 the Enforcement Official can only arrest a person by issuing a misdemeanor field citation.

78.    26 SDMC § 12.0201 provides:

It shall be unlawful for any person to violate any provision or to fail to comply with any of the requirements of this Code. A violation of any of the provisions or failing to comply with any of the mandatory requirements of this Code shall constitute a misdemeanor; except that notwithstanding any other provision of this Code, any such violation constituting a misdemeanor under this Code may, in the discretion of the City Attorney, be charged and prosecuted as an infraction; and, with the further exception that any violation of the provisions relating to parking, operation of bicycles, operation of motor vehicles, and use of freeways, highways and streets by animals, bicycles, motor vehicles or pedestrians shall constitute an infraction. Any person convicted of a misdemeanor under the provisions of this Code, unless provision is

otherwise herein made, shall be punishable by a fine of not more than one thousand dollars ($1000) or by imprisonment in the County Jail for a period of not more than six months or by both fine and imprisonment. Any person convicted of an infraction under the provisions of this Code, unless provision is otherwise herein made, shall be punishable by fine only as follows: Upon a first conviction, by a fine of not exceeding two hundred fifty dollars ($250) and for a second conviction or any subsequent conviction within a period of one year, by a fine of not exceeding five hundred dollars ($500).

Each such person shall be charged with a separate offense for each and every day during any portion of which any violation of any provision of this Code is committed, continued or permitted by such person and shall, upon conviction, be punished accordingly.

79.    SDMC § 12.0202 provides:

(a) In addition to any other remedy provided by this Code, any provision of this Code may be enforced by injunction issued by the Superior Court upon a suit brought by The City of San Diego.

(b) As part of a civil action filed to enforce provisions of this Code, a court may assess a maximum civil penalty of two thousand five hundred dollars ($2,500) per violation of the Municipal Code for each day during which any person commits, continues, allows or maintains a violation of any provision of this Code.

80.    10 SDMC § 12.0204 provides:

(a) It is unlawful to maintain or allow the existence of any condition that creates a public nuisance.

(b) Pursuant to California Government Code section 38773, the City has the authority to judicially abate public nuisances by filing criminal or civil actions. The City also has the authority to make the expense of abatement of the public nuisance a special assessment, or a lien against the property on which it is maintained and a personal obligation against the property owner, in accordance with California Government Code section 38773.1 or 38773.5.

### C.    The County's Ban.

81.    County of San Diego Ordinance Number 10765, a copy of which is attached as Exhibit B, prohibits, *inter alia*, the possession, purchase, sale, receipt, and transportation of non-serialized, unfinished frames and receivers, as well as non-serialized firearms. San Diego County, Cal., Ordinance 10765 (Jan. 25, 2022).

82.    The County Ordinance was enacted by the Board of Supervisors of the County of San Diego on January 25, 2022. It took effect on February 25, 2022, County Ordinance § 3, and is codified as San Diego County, California, Code of Regulatory Ordinances tit. 3, div. 3, ch. 3 ("hereinafter San Diego County Code").

83.    Under the County Ordinance, with few exceptions not relevant to the instant action, "[i]t shall be unlawful for any person to sell, offer to sell, transfer, offer to transfer a Non-Serialized Unfinished Frame or Non-Serialized Unfinished Receiver." San Diego County Code § 33.301(d).

84.    Under the County Ordinance, with few exceptions not relevant to the instant action, "[i]t is unlawful for any person to possess, purchase, transport, or receive a Non-Serialized Firearm." San Diego County Code § 33.301(e).

85.    Under the County Ordinance, with few exceptions not relevant to the instant action, "[i]t shall be unlawful for any person to sell, offer to sell, transfer, or offer to transfer a Non-Serialized Firearm." San Diego County Code § 33.301(f).

86.    The County Ordinance uses these definitions of "Unfinished Frame," "Unfinished Receiver," and other key terms:

3D Printing: The process of manufacturing a physical object from a three dimensional digital model by adding successive layers of material.

Federal Firearms Importer: A licensed firearm importer as defined in 18 U.S.C. section 921(a)(9), as may be amended.

Federal Firearms Manufacturer: A licensed firearm importer as defined in 18 U.S.C. section 921(a)(10), as may be amended.

Firearm: As defined in California Penal Code section 16520(a), as may be amended. As used in this section, "Firearm" shall include a Handgun, Rifle or Shotgun.

Fire Control Component: A component necessary to initiate, control, or complete the firing sequence of a Firearm, including but not limited to a hammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rail.

Frame: The primary structural component of a Firearm to which the Fire Control Components are attached.

Handgun: As defined in California Penal Code section 16640, as may be amended.

Non-Serialized: Term describing an item that is not either imprinted with a serial number issued to it by Federal Firearms Importer or Federal Firearms Manufacturer in compliance with federal law or engraved or permanently affixed with a serial number provided by the California Department of Justice for that item.

Person: As defined in San Diego County Regulatory Code section 12.115.

Receiver: The primary structural component of a Firearm to which the Fire Control Components are attached.

Rifle: As defined in California Penal Code section 17090, as may be amended.

Shotgun: As defined in California Penal Code section 17190, as may be amended.

Unfinished Frame: Any piece of material that does not constitute the completed Frame of a Firearm, but that has been shaped or formed in any way for the purpose of becoming the Frame of a Firearm, and which may be made into a functional Frame of a Firearm through milling, drilling, or other means.

Unfinished Receiver: Any piece of material that does not constitute the completed Receiver of a Firearm, but that has been shaped or formed in any way for the purpose of becoming the Receiver of a Firearm, and which may be made into a functional Receiver of a firearm through milling, drilling, or other means.

San Diego County Code § 33.301(a). A proviso says that "any reference to Firearms, Frames, Receivers, Unfinished Frames or Unfinished Receivers includes those that are manufactured by 3D printing." San Diego County Code § 33.301(b).

87.    The County Ordinance's definitions of "Unfinished Frame," "Unfinished Receiver" are so broadly defined as to sweep into their net virtually all conceivable forms and types of firearm precursor parts, as well as even raw materials.

88.    Indeed, based on the County Ordinance's expansive definitions, even raw materials, such as a uniform block of metal or plastic, would be captured by the County Ordinance—and therefore subject a buyer, seller, or possessor to criminal

24-cv-0971-AJB-SBC

prosecution if the materials had been "shaped or formed in any way" for the purpose of becoming" the frame or receiver of a firearm.

89.    The phrase "shaped or formed in any way" is undefined in the County Ordinance.

90.    The County Ordinance's proviso for items serialized pursuant to federal law, San Diego County Code § 33.301(a), is illusory because the County Ordinance proscribes far more than federal law would ever allow. Whereas the County Ordinance proscribes *anything* that has been formed "in any way" and "may be made" into a frame or receiver, San Diego County Code § 33.301(a), the federal regime covers only certain unfinished frames and unfinished receivers that "may *readily* be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). Everything not meeting the federal definition—most if not all of what Plaintiffs seek to keep and bear—is outside of the federal licensing scheme and therefore not subject to the County Ordinance's proviso about federal law.

91.    Likewise, the County Ordinance's proviso for items serialized pursuant to California state law, San Diego County Code § 33.301(a), is illusory because the County Ordinance proscribes far more than California state law would ever allow. Whereas the County Ordinance proscribes *anything* that has been formed "in any way" and "may be made" into a frame or receiver, San Diego County Code §

33.301(a), the state regime covers only unfinished frames and unfinished receivers that "may readily be completed, assembled or converted to be used as the frame or receiver of a functional firearm" or are marketed or sold as such. Cal. Penal Code § 16531. Everything not meeting that latter definition—most if not all of what Plaintiffs seek to keep and bear—is outside of the state licensing scheme and therefore not subject to the County Ordinance's proviso about state law. And because the federal rule's application turns on a multifaceted test consisting of myriad objective and subjective factors, it cannot be said with any certainty— especially not by laypeople or courts lacking the technical expertise in the industry— whether any particular materials, parts, or components that a San Diego County resident may have or seek to obtain in the future individually or collectively constitute an "unfinished frame or receiver" within the revised definition of a "firearm" under this regime.

92.    Rather than tailor its laws, as the Constitution requires, the County elected to take an overbroad, categorical approach that unquestionably infringes on the rights of San Diego County residents, businesses, and visitors, and empowers the County Defendants to use criminal sanctions and impose by such force the County's policy preferences on individuals in San Diego, denying them access to and the exercise of their right to keep and bear protected arms.

### D.    The Consequences for Violating the County's Ban.

93.    Violations of the County Ordinance constitute misdemeanors punishable by fine, imprisonment, or both. *See* Cal. Gov't Code § 25132.

94.    San Diego County Code § 11.116 provides in relevant part that "[i]t shall be unlawful for any person to violate any provision or to fail to comply with any requirement of this code" and that "[a]ny person who violates any provision or fails to comply with any requirement of this code shall be guilty of a misdemeanor."

95.    San Diego County Code § 11.116(a) provides that "[a] conviction for a misdemeanor is punishable by a fine not to exceed $1,000 or by imprisonment in the County Jail for a period not to exceed six months, or by both fine and imprisonment."

96.    San Diego County Code § 11.117 provides: "Each and every day a violation of this code is committed is a separate and distinct offense."

97.    San Diego County Code § 11.118 provides: "Whenever in this code any act or omission is declared to be unlawful, it shall include causing, allowing, aiding or abetting the act or omission."

98.    San Diego County Code § 11.121 provides: "The County may use any or all of the following remedies to address any violation of this code or failure to abide by any requirement of this code: (a) Criminal prosecution; (b) Civil action for any legal and/or equitable remedy including, but not limited to injunctive relief, declaratory relief, civil penalties, damages, restitution, site restoration and cost

recovery;(c) Nuisance abatement as provided by this code; and (d) Administrative action as provided by this code."

## V.    The Section 1021.11 Fee-Shifting Regime Violates the Constitution.

### A.    The Section 1021.11 Fee-Shifting Regime.

99.    Senate Bill 1327, enacted as Code of Civil Procedure §1021.11, is based largely word-for-word on Texas's SB 8, enacted in 2021 in the abortion context. This case challenges Section 1021.11's radical effort to suppress firearms-related litigation by putting civil rights litigants and their attorneys on the hook for the government's attorney's fees if a case results in anything short of victory on every claim alleged in a complaint.[1]

100.    Section 1021.11 provides in relevant part: "Notwithstanding any other law, any person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms, or that represents any litigant seeking that relief, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party." Cal. Civ. Proc. Code § 1021.11 (West).

---

[1] Senate Bill 1327 also created a private right of action to enforce state laws relating to the unlawful manufacture, distribution, or sale of specified firearms. 2022 Cal. Stat. ch. 146, § 1 (adding Bus. & Prof. Code §§ 22949.60–.71). This case does not challenge SB 1327's private attorney general features.

101.   Due to the unique political circumstances in which it was enacted—namely, targeting firearms litigation as a form of protest over Texas's targeting of abortion litigation in SB 8—Section 1021.11's unconstitutionality has never been in question. Attorney General Rob Bonta has described SB 8 as "blatantly unconstitutional." Press Release, Cal. Dep't of Just., *Att'y Gen. Bonta: Texas Cannot Avoid Judicial Review of Its Constitutional Abortion Ban* (Oct. 27, 2021), https://bit.ly/3pRWA4F. Despite signing SB 1327 into law, Gov. Newsom had likewise blasted the Supreme Court's refusal to block the Texas law on which it was based as "outrageous" and "an abomination." Gavin Newsom, Opinion, *The Supreme Court Opened the Door to Legal Vigilantism in Texas. California Will Use the Same Tool To Save Lives.*, WASH. POST (Dec. 20, 2021), https://bit.ly/4mBXzRI. And SB 1327's legislative history includes similar acknowledgements. *See* S.B. 1327, S. Floor Analysis, p. 6 (June 28, 2022) ("While the goal of repurposing the Texas law may be sound, these problematic provisions may not justify those ends. They insulate government action from meaningful challenge by creating a strong, punitive deterrent for any that try and in the end, may violate due process guarantees."); S.B. 1327, A. Jud. Comm. Analysis, p. 13 (June 10, 2022) (describing SB 1327's fee-shifting as "a lose-lose scenario for plaintiffs who challenge the bill or a gun law; and a win-win scenario for the government").

102. Unlike any other ordinary "fee shifting" statute, SB 1327 says a "prevailing party" cannot be a plaintiff who brings a case seeking declaratory or injunctive relief regarding a state or local firearm regulation. Cal. Civ. Proc. Code § 1021.11(e). And it says government defendants in a firearms case will be treated as a "prevailing party" if the court either "[d]ismisses any claim or cause of action" in the case, "regardless of the reason for the dismissal," or "[e]nters judgment in favor of the [government] party" "on any claim or cause of action." Cal. Civ. Proc. Code § 1021.11(b) (emphasis added). In simple terms, then, SB 1327 would enable government defendants to recover fees if a firearms plaintiff loses on any claim in the case, while the plaintiff can only avoid liability for fees if it prevails on every claim in the case. This means, among other things, that a plaintiff could be liable for the government's fees even if the plaintiff obtained all of the relief sought in the litigation.

103. Section 1021.11(c) further gives these "prevailing party" government defendants a three-year window to bring a state law action to recover their fees, notwithstanding that the vast majority of firearms litigation, like this case, is brought under 42 U.S.C. § 1983, and that federal law already provides for the treatment of attorney's fees in those cases: 42 U.S.C. § 1988(b) provides that "prevailing part[ies]" in federal civil rights actions may recover "a reasonable attorney's fee as part of [their] costs" in the action itself.

104.    The State is now enjoined from enforcing Section 1021.11 under *Miller v. Bonta*, 646 F.Supp.3d 1218 (S.D. Cal. Dec. 19, 2022).[2] The Court in *Miller* found that Section 1021.11 violated the First Amendment and is pre-empted under the Supremacy Clause by 42 U.S.C. § 1988. For the same reasons, Section 1021.11 should be enjoined here.

### B.    Section 1021.11 Violates the First Amendment

105.    Section 1021.11's Fee-Shifting Regime Violates the First Amendment. Section 1021.11 encourages state and local governments to push the constitutional envelope when crafting firearms regulations by threatening would-be plaintiffs considering suing over those regulations with a potentially ruinous fee award. As the court in *Miller* observed, "[t]he principal defect of § 1021.11 is that it threatens to financially punish plaintiffs and their attorneys who seek judicial review of laws impinging on federal constitutional rights." *Miller*, 646 F. Supp. 3d at 1224. "Laws like § 1021.11 that exact an unaffordable price to be heard in a court of law are intolerable." *Id.* at 1225. The threat posed by Section 1021.11 extends beyond imposing financial ruin on would-be plaintiffs by imposing the same threat of fee liability on attorneys and law firms. The *Miller* court recognized this "does a disservice to the courts" through suppressing "novel," "substantial" claims, thereby

---

2 The Court issued a substantively identical ruling in a related case. *South Bay Rod & Gun Club, Inc. v. Bonta*, S.D. Cal. Case No. 3:22-cv-1461-BEN-JLB, 2022 WL 17811113 (S.D. Cal. Dec. 19, 2022).

"threaten[ing] severe impairment of the judicial function" by "insulat[ing] the Government's laws from judicial inquiry." *Id.* at 1227 (citations omitted).

106.    Section 1021.11 thus improperly threatens the right of access to the courts. The right to petition the government for redress of grievances includes "[t]he right of access to the courts," which "is indeed but one aspect of the right of petition." *Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). The *Miller* court noted that Section 1021.11 struck at the core of this right. "In our ordered system of civil justice, the Second Amendment right, and for that matter all constitutional rights, are ultimately protected by the First Amendment right to identify unconstitutional infringements and seek relief from the courts." *Miller*, 646 F. Supp. 3d at 1225-26. And the court further emphasized "that maintaining the courts as a setting to resolve questions about defective laws is necessary for a peaceful society." *Id.*

107.    This isn't the first time a state has erected and enforced regulatory barriers to avoid civil rights litigation. The Supreme Court rejected Virginia's attempt to keep the NAACP out of court in *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963) (concerning the state's ban against the "improper solicitation" of legal business), and struck down South Carolina's efforts to punish the ACLU's counsel in *In re Primus*, 436 U.S. 412 (1978) (concerning the state's prohibition against solicitation of prospective litigants).

108.   The Supreme Court has recognized the central role the First Amendment plays in securing access to the courts to preserve civil rights, particularly for groups unable protect their rights through the political channels. "Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts. . . . [U]nder the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances." *Button*, 371 U.S. at 429–30. Such is the case here, where Plaintiffs seek to assert their constitutional rights in litigation against local governments that disfavor Second Amendment rights.

109.   Since *Button*, the Supreme Court has consistently enjoined state action that imposes barriers on litigation that may chill protected activity. See, e.g., *Bhd. Of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 7 (1964) (a state cannot"handicap[]" "[t]he right to petition the courts" through indirect regulation that "infringe[s] in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest"); *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222–23 (1967) (the state cannot "erode [the First Amendment's] guarantees by indirect restraints" on citizens' ability to assert their legal rights); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 580–81, 585–86 (1971) ("the First Amendment forbids . . .restraints" that effectively prevent groups from "unit[ing] to assert their

legal rights," and striking down economic regulation that denied union members "meaningful access to the courts").

110.   Section 1021.11's obvious and impermissible purpose is to give state and local governments in California a free hand to regulate firearms by suppressing litigation over firearm regulations. Because "[t]he Constitution does not permit" the government to "insulate [its] interpretation of the Constitution from judicial challenge," courts "must be vigilant when [the government] imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001).

111.   Section 1021.11's fee-shifting regime further violates the First Amendment because it is content-based and viewpoint-discriminatory: It imposes a unique burden on those who seek to vindicate their civil rights through firearms litigation while favoring all other sorts of constitutional and statutory civil rights claims. Civil-rights litigation involves core protected speech. *See Button*, 436 U.S. at 431 (civil rights litigation "form of political expression"); *Primus*, 436 U.S. at 429; *Velazquez*, 531 U.S. at 545. Yet Section 1021.11 singles out speech over firearms restrictions for special unfavorable treatment. Laws that impose special burdens on disfavored speech and single out disfavored speakers are constitutionally suspect. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564–66 (2011). States are not permitted to advance their policy goals "through the indirect means of restraining

certain speech by certain speakers," *id.* at 577, and "may not burden the speech of others in order to tilt public debate in a preferred direction." *Id.* at 578–79. Indeed, "the First Amendment is plainly offended" when the government "attempt[s] to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785–86 (1978).

112.    There is also no legitimate historical precedent for a fee-shifting statute that only allows government defendants to recover fees in civil rights litigation. Section 1021.11 thus falls outside of the history and tradition of the First Amendment that is the touchstone of First Amendment analysis. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468–71 (2010) (placing the burden on the government to show that a type of speech belongs to one of the "historic and traditional categories" of constitutionally unprotected speech); *accord Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) (Establishment Clause analysis must be anchored to "historical practices and understandings"); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022) ("[T]o carry [its] burden, the government must generally point to historical evidence about the reach of the First Amendment's protections."). The lack of historical precedent further demonstrates that SB 1327 violates the First Amendment.

113.    But even under First Amendment balancing tests, Section 1021.11 cannot withstand the appropriate strict scrutiny. For example, it is impossible to

imagine any interest the Defendants could assert as compelling, or even permissible, in support of this statute. Indeed, Defendants cannot possibly sustain their burden of identifying a compelling interest, as there is no compelling interest for targeting a particular type of civil rights litigant for unfavorable treatment when exercising the fundamental right to assert constitutional claims. Moreover, Section 1021.11 is not narrowly tailored: the State failed even to consider less restrictive alternatives that would serve such an interest without imposing such severe burdens on core protected rights. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

### C. Section 1021.11 is Preempted by 42 U.S.C. § 1988.

114.    The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." U.S. Const. Art. VI, Cl. 2. "Consistent with that command, [the Supreme Court has] long recognized that state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). To that end, "state law is naturally preempted to the extent of any conflict with a federal statute," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), and "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted); *see also Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) ("[U]nder the Supremacy Clause . . . any state law, however clearly within a State's acknowledged power, which

interferes with or is contrary to federal law, must yield.") (internal quotation marks and citation omitted).

115. Section 1021.11's attempt to shift the government's fees onto the shoulders of civil rights plaintiffs conflicts with the text and structure of Section 1988, and it strongly undermines Section 1988's purposes. Section 1988 provides that, in most categories of federal civil rights litigation, the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" of the case. 42 U.S.C. § 1988(b). "[A] prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (emphasis added). By contrast, the Supreme Court has repeatedly held that, given the purposes of Section 1988, prevailing defendants may recover fees only "where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Id.* at 429 n.2; see *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978) (under analogous fee award language in Title VII, establishing standard that "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless").

116. Section 1021.11 directly conflicts with Section 1988 by establishing a wholly separate state law fee regime. As the *Miller* court observed, "[t]hrough its unfair legal stratagems, the state law chills the First Amendment right to petition

government for the redress of grievances, which, in turn, chills the Second Amendment right. The chill is deepened by the extraordinary provision that declares a plaintiff shall not be a prevailing party. In the end, this state statute undercuts and attempts to nullify 42 U.S.C. § 1988." *Miller*, 646 F. Supp. 3d at 1227. Not only does "California's fee shifting provision turns [the federal] approach upside down," "California attorney's fee-shifting construct goes beyond § 1988 by discouraging attorneys from representing civil rights plaintiffs." *Id.* at 1229. And because Section 1021.11 "will have the effect of thwarting federal court orders enforcing Second Amendment rights through § 1988 attorney's fee awards, then" the statute "cannot survive." *Id.* at 1230.

117.   Section 1988 doesn't require a plaintiff to win every claim in order to be a "prevailing party." Relying on congressional guidance, the Supreme Court has "made clear that plaintiffs may receive fees under [Section] 1988 even if they are not victorious on every claim. A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox v. Vice*, 563 U.S. 826, 834 (2011); *see Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793 (1989) (Section 1988 fees are appropriate if a party has "prevailed on a significant issue in the litigation and have obtained some of the relief they sought").

118.    Section 1021.11(e), however, says that only government defendants can be "prevailing parties." And because it also says a government defendant is a "prevailing party" if the plaintiff loses on any of its claims, the government would be entitled to fees even where it has been found to violate the Constitution on other claims in the case. In other words, Section 1021.11 flips Section 1988, putting government defendants in a similar if not better position than plaintiffs under Section 1988.

119.    Indeed, Section 1021.11 asserts reverse supremacy over federal law. The statute remarkably asserts that Section 1021.11 applies regardless of what any federal court does in an underlying Section 1983 case: Section 1021.11 pronounces that government officials may plow ahead with enforcing the fee-shifting penalty against a Section 1983 plaintiff with a state court collection action even when *"[t]he court in the underlying action held that any provision of this section is invalid, unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion.*" Cal. Civ. Proc. Code § 1021.11(d)(3) (emphasis added).

120.    Section 1021.11 also undermines the manifest purpose of Section 1988. Shortly after the Civil Rights Act's passage, the Supreme Court recognized the link between fee-shifting and effective enforcement of civil rights laws. "When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of

securing broad compliance with the law. . . . If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees . . . to encourage individuals injured by racial discrimination to seek judicial relief . . . ." *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401–02 (1968).

121.   In short, "[t]he purpose of [Section] 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley*, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94–1558 at 1 (1976)); *see also* S. Rep. No. 94-1011 at 2 (June 29, 1976) (explaining that the federal "civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies" embodied in those laws).

122.   In direct conflict with Section 1988's purpose, Section 1021.11 threatens to bankrupt any plaintiff considering a challenge to a state or local firearm regulation if the plaintiff does not achieve complete victory in the litigation. This is a heavy-handed deterrent to asserting civil rights claims, whereas Section 1988 expresses Congressional intent to encourage civil rights litigation.

123.   Because Section 1021.11 "stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress," California's law

"must give way." *PLIVA, Inc.*, 564 U.S. 634, 617. Section 1021.11's fee-shifting penalty is preempted and its application is unconstitutional under the Supremacy Clause.

**D.    Section 1021.11 Violates the Equal Protection Clause.**

124.    For the many reasons described above with respect to discrimination against federal constitutionally protected rights, discrimination against gun rights plaintiffs in particular, and discrimination related to viewpoint, Section 1021.11 also violates the Equal Protection Clause. Indeed, while such discrimination against those who seek to exercise First and Second Amendment protected rights would be subject to, and plainly fail, strict scrutiny, as explained above the classifications at issue here could not even survive rational basis scrutiny.

125.    As Judge Benitez explained in *Miller*, "[l]aws like § 1021.11 that exact an unaffordable price to be heard in a court of law are intolerable." *Miller*, 646 F. Supp. 3d at 1225. Section 1021.11 strikes at the core of the due process guarantee, which "requires that a citizen be able to be heard in court." *Id.* And it likewise implicates equal protection: "Where money determines not merely 'the kind of trial a man gets,' but whether he gets into court at all, the great principle of equal protection becomes a mockery." *Id.* (citation omitted).

## VI.    Facts as to the Individual Plaintiffs.

### A.    Desiree Bergman.

126.    The foregoing paragraphs are incorporated herein as if set forth in full.

127.    Plaintiff Bergman is not disqualified from exercising her Second Amendment right to acquire and possess firearms and ammunition.

128.    Plaintiff Bergman holds a valid license to carry a firearm under Cal. Penal Code § 26150, et seq. ("CCW"), which she acquired after passing an extensive background check and being placed in a "Rap-Back" law enforcement notification system.

129.    Plaintiff Bergman is not a licensed firearms manufacturer, importer, or dealer.

130.    Plaintiff Bergman is a member of Plaintiffs FPC and SDCGO.

131.    As a resident of the City, Plaintiff Bergman owns and possesses in the City of San Diego an unfinished frame or receiver now prohibited under the City and County Ordinance, which she lawfully acquired before enactment of the Ban.

132.    Plaintiff Bergman desires and intends to use her unfinished frame or receiver now prohibited under the City and County Bans to construct a California-compliant firearm for her own self-defense, defense of others, and other lawful purposes in the future.

133.   Plaintiff Bergman's unfinished frame or receiver now prohibited under the City and County Bans is of a type that would allow for the construction of a California-compliant AR-15-platform semi-automatic rifle in common use for lawful purposes by citizens throughout California and the United States.

134.   Plaintiff Bergman desires and intends to use for all lawful purposes, including self-defense, defense of others, and proficiency training at her local shooting range in the exercise of her rights secured under the Second Amendment, the AR-15 type firearm that she would otherwise construct but for the Ban.

135.   But for the City and County Bans and Defendants' imminent enforcement of them, Plaintiff Bergman would retain her now-prohibited unfinished frame or receiver and use it to construct such a firearm in common use for such purposes.

136.   However, because of the City and County Bans and Defendants' imminent enforcement of them, Plaintiff Bergman must dispossess herself of the property or face criminal prosecution and thus forfeit the ability to use it for such protected purposes.

137.   Plaintiff Bergman also desires and intends to purchase, acquire, possess, and transport in San Diego additional unfinished frames and receivers prohibited under the City and County Bans in the future so she may construct other

California-compliant firearms for her own self-defense, defense of others, and other lawful purposes in the exercise of her rights secured under the Second Amendment.

138.   But for the City and County Bans and Defendants' enforcement of them, Plaintiff Bergman would exercise her constitutional right to purchase, acquire, possess, and transport in San Diego unfinished frames and receivers for the lawful and constitutionally protected purpose of constructing firearms in common use for self-defense, defense of others, and other lawful purposes.

**B.    Colin Rudolph.**

139.   The foregoing paragraphs are incorporated herein as if set forth in full.

140.   Plaintiff Rudolph is not disqualified from exercising his Second Amendment right to acquire and possess firearms and ammunition.

141.   Plaintiff Rudolph is not a licensed firearms manufacturer, importer, or dealer.

142.   Plaintiff Rudolph is a member of Plaintiffs FPC and SDCGO.

143.   As a resident of the City, Plaintiff Rudolph owns and possesses in the City of San Diego an unfinished frame or receiver now prohibited under the City and County Bans, which he lawfully acquired before enactment of the Ban.

144.   Plaintiff Rudolph desires and intends to use his unfinished frame or receiver now prohibited under the City and County Bans to construct a California-

compliant firearm for his own self-defense, defense of others, and other lawful purposes in the future.

145.   Plaintiff Rudolph's unfinished frame or receiver now prohibited under the City and County Bans are of a type that would allow for the construction of a California-compliant AR-15-platform semi-automatic rifle in common use for lawful purposes by citizens throughout California and the United States.

146.   Plaintiff Rudolph desires and intends to use for all lawful purposes, including self-defense, defense of others, and proficiency training at his local shooting range in the exercise of his rights secured under the Second Amendment, the firearms that he would otherwise construct but for the Ban.

147.   But for the City and County Bans and Defendants' imminent enforcement of them, Plaintiff Rudolph would retain his now-prohibited unfinished frame or receiver and use it to construct such a firearm in common use for such purposes.

148.   However, because of the City and County Bans and Defendants' imminent enforcement of them, Plaintiff Rudolph must dispossess himself of the property or face criminal prosecution and thus forfeit the ability to use it for such protected purposes.

149.   Plaintiff Rudolph also desires and intends to purchase, acquire, possess, and transport in San Diego additional unfinished frames and receivers prohibited

under the City and County Bans in the future so he may construct other California-compliant firearms for his own self-defense, defense of others, and other lawful purposes in the exercise of his rights secured under the Second Amendment.

150.  But for the City and County Bans and Defendants' enforcement of them, Plaintiff Rudolph would exercise his constitutional right to purchase, acquire, possess, and transport in San Diego unfinished frames and receivers for the lawful and constitutionally protected purpose of constructing firearms in common use for self-defense, defense of others, and other lawful purposes.

### C.    Section 1021.11 Injures Plaintiffs Now.

151.  The County Defendants will imminently enforce Section 1021.11's fee-shifting provisions against Plaintiffs for litigating this action's challenges to the City and County Bans. It has the option of enforcing the law and is content to continue taking advantage of the statute to shield itself from litigation.

152.  But for the County Defendants' imminent enforcement of Section 1021.11's fee-shifting provisions against Plaintiffs here, Plaintiffs would forthwith litigate this action's challenges to the City and County Bans. Plaintiffs incurred fees to investigate, research, and prepare this lawsuit's underlying claims and would prosecute them now but for the County Defendants' imminent enforcement of Section 1021.11's fee-shifting provisions, which deters Plaintiffs from pressing their claims by threatening them with asymmetric and potentially ruinous fee liability.

153.   The County Defendants are also exerting, through their enforcement of Section 1021.11's fee shifting provisions in this case, an ongoing chill on Plaintiffs' exercise of rights otherwise. Their enforcement of the statute here functions to deter Plaintiffs from otherwise exercising of their right to seek judicial relief for fear of asymmetric and potentially ruinous fee liability.

154.   Without a judgment declaring Section 1021.11 unconstitutional and enjoining its enforcement against Plaintiffs, Plaintiffs cannot vindicate their rights in this action or against the County Defendants otherwise.

## VII.  Causes of Action

### A.    Count One—City and County Bans • Second Amendment

**COUNT ONE**
**City and County Bans**
**42 U.S.C. § 1983**
**Action for Deprivation of Plaintiffs' Rights under the**
**Second and Fourteenth Amendments**
**Facial and As-Applied**
**(All Plaintiffs v. All Defendants)**

155.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

156.   All Plaintiffs assert Count One against all Defendants.

157.   Count One proceeds both facially and as-applied.

158.   Under federal law, "a license is not required to make a firearm solely for personal use." *See, e.g.*, Bureau of Alcohol, Tobacco, Firearms & Explosives, *Does an individual need a license to make a firearm for personal use?*, https://bit.ly/4nnxgzH (last visited Sept. 26, 2025). And that is true whether the firearm is based on an NFO, such as an "unfinished frame" or "unfinished receiver" proscribed by the City and County Bans, a frame or receiver machined from a block of raw materials, or one stamped from a piece of sheet metal or fashioned from a tube.

159.   California law expressly provides that persons who can pass a background check may self-manufacture firearms for their own lawful use. *See*

*generally* Cal. Penal Code § 29180, et seq. and 11 Cal. Code. of Regulations § 5505, et seq. ("These regulations apply to self-manufactured or self-assembled firearms made from any material, including wood, metal, or plastic, and made through any process, including those produced by 3D printers.").

160.    In fact, there are no restrictions on non-prohibited persons from possessing, purchasing, transporting, receiving, or selling unfinished frames or unfinished receivers under California law. As stated above, the ability to purchase and possess unfinished frames or receivers is necessary in order to self-manufacture a firearm in accordance with state law. *See* Cal. Penal Code § 29180(b) & (b)(2)(A); see also 11 CCR § 5518(b)(2).

161.    Defendants' Bans unconstitutionally require that all ordinary, law-abiding citizens dispossess themselves of all proscribed items.

162.    Defendants' Bans unconstitutionally prohibit all ordinary, law- abiding citizens from ever again purchasing, receiving, possessing, or transporting all proscribed items after the Ordinances' enactment and final passage.

163.    Defendants' Bans impose a blanket prohibition against not only constitutionally protected conduct—self-manufacturing arms for one's own lawful purposes, including self-defense in the home—but a vast category of materials and parts necessary to engage in that conduct, and thus prohibits a class of protected arms in common use for self-defense and other lawful purposes by ordinary law-abiding

citizens like the Individual Plaintiffs in this case, including AR-15-platform semi-automatic rifles.

164.   The Second Amendment guarantees ordinary law-abiding citizens the right to acquire, possess, use, and self-manufacture all firearms in common use for self-defense and other lawful purposes, *Caetano*, 577 U.S. at 420, including AR-15 semi-automatic rifles.

165.   Because Defendants' Bans outlaw all parts, materials, and inherent conduct necessary to self-manufacture constitutionally protected arms by outlawing it all, each Ban is categorically unconstitutional and must be enjoined as such. *Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021) (quoting *Silvester v. Harris*, 843 F.3d 816, 824 (9th Cir. 2016) ("If a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny.").

166.   If any tiers-of-scrutiny analysis were to apply, only the highest level—strict scrutiny—could be applied since each Ban unquestionably "'implicates the core of the Second Amendment right and severely burdens that right.'" *Young*, 992 F.3d at 784 (quoting *Silvester*, 843 F.3d at 824). Whatever public safety interest Defendants may claim in enacting each Ban, there has been no effort to tailor it so as to minimize imposing unnecessary or overly broad restraints—much less to establish "the least restrictive means" of achieving any "compelling" interests—as the law requires.

167.   But the lack of tailoring in each Ban's broad prohibition renders each Ban unconstitutional even under intermediate scrutiny, because that test requires at least "a means narrowly tailored to achieve the desired objective." *Bd. of Trustees of State Univ. of New York*, 492 U.S. 468, 480 (1989).

168.   There has been no showing that any of the countless law-abiding San Diego residents and visitors targeted under these Bans has had any involvement in any crime associated with any unserialized firearm or any unserialized firearm component, much less any significant number of these individuals, so as to somehow justify dispossessing them of all such firearm parts and prohibiting them from exercising their fundamental right to possess, use, and self-manufacture protected arms in common use for self-defense and lawful purposes.

169.   The answers to the questions of law in this case require a textual and historical inquiry into original meaning of the Second Amendment, *Heller*, 554 U.S. at 634-35, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."

170.   The Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

171.   Plaintiffs have a right to self-manufacture arms for protection and all lawful purposes, including those arms and precursor materials, including but not limited to NFOs, prohibited under Defendants' Bans. The right to self- manufacture arms "wouldn't mean much" without the right to own, possess, and use the constituent parts necessary to engage in such activity—and, of course, the firearm itself as the end product of this protected activity—for lawful purposes. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011) (explaining the corollary principle that the right to bear arms "wouldn't mean much without the training and practice that make it effective").

172.   Defendants' Bans prohibit law-abiding citizens from acquiring, possessing, and transporting materials and supplies necessary to self- manufacture, construct, and/or assemble constitutionally protected arms of designs and functions—including but not limited to California-compliant AR-15-platform semi-automatic rifles2—that are commonly possessed and used for self-defense and other lawful purposes.

173.   Defendants' Bans prohibit law-abiding citizens from self-manufacturing, constructing, and/or assembling constitutionally protected arms of designs and functions, including but not limited to AR-15 semi- automatic rifles, that are commonly possessed and used for self-defense and other lawful purposes in California and the vast majority of states.

174.   Defendants' Bans prohibit law-abiding citizens from possessing self-manufactured, constitutionally protected arms of designs and functions, including but not limited to AR-15-platform semi-automatic rifles that are commonly possessed and used for self-defense and other lawful purposes in California and the vast majority of states.

175.   The AR-15-platform rifle is an incredibly common and constitutionally protected firearm. Over 25 years ago, the Supreme Court recognized the AR-15 as a common firearm possessed by regular individuals (not military or law enforcement) when it held: "The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Staples*, 511 U.S. at 603. So even in 1994, it was widely known that the common AR-15 rifle was a firearm commonly possessed for lawful purposes by non-government "civilian" individuals.

176.   "The AR-15 platform in particular, is an 'open source' design … with countless variations and adaptations. In fact, the platform's ability to accept modifications with ready-made retail parts without the need for specialized tools or expertise, is part of what makes these rifles popular." *Miller*, 542 F. Supp. 3d at 1014. "Furthermore, the modularity and standardization of the AR-15, its ubiquity, commonality, and widespread ownership in common ammunition sizes such as .223 and 5.56 x 45mm, and the interchangeability of parts, including magazines, makes it ideal." *Id.* at 1062.

177.    Because it is "open source" in nature, has a large volume of (constitutionally protected) educational materials on manufacturing and construction dedicated to it readily available on the Internet, is relatively easily constructed, has excellent availability of parts, and is a modular design ready and able to be configured in countless lawful ways for many lawful purposes, "the popular AR-15 rifle is a perfect combination of home defense weapon and homeland defense equipment. Good for both home and battle, the AR-15 is the kind of versatile gun that lies at the intersection of the kinds of firearms protected under District of Columbia v. *Heller* and United States v[.] Miller," *Id.* at 1020 (internal citations omitted).

178.    Defendants' Bans inflict irreparable harm on Plaintiffs by prohibiting property and conduct protected under the Second Amendment individual right to keep and bear arms. Plaintiffs lack an adequate remedy at law for these burdens on their Second Amendment rights, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining enforcement of unconstitutional laws such as Defendants' Bans.

179.    Therefore, as a direct and proximate result of the above infringements of and impermissible burdens on the rights of Plaintiffs protected under the Second and Fourteenth Amendments, Plaintiffs and all similarly situated members of FPC

and SDCGO who reside in or travel through the City of San Diego and County of San Diego in possession of proscribed items, or who desire and intend to self-manufacture arms in common use for lawful purposes, have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such injury unless and until granted the relief they seek herein.

**B.    Count Two—Section 2021 • First Amendment**

**COUNT TWO**
**Section 1021.11**
**42 U.S.C. § 1983**
**Action for Deprivation of Plaintiffs' Rights under the**
**First and Fourteenth Amendments**
**Facial and As-Applied**
**(All Plaintiffs v. County Defendants)**

180.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

181.    All Plaintiffs assert Count Two against the County Defendants.

182.    Count Two proceeds both facially and as-applied.

183.    The First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the government for a redress of grievances." U.S. CONST. amend. I. The First Amendment is applicable against the States. See Gitlow v. New York, 268 U.S. 652, 666 (1925).

184.    For the reasons set forth above in Part V.B, Section 1021.11's fee-shifting penalty violates the First Amendment to the Constitution.

### C.    Count Three—Section 2021 • Supremacy Clause

**<u>COUNT THREE</u>**
**Section 1021.11**
**42 U.S.C. § 1983**
**Action for Deprivation of Plaintiffs' Rights under the Supremacy Clause**
**Facial and As-Applied**
**(All Plaintiffs v. County Defendants)**

185.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

186.    All Plaintiffs assert Count Three against the County Defendants.

187.    Count Three proceeds both facially and as-applied.

188.    The Supremacy Clause provides in relevant part that "[t]his Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land . . . any thing in the constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, § 2.

189.    Section 1988(b) provides in relevant part that, "[i]n any action or proceeding to enforce a provision of [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

24-cv-0971-AJB-SBC

190.   For the reasons set forth above in Part V.C, Section 1021.11's fee-shifting penalty is preempted by Section 1988(b) and its application is unconstitutional under the Supremacy Clause.

**D.    Count Four—Section 2021 • Equal Protection**

**<u>COUNT FOUR</u>**
**Section 1021.11**
**42 U.S.C. § 1983**
**Action for Deprivation of Plaintiffs' Rights under the**
**Equal Protection Clause**
**Facial and As-Applied**
**(All Plaintiffs v. County Defendants)**

191.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

192.   All Plaintiffs assert Count Four against the County Defendants.

193.   Count Four proceeds both facially and as-applied.

194.   The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

195.   For the reasons set forth above in Part V.D, Section 1021.11's fee-shifting penalty is preempted by Section 1988.

**E.    Count Five—Section 2021 • Due Process**

**<u>COUNT FIVE</u>**
**Section 1021.11**
**42 U.S.C. § 1983**
**Action for Deprivation of Plaintiffs' Rights under the**

**Due Process Clause**
**Facial and As-Applied**
**(All Plaintiffs v. County Defendants)**

196.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

197.    All Plaintiffs assert Count Five against the County Defendants.

198.    Count Five proceeds both facially and as-applied.

199.    The Due Process Clause of the Fourteenth Amendment provides that provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

200.    For the reasons set forth above in Part V.D, Section 1021.11's fee-shifting penalty is preempted by Section.

**PRAYER FOR RELIEF**

201.    Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, as follows.

202.    The Court should address and resolve Counts Two, Three, Four, and Five before addressing and resolving Count One.

203.    As to Counts Two, Three, Four, and Five, the Court should enter judgment in Plaintiffs' favor and against the County Defendants, as follows:

a. Declare that the SB 1327 fee-shifting penalty set forth in California Code of Civil Procedure section 1021.11 violates the First Amendment to the Constitution.

b. Declare that the SB 1327 fee-shifting penalty set forth in California Code of Civil Procedure section 1021.11 is preempted and its application is unconstitutional under the Supremacy Clause of the Constitution.

c. Declare that the SB 1327 fee-shifting penalty set forth in California Code of Civil Procedure section 1021.11 violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

d. Declare that the SB 1327 fee-shifting penalty set forth in California Code of Civil Procedure section 1021.11 violates the Due Process Clause of the Fourteenth Amendment to the Constitution.

e. Preliminary and permanently enjoin the County Defendants' enforcement or application of the SB 1327 fee-shifting penalty set forth in California Code of Civil Procedure section 1021.11 against Plaintiffs, Plaintiffs' members, and any attorney or law firm representing any Plaintiff in any litigation involving the County Defendants potentially subject thereto.

f.  Award Plaintiffs costs of suit, including reasonable attorneys' fees under 42 U.S.C. § 1988 and any other applicable law, and all further relief to which Plaintiffs may be justly entitled.

g.  Grant any and all other equitable and/or legal remedies this Court may see fit.

204.  As to Count One, the Court should enter judgment in Plaintiffs' favor and against Defendants, as follows:

a.  Declare that Ordinance O-2022-7, San Diego Municipal Code §§ 53.18(c)(1) and 53.18(c)(2), and the City Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate Plaintiffs' rights guaranteed by the Second and Fourteenth Amendments to the United States Constitution;

b.  Preliminarily and permanently enjoin the City Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, and all persons who have notice of the injunction, from enforcing Ordinance O-2022-7, San Diego Municipal Code §§-53.18(c)(1) and 53.18(c)(2), and the City Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs;

c.  Declare that Ordinance Number 10765, San Diego County Code § 33.301, and the County Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate Plaintiffs' rights guaranteed by the Second and Fourteenth Amendments to the United States Constitution;

d.  Preliminarily and permanently enjoin the County Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, and all persons who have notice of the injunction, from enforcing Ordinance Number 10765, San Diego County Code § 33.301, and the County Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs;

e.  Award Plaintiffs nominal damages;

f.  Award Plaintiffs' costs, attorney fees, and all other allowable expenses pursuant to 42 U.S.C. § 1988 and all applicable laws; and,

g.  Grant any and all other equitable and/or legal remedies this Court may see fit.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Respectfully submitted,

Chad Flores (Texas Bar. No 24059769)
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640
cf@chadflores.law

John W. Dillon (California Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road, Suite 105, No. 255
Carlsbad, California 92009
(760) 642-7150
jdillon@dillonlawgp.com

Attorneys for Plaintiffs

24-cv-0971-AJB-SBC

1

### Table of Contents of Exhibits

2
Exhibit A ........................................ City of San Diego Ordinance Number O-2022-7

3
Exhibit B.......................................County of San Diego Ordinance Number 10765

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

24-cv-0971-AJB-SBC